FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC WAREHOUSING CO., K.S.C., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Civil Action No. 07-01476 (RBW) |
| | ) |
| DEFENSE SUPPLY CENTER, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

NOTICE OF FILING OF DECLARATION AND EXHIBIT

On November 19, 2007, Defendants Defense Supply Center Philadelphia ("DSCP"), Defense Logistics Agency ("DLA") and the Department of Defense ("DOD") filed a motion for summary judgment. Attached are the declarations of Raymond G. Miller of DLA and Art J. Coulter and James J. Graham of the Department of Justice which support that dispositive motion.


Dated: November 20, 2007        Respectfully submitted,


/s/
ANDREA McBARNETTE, D.C. Bar # 483789
Assistant United States Attorney Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7153

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PUBLIC WAREHOUSING COMPANY

K.S.C.

    V.

                          CIVIL ACTION NO. 07-1476

DEFENSE SUPPLY CENTER

PHILADELPHIA
THE DEFENSE LOGISTICS AGENCY,

THE DEPARTMENT OF DEFENSE

## DECLARATION OF RAYMOND G. MILLER

I, RAYMOND G. MILLER, do make the following declarations:

1. I am the Director of the Subsistence Supplier Operations, which is part of the Defense Supply Center Philadelphia (DSCP), which is part of the Defense Logistics Agency, which is part of the Department of Defense.

2. Supplier Operations is responsible for the acquisition and distribution of food and food related products to the United States military worldwide.

3. As part of my responsibilities I am the supervisor for contracting officers, Linda Ford and Maryann DiMeo.

4. My office received a FOIA request from Public Warehousing Company (PWC) by e-mail on February 12, 2007.

5. The request was for the Price Negotiation (PNM) for three (3) DSCP contracts awarded to PWC.

6. The contracts in PWC's FOIA request are: SPO300-03-D-3061; SPM300-05-D-3119 and SPM300-05-D-3128.

7. No PNM was created for SPM300-05-D-3119. This was an emergency acquisition and offers were solicited from one source only.

8. The Government solicitations leading to the award of contracts SPO300-03-D-3061 and SPM300-05-D-3128, explicitly required offerors to provide specific proprietary and confidential business information to the government for evaluation during negotiation, such as supplier relationships, asset control systems, warehouse locations, logistic operations, and security measures. Were DLA to violate this trust and release such information, it would severely impair DLA's future ability to acquire and deliver the best quality goods and services at the best price for the Warfighter as vendors would hesitate to provide full disclosure of their confidential information for fear of revealing all their business secrets to their competitors. Competitive harm suffered by the businesses in such instances could include disclosure of proprietary business plans, relationships, practices, and assets to direct competitors if DLA were to release this confidential information. Disclosure would limit the amount of detail received by the Government, skewing competitor comparisons, especially making competitors whose information was disclosed hesitant to be as forthcoming in the future.

9. During negotiation, offerors voluntarily provided additional clarifying information in response to DLA questions arising from review of the offerors' proposals. Offerors provided this required fine level of information because they trust the Government not to make inappropriate releases to competitors, e.g., past performance information; sanitation and pest management reports; discount information; and reevaluation of socio-economic goals. The detailed information submitted by the offerors is the type competing companies typically would not share with members of the public.

10. Release of the requested information would likely cause competitive harm for a number of reasons. For example, the prices offered under these two solicitations are composed of several factors. Disclosure of these prices or any of their elements would allow competitors to determine just how low their price should be on the next solicitation.

11. In addition, the offerors also provided information regarding their suppliers in their business proposal. Disclosure of the offeror's suppliers would allow, among harms, other competitors to use these same suppliers or attempt to tie the supplier to an exclusive contract. The offeror may have incurred substantial cost in finding these suppliers. The offeror may have provided financing or other monetary aid for these suppliers. Disclosure of the suppliers would allow competitors the opportunity to use them without incurring costs the offeror may have incurred.

12. Further, sources of supply are routinely withheld from the public to avoid just these competitive harms. Disclosure of the location and capacity of storage facilities, inventory control quality control, security measures and management practices would allow competitors to adopt these same measures. These measures may have used the financial resources of the offeror to develop. Disclosure of these measures gives competitors an unfair advantage.

13. A PNM is a document containing analysis factors relevant to proposed contract pricing, including negotiation goals and potential contractor risk assessments (based on proprietary and confidential business information submitted by all potential offerors), used by the Contracting Officer and agency as a basis for price negotiations and acquisition strategy setting. The thought processes and risk analysis factors used in establishing price negotiations and setting acquisition strategy, while changing from procurement to procurement, have consistent patterns and threads of logic for our agency, the disclosure of which would cause demonstrable harm to the government's competitive position in future negotiations.

14. In order to have conducted DLA's typical submitter notice under Executive Order 12600 Exemption, large sections of this internal, deliberative document would have been required to be shared with contractors from whom, under (b)(5) the government is trying to protect its internal price and acquisition strategy setting practices. Therefore, a generalized submitter notice was conducted where submitters indicated the information contained in their offers were to be considered proprietary and confidential business information. Further, all material submitted by the offerors upon which the analysis of the PNM are based are appropriately marked in accordance with the Federal Acquisition Regulation to indicate the contents are to be treated as proprietary, confidential business information.

15. The requested PNMs are maintained in the contract files for each of the two contracts. I have verified that the PNMs are, in fact, part of each contract file.

16. The PNMs contain either information about each offeror's proposal, both successful and unsuccessful and the agency's evaluation of these proposals.

17. The requested PNMs contain detailed information about the following information contained in the offers of the contract awardee as well as the unsuccessful offerors:

    a. The prices offered.
    b. The business proposal of each offeror
    c. The technical proposal of each offeror
    d. The location and capacity of storage facilities of the offerors.
    e. The methods of inventory control of each offeror.
    f. The quality control and assurance programs of each offeror.
    g. Security measures of each offeror.
    h. The suppliers of each offeror as well as the method used by each offeror to select each supplier.
    i. Management practices of each offeror.
    j. Employees of each offeror.

18. The requested PNMs contain detailed the government's assessment about the following:

    a. The prices offered by each offeror.
    b. The strength of the technical offer of each proposal.
    c. The strength of the business offer of each proposal.

3

    d. The government's pricing strategy for negotiations.
    e. The analysis of the delivery and distribution prices of each offeror.
    f. The comparison of the aggregate price of each offeror
    g. The government's determination of what further information was needed from each offeror to assess the favorability or increase the favorability of each proposal.
    h. The government's assessment of the strengths and weaknesses of each proposal.
    i. The government's confidence in the various control systems of each offeror.
    j. The ability of each offeror to satisfy the customers' needs.
    k. The ability of each offeror to substantially increase production if a surge is needed.
    l. The government's assessment of each offeror to meet the socioeconomic requirements of government contracts.
    m. The government's assessment of the proposals for mentoring businesses as required by government regulations.
    n. The overall ranking of each offeror's proposal.
    o. The negotiation objective of each offeror.

19. DSCP denied the FOIA request pursuant to 5 USC §552(b)(7)(A).

20. PWC appealed this denial to the headquarters of DSCP, the Defense Logistics Agency (DLA) located at Fort Belvoir, Virginia.

21. DLA determined that the information of each offeror's proposal that was contained in the PNMs fell under 5 USC §552 (b)(4), which provides as follows:

    a. Trade secrets and commercial or financial information obtained from a person and privileged or confidential.

22. DLA upheld the determination not to release the PNMs. It held that DSCP had properly invoked exemption (b)(7)(A).

23. DLA further determined that exemption (b)(4) applied to the information in the PNMs that came from the proposals of the offerors.

24. DLA further determined that the information covered by exemption (b)(4) was so inextricably interwoven with information not covered by this exemption such that excision of this information would render the document meaningless.

25. Upon review of these PNMs when this lawsuit was filed, DSCP determined that the information in the documents that were not covered by exemption (b)(4) was covered by exemption (b)(5), which provides as follows:

    a. Inter-agency or intra-Agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.

26. DSCP has determined that the "deliberative "process" privilege contained within exemption (b)(5) protects the information not protected by exemption (b)(4).

27. DSCP has determined that the information covered by exemption (b)(5) was so inextricably interwoven with information not covered by this exemption such that excision of this information would render the document meaningless.

28. DLA further determined that the information of each offeror's proposal that was contained in the PNMs fell under 5 USC §552 (b)(3), which provides as follows:

    a. "Specifically exempted from disclosure by statute (other than §552b of this title), provided that such (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue

29. The National Defense Authorization Act for Fiscal Year 1997 (Public Law 104-201 amending 10 USC §2305 and 41 USC §253b) bars the release of the proposals of unsuccessful offerors. The PNMs that are the subject of this lawsuit contain all the details of all the offerors' proposals, successful and unsuccessful. This information is so inextricably interwoven with information not covered by this exemption such that excision of this information would render the document meaningless.

30. The solicitation that resulted in the award of contract no. SPO300-03-D-3061 received four offers.

31. The solicitation that resulted in the award of contract no. SPO300-05-D-3158 received five offers.

32. One of the offerors when given the opportunity pursuant to Executive Order 12600 to state its position on the release of information replied as follows: "Our competitive Proposals contain in-depth and descriptive accounts of [our] solution, planning, and performance of key functions for the overall operations necessary to carry out the requirements listed out in the Solicitations. As the current Contract has a fixed term and will likely be recompeted in the future, making information from [our] competitive Proposals public would seriously jeopardize [our] competitiveness in future public procurements and other similar undertaking". (Exhibit A)

33. A second offeror replied as follows: "Yes, the disclosure of the information in question could cause a substantial harm to our competitive position. Sine the number of competitors and opportunities are limited, as well as we were not awarded the business for the solicitations in question, then we feel by disclosing our know-how "technical proposal" and prices, our competitors will be able to predict our proposal and prices in any forthcoming solicitations." (Exhibit B)

I declare pursuant to 28 USC §1746, under the penalty of perjury that the foregoing are true and correct statements.

RAYMOND G. MILLER
Chief, Subsistence Supplier Operations
Defense Supply Center Philadelphia

Bahrain Maritime & Mercantile
International asc

P.O Box 828, 812 Shaikh Jabar Al Ahmad
Al Subah Highway, Sitra, Kingdom of Bahrain
Tel: +973 1773 9444 Fax: +973 1773 1186
C.R. 10999

شركة البحرين للملاحة والتجارة
الدولية ش.م.ب



BMMI

Defense Logistics Agency
Defense Supply Center Philadelphia
700 Robbins Avenue
Philadelphia, Pennsylvania 19111-5092

Date: 11th July 2007

**Attention:** Ms. Pamela Tull
Office of Procurement Management

### RE: FOIA CONTROL NO. 07H010

Dear Ms. Tull

In reference to your two letters dated 5th July 2007 (to Mr Robert Smith and Ms Linda Lawrence) regarding the confidentiality of information forming part of our responses to Solicitations no. SPM300-02-R-4003, SPM300-04-R-0323, SPM300-02-R-4003 and SPM300-04-R-40323 where applicable Bahrain Maritime & Mercantile International BSC (dba BMMI) answers the following questions:

Question 1: Was the information in question given to DSCP and received in confidence?

*Answer: Yes. Please refer to confidentiality clause on page 1 of 173 of BMMI Proposal in response to Solicitation SPM300-04-R-0323 Middle East Zone 4 dated 16 Nov 2004. Our responses to competitive acquisitions are always submitted in confidence.*

Question 2: To the best of your knowledge, is this information, or part thereof, currently available to public sources? If so, please identify what information is available to the public.

*Answer: No, information contained within BMMI competitive proposals is not available to public sources.*

Question 3: Does your company customarily treat this information, or this type of information, as confidential? If so, why?

*Answer: Yes. BMMI treats information of this nature confidential.*

*It is BMMI's company policy that company information provided in response to competitive public procurements is strictly confidential.*

An ISO 9001 : 2000 registered company    www.bmmigroup.com



*Furthermore, as the Defense Logistics Agency's current Contract with BMMI deals with OCONUS support of US Military forces currently engaged in combat operations and BMMI is situated in theatre, divulgence of the said information could lead to security breaches in the completion of BMMI's operations while servicing US military forces, and thus all information in regard to BMMI's Contract with DSCP is kept strictly confidential.*

<u>Question 4: Would public disclosure of this specific information likely cause your company substantial harm to its competitive position? If so, please specify the type of competitive harm.</u>

*Answer: Yes, public disclosure of this specific information would cause harm to BMMI's competitive position.*

*Our competitive Proposals contain in-depth and descriptive accounts of BMMI's solution, planning, and performance of key functions for the overall operations necessary to carry out the requirements listed out in the Solicitations. As the current Contract has a fixed term and will likely be re-competed in the future, making information from BMMI's competitive Proposals public would seriously jeopardize BMMI's competitiveness in future public procurements and other similar undertakings.*

*The education and experiences of our Key Personnel are not revealed. The education and experiences of our Key Personnel is carefully evaluated when a Solicitation asks for Key Personnel, and knowledges about our Key Personnel could enable our competitors to craft specific responses that would negate our advantages.*

Sincerely,

Robert Smith
COO, Supply Chain & Logistics
Bahrain Maritime & Mercantile Int'l
P.O. Box 828, Sitra
Kingdom of Bahrain

Linda Lawrence
Division Manager – Government Contrac
Bahrain Maritime & Mercantile Int'l
P.O. Box 828, Sitra
Kingdom of Bahrain



شركة جلوبال للخدمات اللوجستية والتخزين(ش.م.م)
**GLOBAL LOGISTICS SERVICES & WAREHOUSING CO.**

O/Ref: Glow /355/2007

Date: 10 July 2007

To: Pamela Tull
Defense Logistics Agency
Defense Supply Center Philadelphia
700 Robbins Avenue
Philadelphia, Pennsylvania 19111-5092

**Subject: FOIA Control No. 07H010**

Dear Pamela,

Reference to your letter dated July 5, 2007, regarding the above mentioned subject. Please be advised that we **don't** wish to disclose any of the information in our proposals for the solicitations Ref. SPM 300-02-R-4003 and SPM300-04-R-0323. Please find our answers with regards to your questions in above subject matter:

1) Yes, the information in question was given to DSCP in confidence.
2) To the best of our knowledge, the information is question or part of is not currently available to public resources.
3) Yes, our company normally treats such information as confidential, since it could affect our position in the market place, and compromises our internal policies, processes, solutions and pricing methodologies.
4) Yes, the disclosure of the information in question could cause a substantial harm to our competitive position. Since the number of competitors and opportunities are limited, as well as we were not awarded the business for the solicitations in question, then we feel by disclosing our know-how "technical proposal" and prices, our competitors will be able to predict our proposal and prices in any forthcoming solicitations.

Best regards,

Ahmad Hammauda
Assistant Managing Director
Global Logistics Services & Warehousing Co.

### Declaration of Art J. Coulter

1. I, Art J. Coulter, am a trial attorney in the Fraud Section of the Civil Division, Commercial Litigation Branch, United States Department of Justice and have been assigned to the civil investigation of alleged contract fraud involving contracts awarded to the Public Warehousing Company (PWC) since November 2005.

2. The investigation focuses on allegations that PWC engaged in war profiteering on the Prime Vendor contract with the Defense Logistics Agency - Defense Supply Command Philadelphia (DLA).

3. Responsibility for the civil investigation is shared by my office and the United States Attorney's office in the Northern District of Georgia. There is also a parallel criminal investigation into this matter.

4. One of my first steps on this matter was to read the pertinent contract provisions as well as review in detail the Price Negotiation Memorandum (PNM) for contracts SP0300-03-D-3061, SPM300-05-D-3119 and SPM300-05-D-3128. The PNM is an internal government document reflecting the government thinking in awarding the contract and contractor statements to the government influencing the award and reflecting their intentions with regard to contract performance

5. From my experience in the contract fraud field, the PNM is a critical internal document to be used by prosecutors and investigators in formulating a contract fraud prosecution theory as well as a way to anticipate possible defenses. In many ways it is often the foundation of both the investigation strategy and the prosecution theory.

6. I and the other civil attorneys on this matter as well as the AUSAs and DOJ lawyers responsible for the criminal fraud aspect of the matter have asked the Defense Logistics agency to withhold release of the PNM until our investigations are concluded.

7. Release of the PNM, a confidential internal government document, before the conclusion of the investigation would interfere with the investigation in several very specific and concrete ways. First, the document reflects the government internal discussions regarding the contractor and the contract terms which, if disclosed prematurely, would invite company officials otherwise not privy to this internal government thinking to shape their testimony to what is in the PNM. Second, the PNM, if released before the conclusion of the investigation, would identify DLA contract officials who authored the document and invite contact by the company which continues to deal with the company in this ongoing contract. Third, premature release during the pendency of an investigation, would invite the company to manufacture evidence and formulate its defenses before the government has the opportunity to find out the facts in this matter.

8. Most importantly, the PNM, an internal government document, is being used to formulate the government theory of investigation and prosecution, much the way an internal memo between prosecutors and investigators is used to plan the case, and premature release can only damage the chance of success of the investigation if the target company gets access to this information at this stage of the matter. It invites witnesses to shape their testimony and exposes government witnesses to attack prematurely. The company will get discovery at the appropriate time under the Federal Rules.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 1, 2007

Art J. Coulter

### Declaration of James J. Graham

1. I, James J. Graham, am a trial attorney in the Fraud Section of the Criminal Division, United States Department of Justice and have been assigned to the criminal investigation of alleged contract fraud involving contracts awarded to the Public Warehousing Company (PWC) since October 2006.

2. The investigation focuses on allegation PWC, in its capacity as the Prime Vendor responsible for supplying food to the troops in the Middle East solicited as much as $80 million in kickbacks under the cover of "discounts" from US suppliers that should have been refunded to the Government and overcharged the Defense Logistics Agency (DLA) as much as $374 million in the subject contract by inserting a related company to inflate the amount billed DLA under the contract.

3. Responsibility for the criminal investigation is shared by my office and the United States Attorney's office in the Northern District of Georgia which has assigned five AUSAs to the matter as well.

4. One of my first steps on this matter was to read the pertinent contract provisions as well as review in detail both the Pre-Negotiation Briefing Memorandum (PBM) and Price Negotiation Memorandum(PNM) for contracts SPO300-03-D-3061 and SPM300-05-D-3128 which are internal government documents reflecting the government thinking in awarding the contract, including evaluation of risk factors with descriptions of contractor strengths and weaknesses, and contractor statements to the government influencing the award and reflecting their intentions with regard to contract performance.

5. From my experience in the contract fraud field, the PBM and PNM are critical internal documents to be used by prosecutors and investigators in formulating the contract fraud prosecution theory as well as a tool to anticipate possible defenses. In many ways it is often the foundation of both the investigation strategy and the prosecution theory.

6. I and the other prosecutors on this matter as well as the AUSAs and DOJ lawyers responsible for the civil fraud aspect of the matter have asked the Defense Logistics agency to withhold release of the PBM and PNM until our investigations are concluded.

7. Release of the PBM and PNM, confidential internal government documents, before the conclusion of the investigation would interfere with the investigation in several very specific and concrete ways. First, the documents reflect the government internal discussions regarding the contractor and the contract terms which, if disclosed prematurely, would invite company officials otherwise not privy to this internal government thinking to shape their testimony to what is in the PBM and PNM. Second, the PBM and PNM, if released before the conclusion of the investigation, would disclose the views of the DLA contract officials who authored the documents and invite contact by

Case 1:07-cv-01476-RBW   Document 10-3   Filed 11/20/2007   Page 4 of 4

the company which continues to deal with the company in this ongoing contract. Third, premature release during the pendency of an investigation, would invite the company to manufacture evidence and formulate its defenses before the government has the opportunity to find out the facts in this matter.

8. Most importantly, the PBM and PNM, internal government documents, are being used to formulate the government theory of investigation and prosecution, much the way an internal memo between prosecutors and investigators is used to plan the case, and premature release can only damage the chance of success of the investigation if the target company and its target officers and employees gets access to this information at this stage of the matter. It raises the risk targets and/or witnesses will alter evidence or shape their testimony as well as exposes government witnesses to attack before the government completes the investigation. The company has already initiated frivolous litigation in the district court in the District of Columbia and the ASBCA to disrupt the investigation and will get discovery of the PNM without resort to the FOIA at the appropriate time under the Federal Rules in the event the government brings a contract fraud case here.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 8, 2007

_____
James J. Graham