**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY** | ) | |
| **K.S.C.,** | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 07-01476 (RBW) |
| | ) | |
| **DEFENSE SUPPLY CENTER** | ) | |
| **PHILADELPHIA, THE DEFENSE** | ) | |
| **LOGISTICS AGENCY, and THE** | ) | |
| **DEPARTMENT OF DEFENSE.** | ) | |

_____

**PLAINTIFF'S COMBINED MOTION FOR SUMMARY JUDGMENT**
**AND *IN CAMERA* REVIEW**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Public Warehousing Company K.S.C. respectfully moves this Court to grant summary judgment in favor of Plaintiff, and order Defendants to release the documents requested pursuant to the Freedom of Information Act.  In the event the Court feels unprepared to grant summary judgment to Plaintiff on the motion and attached filings alone, Plaintiff respectfully moves the Court to examine the requested document *in camera*.

In support of its motion, Plaintiff respectfully refers the Court to the attached of statement of material facts not in dispute; the attached memorandum of points and authorities, with accompanying exhibits; and the attached proposed order.

Dated:  December 5, 2007

Respectfully submitted,


  /s/ Michael R. Charness

Michael R. Charness (D.C. Bar No. 289322)
Alexander O. Levine (D.C. Bar No. 501924)
VINSON & ELKINS, L.L.P.
The Willard Office Building
1455 Pennsylvania Ave. Suite 600
Washington, D.C. 20004
Telephone:  (202) 639-6780
Facsimile:  (202) 639-6640

Attorneys of Record for Public Warehousing
Company K.S.C.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY K.S.C.,** | ) ) | |
| | ) | |
| **v.** | ) | Civil Action No. 07-01476 (RBW) |
| | ) | |
| **DEFENSE SUPPLY CENTER PHILADELPHIA, THE DEFENSE LOGISTICS AGENCY, and THE DEPARTMENT OF DEFENSE.** | ) ) ) ) | |

_____

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS
NOT IN GENUINE DISPUTE**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7(h) and 56.1 of the Local Rules of the U.S. District Court for the District of Columbia, Plaintiff respectfully submits this statement of material facts as to which there is no genuine issue.

1.     Plaintiff submitted a Freedom of Information Act ("FOIA") request to Defense Supply Center Philadelphia ("DSCP") on February 12, 2007.  Plaintiff requested the Price Negotiation Memoranda ("PNM") for its contracts with DSCP, numbered SPO300-03-D-3061, SPM300-05-D-3119 and SPM300-05-D-3128.  Compl. ¶ 7.

2.     The PNM is described in Federal Acquisition Regulation ("FAR") 15.406-3(a).  48 C.F.R. § 15.406-3(a).  According to that regulation, the purpose of the PNM is to "document in the contract file the principal elements of the negotiated agreement."  Id. The regulation lists the information to be included in the PNM, which includes "[d]ocumentation of fair and reasonable pricing."  48 C.F.R. § 15.406-3(a)(11).

1

3.      The Department of Justice has been conducting an investigation of Plaintiff since late 2005. Coulter Decl. ¶ 1. The investigation focuses on various pricing issues on the aforementioned contracts. Coulter Decl. ¶ 2; Graham Decl. ¶ 2.

4.      By letter dated April 9, 2007, DSCP denied Plaintiff's FOIA request pursuant to FOIA Exemption 7(A) at 5 U.S.C. § 552(b)(7)(A). Compl. ¶ 8.

5.      Plaintiff appealed DSCP's denial to the Defense Logistics Agency ("DLA") by letter dated May 3, 2007. Compl. ¶ 10. By letter dated July 20, 2007, DLA denied PWC's appeal pursuant to Exemption 7(A) and Exemption 4 at 5 U.S.C. § 552(b)(4). Compl. ¶ 10.

6.      On August 16, 2007, Plaintiff filed a complaint for injunctive relief in this Court. Defendants filed their first responsive pleading, a motion for summary judgment, on November 19, 2007.

Dated: December 5, 2007                             Respectfully submitted,


                                                     /s/ Michael R. Charness
                                                   _____

                                                   Michael R. Charness (D.C. Bar No. 289322)
                                                   Alexander O. Levine (D.C. Bar No. 501924)
                                                   VINSON & ELKINS, L.L.P.
                                                   The Willard Office Building
                                                   1455 Pennsylvania Ave. Suite 600
                                                   Washington, D.C. 20004
                                                   Telephone:  (202) 639-6780
                                                   Facsimile:  (202) 639-6640

                                                   Attorneys of Record for Public Warehousing
                                                   Company K.S.C.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY K.S.C.,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 07-01476 (RBW) |
| | ) | |
| **DEFENSE SUPPLY CENTER** | ) | |
| **PHILADELPHIA, THE DEFENSE** | ) | |
| **LOGISTICS AGENCY, and THE** | ) | |
| **DEPARTMENT OF DEFENSE.** | ) | |

_____

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF COMBINED MOTION FOR SUMMARY
## JUDGMENT AND IN CAMERA REVIEW

Michael R. Charness (D.C. Bar No. 289322)
Alexander O. Levine (D.C. Bar No. 501924)
VINSON & ELKINS, L.L.P.
The Willard Office Building
1455 Pennsylvania Ave. Suite 600
Washington, D.C. 20004
Telephone:  (202) 639-6780
Facsimile:  (202) 639-6640

Attorneys of Record for Public Warehousing
Company K.S.C.

Dated:  December 5, 2007

# TABLE OF CONTENTS

<u>Page</u>

I.     INTRODUCTION ....................................................................................................1

II.    BACKGROUND .....................................................................................................5

     A.     Price Negotiation Memoranda ....................................................................5

     B.     The Department of Justice Investigation ....................................................6

III.   STANDARD OF REVIEW .....................................................................................7

IV.    ARGUMENT ...........................................................................................................7

     A.     Exemption 3 Does Not Apply .....................................................................8

     B.     Exemption 4 Does Not Apply ...................................................................10

     C.     Exemption 5 Does Not Apply ...................................................................15

     D.     Exemption 7(A) Does Not Apply .............................................................18

     E.     Defendants Have Not Shown That Exempt Information Is Non-Segregable ........25

     F.     Plaintiff Requests *In Camera* Review Of Requested Documents .........26

V.     CONCLUSION.......................................................................................................28

# TABLE OF AUTHORITIES

**Cases**

Animal Legal Def. Fund, Inc. v. Dep't of the Air Force,
44 F. Supp. 2d 295 (D.D.C. 1999) ............................................................... 25

Badhwar v. U.S. Dep't of the Air Force,
622 F. Supp. 1364 (D.D.C. 1985) ........................................................... 13, 14

Bevis v. Dep't of State,
801 F.2d 1386 (D.C. Cir. 1986). ................................................................. 20

Browntein Zeidman & Schomer v. Dep't of the Air Force,
781 F. Supp. 31 (D.D.C. 1991) ................................................................... 17

*Campbell v. Dep't of Health & Human Services,
682 F.2d 256 (D.C. Cir. 1982) .............................................................. passim

Carter v. Dep't of Commerce,
830 F.2d 388 (D.C. Cir. 1987) .................................................................... 27

Chemical Waste Mgmt., Inc. v. O'Leary,
No. 94-2230, 1995 WL 115894, at *8 (D.D.C. 1995) .................................. 12

Coastal States Gas Corp. v. Dep't of Energy,
617 F.2d 854 (D.C. Cir. 1980) .................................................................... 24

Cobell v. Norton ,
213 F.R.D. 1 (D.D.C. 2003) ........................................................................ 16

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n,
975 F.2d 871 (D.C. Cir. 1992) .............................................................. 10, 12

Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,
331 F.3d 918 (D.C. Cir. 2003). ................................................................... 20

Dep't of the Air Force v. Rose,
425 U.S. 352 (1976) ...................................................................................... 8

Hornbostel v. U.S. Dep't of Interior,
305 F. Supp. 2d 21 (D.D.C. 2003) ................................................................ 9

J. H. Lawrence Co. v. Smith,
545 F. Supp. 421 (D. Md. 1982) ................................................................. 13

*John Doe Agency v. John Doe Corp.,
493 U.S. 146 (1989) ...................................................................... 7, 8, 18, 19

Kamman v. U.S. IRS,
56 F.3d 46 (9th Cir. 1995) ............................................................................ 7

Kay v. FCC,
867 F. Supp. 11 (D.D.C. 1994) ................................................................... 19

Martin Marietta Corp. v. Dalton,
974 F. Supp. 37 (D.D.C. 1997) ................................................................... 12

Maydak v. U.S. Dep't of Justice,
254 F. Supp. 2d 23 (D.D.C. 2003) .............................................................. 11

*Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,
566 F.2d 242 (D.C. Cir. 1977) .............................................................. passim

Mehl v. U.S. EPA,
797 F. Supp. 43 (D.D.C. 1992) ................................................................... 27

Military Audit Project v. Casey,
  656 F.2d 724 (D.C. Cir. 1981) ......................................................................... 7
*National Parks & Conservation Ass'n v. Morton,
  498 F.2d 765 (D.C. Cir. 1974) .................................................................. 10, 13
NLRB v. Robbins Tire & Rubber Co.,
  437 U.S. 214 (1978) ................................................................................. 20, 24
*NLRB v. Sears, Roebuck & Co.,
  421 U.S. 132 (1975) ......................................................................................... 17
North v. Walsh,
  881 F.2d 1088 (D.C. Cir. 1989) ............................................................... 20, 23
Pruitt Electric Co. v. U.S. Dep't of Labor,
  587 F. Supp. 893 (N.D. Tex. 1984) ................................................................ 24
*Quiñon v. FBI,
  86 F.3d 1222 (D.C. Cir. 1996) ........................................................... 26, 27, 28
Russell v. Dep't of the Air Force,
  682 F.2d 1045 (D.C. Cir. 1982) ...................................................................... 16
Schlefer v. United States,
  702 F.2d 233 (D.C. Cir. 1983) .................................................................. 16, 17
Wilderness Soc'y v. U.S. Dep't of the Interior,
  344 F. Supp. 2d 1 (D.D.C. 2004) .................................................................... 25

**Statutes**
41 U.S.C. § 253b(m)(2) ......................................................................................... 9
41 U.S.C. § 253b(m)(3) ......................................................................................... 8
*5 U.S.C. § 552 .................................................................................................... 10
5 U.S.C. § 552(a)(4)(B) .................................................................................. 7, 26
5 U.S.C. § 552(a)(4)(C) ......................................................................................... 4
5 U.S.C. § 552(a)(6)(A) ......................................................................................... 4
5 U.S.C. §§ 552(b)(3), (4), (5) and (7)(A) ............................................... passim

**Other Authorities**
DCMA Guidebook, Pricing and Negotiation, § 3.2.8.1 .............................. 6, 16
Defense Logistics Acquisition Directive § 15.406-3(a) ............................. 6, 16
Department of Defense Contract Pricing Reference Guide, Vol. 4, § 5.2 .......... 15, 28
Federal Rule of Civil Procedure 56(c) ................................................................. 7

**Federal Regulations**
48 C.F.R. § 15.402(a) ......................................................................................... 22
*48 C.F.R. § 15.406-3(a) ............................................................................ passim
48 C.F.R. § 15.406-3(a)(11) ................................................................................. 5
48 C.F.R. §§ 15.406-3(a)(1), (7), (8) ............................................................. 5, 6

\* Plaintiff chiefly relies on these cases and authorities.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY** | ) | |
| **K.S.C.,** | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 07-01476 (RBW) |
| | ) | |
| **DEFENSE SUPPLY CENTER** | ) | |
| **PHILADELPHIA, THE DEFENSE** | ) | |
| **LOGISTICS AGENCY, and THE** | ) | |
| **DEPARTMENT OF DEFENSE.** | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF COMBINED MOTION FOR SUMMARY
## JUDGMENT AND *IN CAMERA* REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Plaintiff Public

Warehousing Company K.S.C. ("PWC") hereby submits this memorandum in support of its

combined motion for summary judgment and *in camera* review.

## I.    INTRODUCTION

Plaintiff Public Warehousing Company K.S.C. ("PWC") has made a request under the

Freedom of Information Act ("FOIA") for the price negotiation memoranda ("PNMs") for its

"Prime Vendor" contracts with the Defense Supply Center Philadelphia ("DSCP").  Defendants'

motion for summary judgment is a desperate attempt to prevent the disclosure of information that

Plaintiff is statutorily authorized to receive.  The Department of Justice ("DOJ"), concerned that

the factual, historical information contained in the PNMs could somehow assist Plaintiff in

responding to DOJ's ongoing investigation, has instructed Defendants not to release the

documents.  See Coulter Decl. ¶ 6; Graham Decl. ¶ 6.  Illogically, Defendants have acquiesced,

despite the fact that the PNMs are three to five years old, DOJ's investigation is unrelated to the

information in the PNMs, and Plaintiff's positions on the issues under investigation are already

documented publicly and are well-known to all parties involved.  Defendants have acted in bad faith by denying the request, delaying at every step of the administrative and litigation process, citing plainly inapplicable FOIA exemptions, and refusing to even attempt to redact the small amounts of any arguably exempt information that *may* actually appear in the documents.

In his Declaration filed with Defendants' motion for summary judgment, James J. Graham indicated that DOJ's investigation focuses on two issues.  Graham Decl. ¶ 2.  The first is the issue of prompt payment discounts received by Plaintiff from its suppliers, and whether such discounts should have been passed on to the Government.  Plaintiff has openly acknowledged the fact that it received and retained such discounts, and even offered to enter into a stipulation with the Assistant U.S. Attorney handling the investigation as to this fact.  Furthermore, Plaintiff has repeatedly notified the Government that it was contractually entitled to retain such discounts, and that the Contracting Officer with authority over the current contract had explicitly recognized this fact in writing.  Plaintiff was forced to file a complaint setting out its position with specificity with the Armed Services Board of Contract Appeals when the U.S. Attorney's Office for the Northern District of Georgia commandeered the Defendants' contracting office and ordered a different Contracting Officer to issue an interpretation contrary to the contract language and the previous guidance.  Despite Mr. Graham's opinion that such litigation is "frivolous," Plaintiff is acting responsibly to protect its contractual rights.  Graham Decl. ¶ 8.  Most importantly, however, it defies credulity to argue that the PNMs address prompt payment discounts at all since it is apparently the Government's position that PWC has *hidden* their existence from the Government. If that is the Government's position, then it would be quite shocking to find prompt payment discounts discussed in the PNM.

As described by Mr. Graham, the second focus of the investigation is the role of The Sultan Center ("TSC"), Plaintiff's principal Middle East supplier for local market ready items. Graham Decl. ¶ 2.  Mr. Graham refers to TSC as "a related company," despite the fact that PWC and TSC are two independent, publicly-owned companies.  Id.  Plaintiff has informed the investigators in writing that the two companies are neither parents nor subsidiaries of each other. See Letter from PWC Corporate Secretary at Exhibit A.  Furthermore, Plaintiff has expressed to Defendants and the Government investigators on numerous occasions its position that the billing practices with regard to TSC have been in compliance with the contract.

Plaintiff has gone on the record with respect to these key issues, and its well-documented positions will not change as a result of the information in the PNM, as it is extremely doubtful that the PNMs address either prompt payment discounts or Plaintiff's relationship with TSC.  As discussed in more detail below, the PNMs are factual records of the negotiation process entered into between DSCP and PWC prior to the award of each of the Prime Vendor contracts.  The principal function of the PNM is to document the fairness and reasonableness of the agreed-upon prices.  See 48 C.F.R. § 15.406-3(a)(11).  As such, Defendants' allegation that Plaintiff would somehow tailor its defense to the information in the PNMs is illogical and unpersuasive. Defendants offer only conclusory statements of hypothetical interference in DOJ's investigation without any attempt at connecting the information in the PNMs to the investigation's subject matter.

Defendants have now frivolously heaped on additional FOIA exemptions, despite the fact that DSCP cited only the "law enforcement" exemption in its initial decision.  See Compl. ¶ 8; Miller Decl. ¶ 19.  In doing so, Defendants have grossly exaggerated the existence and amount of other companies' sensitive proprietary information that appear in the PNMs, as well as the

amount of intra-agency deliberative information.  To the extent that small amounts of such information actually appear in the documents, Defendants have in bad faith refused to issue a redacted version.  Instead, they have announced, without providing any detail or rationale, that the exempt information is "so inextricably interwoven" with non-exempt information that it would be impossible to segregate.  Miller Decl. ¶¶ 24, 27, 29.  This is simply impossible to believe.

Perhaps at the urging of the investigators, Defendants have stalled and delayed at every juncture in this process.  The FOIA requires agencies to issue a decision on initial requests and appeals within 20 business days of filing.  5 U.S.C. § 552(a)(6)(A).  Despite this statutory mandate, DSCP's reply to the initial FOIA request arrived nearly two months after the request was made, and the Defense Logistics Agency's ("DLA") decision on Plaintiff's appeal arrived two and one-half months after the appeal was sent.  See Pl.'s Stmt. of Facts ¶¶ 4, 5.  In addition, DLA released its decision only after numerous telephone calls and e-mails from Plaintiff's counsel demanding a decision.  Finally, in this litigation, Defendants abused Plaintiffs' initial willingness to cooperate with regard to deadlines by filing their motion for summary judgment over eight weeks after the statutory deadline for the government's responsive pleading.  5 U.S.C. § 552(a)(4)(C).  This pattern of delaying tactics by Defendants displays an unwillingness to comply with their statutory responsibilities.

Finally, Plaintiff wishes to alert the Court to the fact that the request for the PNMs is only the first in a series of FOIA requests on which Defendants have acted in bad faith.  Plaintiff filed three additional requests with DSCP in July and August of 2007, and despite several phone calls and e-mails from Plaintiff's counsel, the agency failed to issue final decisions on the requests.  Furthermore, the exemptions claimed in initial determinations issued by DSCP's FOIA officer

border on the absurd.  For example, the FOIA officer determined that PWC could not receive a videotape recording of a pre-contractual presentation *by PWC* describing *PWC's* own capabilities because the information constituted confidential commercial information.  <u>See</u> DSCP Initial Response to Request 07H032, and follow-up e-mail at Exhibit B.  Since between three and four months had elapsed since submittal of its requests and no final decisions were forthcoming, on November 14 Plaintiff filed appeals of all three requests with DLA.  <u>See</u> PWC's Appeal to DLA at Exhibit C (without associated attachments).  If Defendants continue to ignore their statutory duties, more unnecessary litigation before this court will result.

## II.    BACKGROUND

This case arises under the Freedom of Information Act, 5 U.S.C. § 552.  Plaintiff has requested copies of the price negotiation memoranda created by Defense Supply Center Philadelphia for "Prime Vendor" Contract Nos. SPO300-03-D-3061 ("PV 1"), SPM300-05-D-3119 ("PV Bridge") and SPM300-05-D-3128 ("PV 2").  Plaintiff is the contractor on the indicated contracts.  Defendants have alleged that no PNM was created for PV Bridge, and they have refused to release the PNMs for PV 1 and PV 2.  Defendants claim that the PNMs are exempt from disclosure pursuant to 5 U.S.C. §§ 552(b)(3), (4), (5) and (7)(A).

### A.    Price Negotiation Memoranda

The contents of the PNM are described in section 15.406-3(a) of the Federal Acquisition Regulation ("FAR").  48 C.F.R. § 15.406-3(a), attached as Exhibit D.  In pertinent part, the regulation instructs that "[t]he contracting officer shall document in the contract file the principal elements of the negotiated agreement."  <u>Id.</u>  The regulation then lists the various pieces of information to be included, among which are "[t]he purpose of the negotiation," "[a] summary of the contractor's proposal," and "[t]he most significant facts or considerations controlling the establishment of the prenegotiation objectives and the negotiated agreement[,] including an

explanation of any significant differences between the two positions."  48 C.F.R. §§ 15.406-3(a)(1), (7), (8).  Most importantly, the PNM must include "[d]ocumentation of fair and reasonable pricing."  48 C.F.R. § 15.406-3(a)(11).

Publicly-available information provides additional details regarding the creation of the price negotiation memorandum within the Department of Defense.  For example, the Defense Contract Management Agency ("DCMA") Guidebook includes the following information: "At the conclusion of negotiation, a PNM is prepared.  The purpose of the PNM is to document and support the determination that the negotiated settlement is fair and reasonable."  DCMA Guidebook, Pricing and Negotiation, § 3.2.8.1, attached as Exhibit E.  Similarly, the Defense Logistics Acquisition Directive ("DLAD"), which regulates the activities of the Defense Logistics Agency and its associated field activities (including DSCP) states that "the PNM, standing alone, must convince all reviewers that the price negotiated . . . was reasonable, given the circumstances of the particular acquisition."  DLAD § 15.406-3(a), attached as Exhibit F.  The DLAD then goes on to describe the standard format for the PNM.

Finally, Gary Rivers, a former contracting official with 34 years of procurement experience at the Defense Supply Center Richmond (another DLA field activity) has submitted an affidavit describing the contents of a PNM.  Mr. Rivers states that "[t]he purpose of the PNM is to document the agency's negotiated price agreement with the contractor, as well as the price negotiation process between the agency and the offerors determined to be in the competitive range . . . The PNM is written after the negotiation process is complete, and after the contracting officer has made his or her choice for award."  Rivers Aff. ¶ 4, attached as Exhibit G.

### B.    The Department of Justice Investigation

As Defendants point out, DOJ is currently conducting an investigation of Plaintiff in connection with the Prime Vendor contracts mentioned above.  Plaintiff first learned of the

investigation on January 7, 2007, when it received a *subpoena duces tecum* from the Department

of Defense ("DoD") Inspector General.  Plaintiff later learned that the investigation had been

under way since November 2005.  As Defendants state, the investigation is focused on pricing of

goods sold to DSCP on the Prime Vendor contracts.  Defs.' Mem. of P. & A. at 4.  For reasons

unbeknownst to Plaintiff, the U.S. Attorney's Office of the Northern District of Georgia has

exercised primary control over the conduct of the investigation, despite the fact that the subpoena

was issued by the DoD Inspector General.  Plaintiff has produced over 500,000 pages of

documents to the aforementioned U.S. Attorney's Office, and personnel in that office have

interviewed several employees of Plaintiff and its suppliers.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings and evidence "show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  In FOIA cases, agency defendants bear the burden of

demonstrating the applicability of the exemptions claimed.  5 U.S.C. § 552(a)(4)(B).  An agency

resorting to agency affidavits satisfies this burden when "the affidavits describe the justifications

for nondisclosure with reasonably specific detail, demonstrate that the information withheld

logically falls within the claimed exemptions, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey,

656 F.2d 724, 738 (D.C. Cir. 1981).  When an agency does not carry its burden, summary

judgment should be granted for the plaintiff.  See, e.g., Kamman v. U.S. IRS, 56 F.3d 46, 49 (9th

Cir. 1995).

## IV.    ARGUMENT

The Supreme Court has repeatedly stated that the "fundamental principle" of the FOIA is

that of "public access to Government documents."  See, e.g., John Doe Agency v. John Doe

Corp., 493 U.S. 146, 151 (1989).  The Court has stressed "the basic policy that disclosure, not

secrecy, is the dominant objective of the Act."  Id. at 152 (quoting Dep't of the Air Force v.

Rose, 425 U.S. 352, 361 (1976)).  As a result, the Act's exemptions to disclosure "must be

narrowly construed."  Id.  With these principles in mind, it is evident that the exemptions

claimed by Defendants are inapplicable to the documents requested.

### A.     Exemption 3 Does Not Apply

FOIA Exemption 3 applies to matters that are "specifically exempted from disclosure by

statute . . . provided that such statute . . . requires that matters be withheld from the public in such

a manner as to leave no discretion on the issue, or . . . establishes particular criteria for

withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).

Defendants claim that the price negotiation memoranda at issue here are exempted by the

National Defense Authorization Act of 1997 (the "NDAA"), which prohibits the release under

FOIA of "a proposal in the possession or control of an executive agency."  41 U.S.C. §

253b(m)(3).

The price negotiation memoranda being requested are not "proposals" and are therefore

not exempt by statute under Exemption 3.  Defendants' claim that the PNMs are "proposals"

flies in the face of the statutory definition of "proposal" as well as common sense.  Proposals are

defined under the NDAA as "any proposal, including a technical, management, or cost proposal,

submitted by a contractor in response to the requirements of a solicitation for a competitive

proposal."  Id.  The PNMs do not satisfy this definition since they are not (1) proposals, (2)

submitted by a contractor, or (3) in response to a solicitation.  The requested PNMs therefore do

not satisfy any part of the definition of "proposals."  Instead, PNMs are memoranda generated by

the Government to document the results of its negotiated agreement.  See 48 C.F.R. § 15.406-

3(a).  They do not focus on the details of losing offerors' proposals.  See Rivers Aff. ¶¶ 5, 6, 9,

10 at Exhibit G.  Even if a PNM briefly references information from a losing offeror's proposal, this does not mean that the PNM itself is a "proposal."  Merely referencing a proposal does not transform a Government-generated memorandum into an offeror-submitted proposal.

Furthermore, the NDAA by its own terms does not apply to proposals that are "set forth or incorporated by reference in a contract entered into between the agency and the contractor that submitted the proposal."  41 U.S.C. § 253b(m)(2).  Therefore, even if Government-generated references to proposal information somehow qualified as a "proposal," the NDAA would not apply to references from PWC's proposals.  This type of proposal information constitutes the majority of proposal information found in the PNMs, whose purpose in this instance is to document the negotiated agreement between the Government and PWC.  See Rivers Aff. ¶¶ 4, 5 at Exhibit G.   To the extent that the PNMs might occasionally reference a losing offeror's proposal, even if such references were to count as "proposals," they would be easily segregable from the rest of the document.  Id. at ¶ 5.  The PNMs' focus is on the agreement actually negotiated, not on rejected proposals.

Defendants' overly broad interpretation of the NDAA as applying to any document generated by the Government which references proposals is inconsistent with the case law of this District as well as the FOIA statute.  The District Court has found that the NDAA applies to FOIA Exemption 3, since the NDAA "specifically prohibits the disclosure of 'a proposal in the possession or control of an agency' to any person under the FOIA."  Hornbostel v. U.S. Dep't of Interior, 305 F. Supp. 2d 21, 30 (D.D.C. 2003).  The NDAA therefore complies with the FOIA requirement that such statute have a limited scope that "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. 552(b)(3)(B).  Going beyond the statutory definition in such a broad, open-ended manner would be inconsistent

with the District Court's finding that the NDAA complies with the limitations of Exemption 3 by being specifically limited in scope.

**B.      Exemption 4 Does Not Apply**

Defendants next claim that the PNMs are protected from disclosure under Exemption 4, which applies to matters that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552.  Under Exemption 4, information required to be submitted to the Government is protected from disclosure if it is likely to either (1) impair the Government's ability to obtain necessary information in the future; or (2) cause substantial harm to the competitive position of the person from whom the information was obtained.  National Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974) (hereinafter "National Parks").  Voluntarily submitted information is protected from disclosure if it would customarily not be released to the public by the person from whom the information was obtained.  Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc) (hereinafter "Critical Mass")

The price negotiation memoranda are not subject to Exemption 4.  First, the PNMs contain little, if any, details provided from other offerors.  Any information from other offerors' proposals, if there is any, is likely to be stale, and would include unit prices for certain food products that do not reveal offerors' overhead, general and administrative expenses and profit. At best, this summary data was used as a reference point for PWC's negotiated agreement with the Government.  Disclosure of that data—now at least three years old, and as much as five years old—would not cause substantial competitive harm.  Even if information in the PNMs did fall under Exemption 4, Defendants have made no substantive showing that such information could not be segregated from the rest of the documentation of the Government's agreement with PWC.

### 1)    **The PNMs Are Not Obtained From A Person**

Most of the contents of the price negotiation memoranda, which are the Government's documentation of the negotiated agreement between itself and PWC, does not contain information obtained from a "person." See 5 U.S.C. 552(b)(4); see also Maydak v. U.S. Dep't of Justice, 254 F. Supp. 2d 23, 49 (D.D.C. 2003) ("As a general rule, exemption 4 does not apply to information generated by the government because such information is not 'obtained from a person' within the meaning of the statute."). The FAR requires contracting officers to include in the PNM a variety of details about the Government's agreement with the winning contractor as part of this documentation. See 48 C.F.R. § 15.406-3(a). Nothing in this regulation, however, requires information from losing offerors' proposals to be included in the documentation. See id. Despite the clear guidelines of the FAR, Defendants claim that the PNMs include a long laundry list of other information from losing offerors' proposals. See Defs.' Mem. of P. & A. at 6.[1] Contrary to Defendants' portrayal, the PNMs are not an evaluator's predecisional assessment of every offeror's proposal, rather they are the documentation of the negotiated agreement. See Rivers Aff. ¶¶ 4, 5, 9, 10 at Exhibit G; see also 48 C.F.R. § 15.406-3(a). The bulk of this information was generated by the Government as it summarized its agreements with PWC, or by using information supplied by PWC. While the document sometimes may contain information on other offerors in the competitive range, this information is limited to information from their price proposals, provided as a reference point for documenting the Government's agreement with

---

[1]    It is not known why the Government is seeking to portray these post-decisional documentations of the negotiated agreements as being akin to pre-decisional evaluation documents. It could be that the Government is grossly exaggerating the contents of the PNMs. It could also be the case that the Government is seeking to attach pre-decisional evaluation documents to the PNMs in an attempt to exempt the entire document from disclosure. As requested in more detail below, the Court should examine these documents for itself in order to resolve this disparity between what the FAR states should be included in the PNM and the Government's conclusory representations of what the PNMs contain.

PWC.  See Rivers Aff. ¶ 6 at Exhibit G.  Therefore, little, if any, of the information in the PNMs

would qualify as being obtained by a "person."[2]

2)    **The PNMs Contain Required Information Not Subject To Exemption 4**

Any summary references to other offerors' proposals are not confidential or privileged

commercial or financial information protected under Exemption 4.  This type of summary

pricing information was required to be given under the terms of the solicitation and therefore

would not qualify as "voluntary." See Rivers Aff. ¶ 7 at Exhibit G; see also Critical Mass, 975

F.2d at 879.   The D.C. Circuit has consistently held that information required to be submitted in

response to the terms of a solicitation is not "voluntary" under the Critical Mass test.[3]  See

Martin Marietta Corp. v. Dalton, 974 F. Supp. 37, 39 (D.D.C. 1997) (recognizing that district

court precedent in the D.C. Circuit uniformly supports the notion that financial and commercial

information, including contract line item numbers and other key contract information, is

"required" when submitted in a government contract bidding situation); see also Chemical Waste

Mgmt., Inc. v. O'Leary, No. 94-2230, 1995 WL 115894, at *4 (D.D.C. 1995) (finding unit

pricing required when contractor would not have won the subcontract without submission of the

pricing data and thus had no choice but to submit the unit price information once it chose to

submit its proposal).

---

[2]    While PWC may be a "person," information obtained from it will not cause competitive harm to PWC, since it is the one requesting the information.

[3]    Defendants also make the claim that certain additional clarification information was voluntarily provided by losing offerors and therefore is exempt under the Critical Mass test.  See Defs.' Mem. of P. & A. at 11-12. Defendants' conclusory statement that such information was voluntarily provided is bereft of any substantive description of what this information was, and, importantly, whether the offerors' proposals would have been considered for award absent such information.  According to Mr. Rivers, the PNMs do not contain voluntary information from other offerors.  Rivers Aff. ¶ 7 at Exhibit G.  The reason for this is that additional voluntarily-provided information would have little bearing on price negotiations or the agreed-upon price.  Id.  Without more details, which Defendants have not provided, it is impossible to know what information is being referenced. Defendants have also not provided any details about whether this mystery information would be reasonably segregable from the rest of the PNMs.

Disclosure of summary references to a losing offeror's proposal in the documentation of the winning contractor's agreement is not "confidential" under National Parks.  498 F.2d at 770. (holding that information is "confidential" for purposes of Exemption 4 if it is likely to either (1) cause substantial harm to the competitive position of the person from whom the information was obtained, or (2) impair the Government's ability to obtain necessary information in the future).  Disclosure of references to unsuccessful proposals would be unlikely to cause substantial harm.  Since the purpose of a PNM is to document the negotiated agreement, the PNMs are unlikely to include detailed information from losing offerors' proposals.  See Rivers Aff. ¶¶ 4, 5, 6, 9, 10 at Exhibit G.  Furthermore, any commercial information contained in losing offerors' proposals was largely based on prices received from suppliers and vendors either three (for PV 2) or five years ago (for PV 1).  By the time the PV 2 contract is resolicited (at the earliest, in mid-2008), these prices will have changed completely.  The earliest possible resolicitation would take place more than five and a half years after the date on which proposals were submitted for PV 1, and more than three and a half years from the date on which proposals were submitted for PV 2.  See J. H. Lawrence Co. v. Smith, 545 F. Supp. 421, 425 (D. Md. 1982) (finding no competitive harm where stale data and other factors made it difficult to determine whether disclosure would likely cause competitive harm).  Stale, summary information from losing offerors' proposals is unlikely to be of any use to anyone in a future resolicitation.

Nor would disclosure impair the Government's ability to obtain necessary information in the future.  The type of information being requested was required under the terms of the solicitation.  Not providing the information would likely mean a contractor would not be considered for contract award.  See Badhwar v. U.S. Dep't of the Air Force, 622 F. Supp. 1364,

- 13 -

1377 (D.D.C. 1985) (no impairment from release of reports when submission is "effectively mandatory" in order to do business with government), aff'd in part & rev'd in part on other grounds, 829 F.2d 182 (D.C. Cir. 1987).  Notably, none of the contractors the Government queried stated that they would be less likely to provide the Government with required proposal information in the future.[4]

### 3)    Defendants Have Failed To Demonstrate That Any Exempted Information Is Not Reasonably Segregable

Even if the PNMs do contain material exempted under Exemption 4, it would be highly unlikely that such information would be non-segregable from the remainder of the memoranda. As described in Section E below, Defendants' conclusory statements that non-exempt information is "inextricably interwoven" with information exempt under Exemption 4 are insufficient to satisfy its burden to demonstrate that such exempt information is non-segregable. Claims of nonsegrability can not be made in a conclusory manner.  See Mead Data Cent., Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).  Most of the information in the Government's documentation of a negotiated agreement addresses information relating to PWC's proposal.  See Rivers Aff. ¶¶ 4, 5 at Exhibit G.  Very little, if any, of the documentation of the negotiated agreement would address the contents of rejected proposals.  Id. at ¶¶ 5, 6, 9, 10.  Thus, even assuming arguendo that the PNMs did contain any protected financial and commercial information, this type of information would be easily segregable from the rest of the document.

---

[4]    The letters submitted by DSCP from losing offerors contain only conclusory allegations of competitive harm.  It appears that DSCP merely asked these contractors (who compete with PWC and have every incentive to hamper PWC's efforts) if, as a general matter, disclosure of information from their proposals would cause them substantial harm.  It bears repeating that a documentation of the negotiated agreement with PWC will contain little if any information from unsuccessful proposals.  The letters contain no indication that DSCP described the specific references, if any, which are included in the requested PNMs.

### C.    Exemption 5 Does Not Apply

Defendants next claim that the PNMs are protected from disclosure under Exemption 5.

Since these PNMs are not "inter-agency or intra-agency memorandums or letters which would

not be available by law to a party other than an agency in litigation with the agency," they are not

exempt under Exemption 5.  5 U.S.C. § 552(b)(5).  First, Defendants have admitted that these

memoranda would be available to PWC in future litigation.  In his declaration, James J. Graham

states "the company . . . will get discovery of the PNM without resort to the FOIA at the

appropriate time under the federal rules in the event that the government brings a contract fraud

case here."[5]  Graham Decl. at ¶ 8.  Similarly, Art J. Coulter states, in reference to his argument

that premature disclosure of the PNMs would interfere with DOJ's investigation, that "the

company will get discovery at the appropriate time."  Coulter Decl. at ¶ 8.  Since both parties

apparently agree that these memoranda are not the types of documents "which would not be

available by law to a party other than an agency in litigation with the agency," the Defendants'

Exemption 5 claim is entirely without merit.[6]

Examining their arguments, however, confirms their lack of substance.  Defendants'

Exemption 5 argument is based on a misrepresentation of the PNMs, characterizing these post-

decisional documentations as something akin to a source selection evaluation document.  These

PNMs are post-decisional documentations of the negotiated agreements, prepared by the person

who has executed the agreement, the Contracting Officer.  See 48 C.F.R. § 15.406-3(a) ("The

Contracting Officer shall document in the contract file the principal elements of the negotiated

---

[5]    Ironically, in the midst of admitting that the Government does not believe its own arguments, Mr. Graham baselessly accuses PWC of bringing frivolous litigation.  See Section I, supra.

[6]    Further support for the fact that PNMs are available to the contractor is provided by the DoD Contract Pricing Reference Guide, which states that "[i]f the contractor requests a copy of the price negotiation memorandum (PNM), most agencies authorize contracting officer release of pertinent portions.  However, you should consult your agency legal counsel to determine your authority for release and any conditions required for release."  Vol. 4, § 5.2 (attached as Exhibit H).

agreement."); <u>see also</u> DLAD § 15.406-3 at Exhibit F; DCMA Guidebook § 3.2.8.1 at Exhibit E ("At the conclusion of a negotiation, a PNM is prepared. The purpose of the PNM is to document and support the determination that the negotiated settlement is fair and reasonable."). Where, as here, a document is written by the final decisionmaker after completing his or her negotiations with the contractor, the document is not pre-decisional. See <u>Cobell v. Norton</u>, 213 F.R.D. 1, 4 (D.D.C. 2003). The Contracting Officer reaching the actual negotiated agreement with PWC is the decisionmaker for purposes of Exemption 5. <u>See</u> <u>Schlefer v. United States</u>, 702 F.2d 233, 238 (D.C. Cir. 1983) (court looks beneath formal lines of authority to the reality of the decisionmaking process in question). While the Contracting Officer's decision may be subject to review, it is the Contracting Officer who makes the decision to choose the winning offeror's proposal. Accordingly, the Contracting Officer's memorandum, documenting his decision, is not pre-decisional.

This type of post-decisional document also is a poor candidate for the FOIA deliberative process exemption. Traditionally, the deliberative process privilege of Exemption 5 has had three policy purposes: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. <u>See</u>, <u>e.g.</u>, <u>Russell v. Dep't of the Air Force</u>, 682 F.2d 1045, 1048 (D.C. Cir. 1982). None of these rationales is implicated by the situation where the Contracting Officer is documenting the decision he or she has already made. For this reason, Exemption 5 ordinarily does not apply to post-decisional documents, as "the public is vitally concerned with the reasons which did

supply the basis for an agency policy actually adopted." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 152 (1975).

Defendants' conclusory statements that the PNMs contain negotiation goals and risk evaluations, which were pre-decisional, are not sufficient to establish that Exemption 5 applies. Even in this scenario, DSCP's statement of its negotiation goals is not being made for a deliberative purpose. Defendants have provided no evidence that the Contracting Officer even used these PNM sections to deliberate with other Government personnel prior to the negotiation. Instead, any pre-negotiation references that may have been included would have been used to more accurately document the negotiated agreement, which is the purpose of the PNM. See 48 C.F.R. § 15.406-3(a).[7]

The PNMs also are not "deliberative" documents, since they are factual documents prepared by the decisionmaker, the Contracting Officer. The PNMs are not recommendations being sent from a subordinate advising a decisionmaker on what course of action to take. See Schlefer, 702 F.2d at 238 (intra-agency memoranda from "subordinate" to "superior" on an agency ladder are likely to be more "deliberative" in character than documents emanating from superior to subordinate). Rather, they represent the documentation of the Contracting Officer's decision. See FAR § 15.406-3(a).

Furthermore, if a pre-decisional document is expressly adopted by a final decisionmaker, that document loses any protected status it might have. See Sears, 421 U.S. at 161. Thus, even

---

[7]    The two cases cited by Defendants in support of its deliberative process argument are not analogous to this situation, since those cases both involve documents having a main purpose of stimulating deliberations between Government officials during the negotiation. In Mead Data Cent. Inc. v. U.S. Dep't of the Air Force, the requested memoranda consisted of advice and recommendations exchanged by Government personnel deliberating on the negotiation. 566 F.2d 242 (D.C. Cir. 1977). In Brownstein Zeidman & Schomer v. Dep't of the Air Force, the requested document was a source selection advisory committee report, i.e. a report by evaluators made in the midst of the solicitation process. 781 F. Supp. 31, 33-34 (D.D.C. 1991). In contrast, a PNM is not a pre-negotiation deliberation document, but rather it is a post-negotiation documentation of the negotiation result. Even if a small part of the document is prepared before the negotiation, that small part is not shared and deliberated upon. Rather, it is merely noted for context, so as to better document the resulting negotiated agreement.

- 17 -

assuming, *arguendo*, that some parts of the PNMs were pre-decisional, they would lose that status because the Contracting Officer has subsequently adopted those sections into the post-decisional PNM. The entire PNM itself is incorporated into the contract file as documentation of the negotiated agreement reached between the agency and the contractor, as well as the reasonableness of that agreement. Rivers Aff. ¶ 8 at Exhibit G. The stated agreement and rationale for that agreement are added into the contract file to document the contracting officer's decision. Id.

Even if some small portion of the PNMs is exempt, the Government has completely failed to demonstrate that these sections would not be segregable from the rest of the documentation of the negotiated agreement. Most, if not all, of the PNM constitutes a post-decisional document not subject to Exemption 5. The Government's conclusory assertion that the exempted portions are "inextricably intertwined" is not sufficient to satisfy its burden of demonstrating non-segregability. See Section E, below.

## D.    Exemption 7(A) Does Not Apply

Exemption 7(A) applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Thus, the threshold inquiry is whether the PNMs have been "compiled for law enforcement purposes." See John Doe Agency, 493 U.S. at 153. If it satisfies the first inquiry, the agency then "must show, by more than conclusory statement, how the particular kinds of . . . records requested would interfere with a pending enforcement proceeding." Campbell v. Dep't of Health & Human Services, 682 F.2d 256, 259 (D.C. Cir. 1982). Defendants have not carried and cannot carry their burden on either part of this test.

**1)      Defendants Have Not Shown That The PNMs Were "Compiled For Law Enforcement Purposes"**

Defendants must first demonstrate that the PNMs were compiled, or "collected and assembled" for law enforcement purposes. John Doe Agency, 493 U.S. at 153. It is true, as Defendants point out, that the documents sought need not have been originally compiled for law enforcement purposes. Id. However, the Supreme Court has stated clearly that the documents must have been compiled for such purposes "when the Government invokes the Exemption." Id. In this case, in order to invoke Exception 7(A), Defendants must have compiled the PNMs for law enforcement purposes at some point prior to April 9, 2007, the date that DSCP first denied the request under that Exemption. See Compl. ¶ 8. Defendants have made no such showing and would be unable to do so. In their pre-scripted and nearly identical declarations, both Art Coulter and James Graham state that "[o]ne of my first steps on this matter was to . . . review in detail" the requested PNMs. However, neither declarant has specified when, if ever, the PNMs were actually compiled for law enforcement purposes. Thus, even assuming the PNMs were at some point "compiled for law enforcement purposes," Defendants have not demonstrated that such compilation took place before Exemption 7(A) was invoked.[8] Defendants have clearly failed to meet their burden with respect to this threshold question.

---

[8] Defendants cite Kay v. FCC, 867 F. Supp. 11 (D.D.C. 1994) for the proposition that records can be deemed compiled for law enforcement purposes even when the compilation was not effected by the time the agency first invoked the exemption. See Defs.' Mem. of P. & A. at 15. This is an inaccurate description of that decision, and such a holding would be contrary to Supreme Court precedent. The court in Kay in fact never stated that the compilation occurred after the date of the FCC's invocation of the exemption. Instead, the court determined that the compilation must have occurred before the date the exemption was invoked because the FCC's investigation was in progress by that time. Kay, 867 F. Supp. at 18. The same assumption cannot be made in this case, because unlike the FCC in Kay, the agency having custody of the records (DSCP) is not also the agency conducting the investigation. Thus, just because the Department of Justice's investigation was in progress by April 9, 2007, the court cannot assume that the PNMs had been compiled for law enforcement purposes prior to that date.

2)    **Defendants Have Not Shown That The PNMs Could Reasonably Be Expected To Interfere With Enforcement Proceedings**

Defendants also bear the burden of demonstrating a "reasonable likelihood" of interference with an enforcement proceeding.  <u>Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice</u>, 331 F.3d 918, 926 (D.C. Cir. 2003).  In other words, Defendants must show that disclosure of the PNMs "could reasonably be expected perceptibly to interfere" with the ongoing investigation.  <u>North v. Walsh</u>, 881 F.2d 1088, 1097 (D.C. Cir. 1989).  This test is meant to guard against "blanket exemptions" for records simply because they are located in law enforcement files.  <u>See</u> <u>NLRB v. Robbins Tire & Rubber Co.</u>, 437 U.S. 214, 236 (1978).  Defendants have made not made the requisite showing.

In their Memorandum of Points and Authorities, Defendants make several conclusory and speculative statements about the harm that release of the PNMs could have on the Department of Justice investigation.  The law of this Circuit is clear in that such statements are insufficient to carry the Government's burden.  <u>See</u> <u>Campbell</u>, 682 F.2d at 259 ("the government must show, <u>by more than conclusory statement</u>, how the particular kinds of . . . records requested would interfere . . . .") (emphasis added).  That is, Defendants do not carry their burden by simply identifying some hypothetical harm.  Instead, they must describe <u>how</u> the information in the PNMs could cause such harm.  <u>Id.</u>

Defendants argue that the descriptions of the PNMs provided in the declarations "functionally describe the withheld information sufficiently for the Court 'to trace a rational link between the nature of the document and the alleged likely interference.'"  Defs.' Mem. of P. & A. at 15-16 (quoting <u>Bevis v. Dep't of State</u>, 801 F.2d 1386, 1389 (D.C. Cir. 1986)).  This is plainly false.  There is no "rational link" between Defendants' description of the PNMs as "internal government documents reflecting the government thinking in awarding the contract,"

and the potential harms listed by Defendants.  Defs.' Mem. of P. & A. at 16.  This is especially true given the fact that the PNMs were created long before the investigation began, and include no information about potential witnesses or the direction or scope of the Government's investigation.

The first potential harm articulated by Defendants is that release of the PNMs "would invite company officials otherwise not privy to this internal government thinking to shape their testimony to what is in the PNM."  Defs.' Mem. of P. & A. at 16.  It is unclear how or why company officials would "shape their testimony" to the information in the PNM, given that the investigation is in no way focused on the bidding and negotiation of the PV 1 and PV 2 contracts.  In his declaration, James J. Graham noted that the investigation is focused on discounts PWC received from its suppliers, as well as the role of an allegedly "related" company in PWC's supply chain.  Graham Decl. ¶ 2.  As discussed in Section I above, PWC has already clearly articulated its position on these issues to the Government, and the information in the PNMs is irrelevant to both the investigators' theories and PWC officials' potential testimony on these issues.  Moreover, it is extremely unlikely that the PNMs say anything about prompt payment discounts PWC was to receive from its suppliers (especially given the Government's position that PWC hid this information) and PWC's purported relationship with TSC.  As described above, the PNM is a document that describes the completed negotiation process conducted by the agency with the contractor, and documents the fairness and reasonableness of the negotiated price.  See 48 C.F.R. § 15.406-3(a).  To the extent Defendants are concerned that company officials could testify that DSCP found the negotiated prices to be fair and reasonable, such a potential "harm" would not derive from disclosure of the PNMs.  Rather, the Federal Acquisition Regulation itself requires the contracting agency to make such a finding as a

prerequisite to contract award.  See 48 C.F.R. § 15.402(a).  As such, Plaintiff is already aware

that DSCP found the negotiated prices to be fair and reasonable.  Therefore, release of such

information could not possibly cause harm.[9]   Defendants have not shown how release of the

PNMs would cause company officials to "shape their testimony" to the PNMs' contents, nor how

such an outcome would interfere with the investigation.

Defendants next allege that the PNMs "would identify DLA contract officials who

authored the document and invite contact by the company."  Defs.' Mem. of P. & A. at 16.

While PWC clearly knows the names of the Contracting Officers for this contract, if there are

references to other participants in the preparation of the PNMs, the obvious response is that

Defendants can easily redact such names.  More importantly, however, Defendants have not

explained why the information in the PNMs would cause PWC employees to contact such

officials, nor have Defendants described how such contact would interfere with the investigation.

As Defendants point out, the PV 2 contract is ongoing, and PWC employees must interact with

DSCP officials on a regular basis.  As such, Defendants have not articulated any potential harm.

The third alleged harm described by Defendants is that the PNMs "would invite the

company to manufacture evidence and formulate its defenses before the government has the

opportunity to find out the facts in this matter."  Defs.' Mem. of P. & A. at 16.  First, the idea

that the government has yet to "find out the facts" in this investigation is preposterous, given that

the investigation has been ongoing for more than two years, the government has interviewed

numerous employees of PWC and its suppliers, and it has received over a half million pages of

documents from PWC alone.  Since the government has also subpoenaed PWC's suppliers, the

---

[9] Exemption 7(A) was meant only to protect against premature release of "evidence or information *not in the possession* of . . . potential defendants."  Campbell, 682 F.2d at 262, quoting Subcomm. on Gov't Info. & Individual Rights, House Comm. on Gov't Operations, and Subcomm. on Admin. Practice & Procedure, Senate Comm. on the Judiciary, 94th Cong., 1st Sess., Freedom of Information Act and Amendments of 1974 (P.L. 93-502) Source Book: Legislative History, Texts, and Other Documents 217, 333 (Joint Comm. Print 1975) (emphasis added).

documents in its possession far exceed one million pages.  Furthermore, it is impossible to

imagine what kind evidence the company could "manufacture" due to release of the PNMs.  As

mentioned above, the PNMs document the final negotiations between DSCP and PWC, and have

no relation to the theories being pursued by the Government.  Finally, the fact that PWC may

"formulate its defenses" before the start of an enforcement proceeding does not constitute

"interference" with the investigation.  Like any target of an investigation, PWC has been

formulating its defenses since receipt of the Government's subpoena in January of 2007, and has

already articulated its positions publicly and to the government on the key issues in the

investigation.  See Section I, supra.  Defendants have not explained how the pre-contractual

information in the PNMs could assist PWC in formulating its defenses.  As mentioned above, the

fact that DSCP found PWC's prices to be fair and reasonable is already publicly known.

Furthermore, even if the PNMs do contain some information that is helpful to PWC, the

disclosure of such information would not constitute "interference" with the investigation.  The

U.S. Court of Appeals in this Circuit has stated, in the context of an exemption 7(A) case, that

"FOIA rights are unaffected by the requester's involvement in other litigation; an individual may

therefore obtain under FOIA information that may be useful in non-FOIA litigation."  North, 881

F.2d at 1099.

  Next, Defendants state that the PNMs are "being used to formulate the government

theory of investigation and prosecution, much the way an internal memo between prosecutors

and investigators is used to plan the case."  Defs.' Mem. of P. & A. at 16.  They argue that

release of the PNMs will therefore "damage the chance of success" of the investigation.  The

comparison of the PNMs to an internal memorandum between prosecutors and investigators is

ludicrous.  As mentioned above, the PNMs are factual documents created long before any

investigation began.  They include no information about the Government's theory of the case, potential witnesses, or evidence against the contractor.  In fact, Mr. Graham's declaration itself includes far more information about the Government's theories than any information in the PNMs.  Thus, as the D.C. Circuit noted in another 7(A) case, it is "highly unlikely that these documents would 'tip the Government's hand' as to the Government's evidence or approach" in the investigation."  Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 870 (D.C. Cir. 1980).  To the extent the PNMs are "being used to formulate" the Government's theories, the same could be said for every document compiled by the investigators for law enforcement purposes.  Refusal to release the documents based on this rationale would create a "blanket exemption" for all law enforcement files and obliterate the requirement of Exemption 7(A) that the Government show some articulable harm.[10]  Robbins Tire, 437 U.S. at 236.

Finally, Defendants state that release of the PNMs "raises the risk targets and/or witnesses will alter evidence or shape their testimony as well as exposes government witnesses to attack . . . ."  Id.  This passage largely summarizes the alleged harms previously described by Defendants.  As explained in the above paragraphs, Defendants do not explain how or why the disclosure of the PNMs would cause such alleged harms, given the lack of any connection between the PNMs and the focuses of the investigation.  Defendants have offered conclusory statements of alleged harm without "even a slim bill of particulars."  Campbell, 682 F.2d at 260.  Such statements are insufficient to carry Defendants' burden.  Therefore, exemption 7(A) is inapplicable to the records sought.

---

[10] A case from the 5th Circuit helps explain the distinction between records which are to be withheld under Exemption 7(A) and those which are not.  In Pruitt Electric Co. v. U.S. Dep't of Labor, the District Court withheld witness statements and agency memoranda generated as a result of an investigation, but refused to withhold reference material consulted by the investigator.  587 F. Supp. 893, 895-6 (N.D. Tex. 1984).  The PNMs are comparable to such reference material.  While they may have been reviewed by investigators, they are "not, on [their] face, concerned with the merits of the . . . investigation."  Id. at 895.

### E.    Defendants Have Not Shown That Exempt Information Is Non-Segregable

To the extent that some exempt information may appear in the PNMs, Defendants have failed to demonstrate that such information is not "reasonably segregable" from the non-exempt portions of the documents.  5 U.S.C. § 552(b).  Instead, Defendants have asserted that the information allegedly exempt under Exemptions 3, 4 and 5 is "so inextricably interwoven with information not covered by this exemption such that excision of this information would render the document[s] meaningless."  Defs.' Mem. of P. & A. at 17; Miller Decl. ¶¶ 24, 27, 29.  Such a "blanket, conclusory statement" is clearly insufficient to carry the agency's burden on this issue.  See Animal Legal Def. Fund, Inc. v. Dep't of the Air Force, 44 F. Supp. 2d 295, 301 (D.D.C. 1999).

Realizing that "self-interest in secrecy . . . might color an administrative official's decision," the D.C. Circuit requires that agencies provide a "detailed justification" for their decisions on the segregability issue.  Mead, 566 F.2d at 260-61.  Such statements must include "the reasons behind their conclusions in order that they may challenged by FOIA plaintiffs and reviewed by the courts."  Id. at 261.  The agency must also "describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document."  Id.  When an agency submits "vague, nonspecific declarations about segregability," it fails to carry this burden.  Animal Legal, supra, at 301.

Here, Defendants have offered exactly the type of conclusory statement that this court has found insufficient in the past.  See id.; Wilderness Soc'y v. U.S. Dep't of the Interior, 344 F. Supp. 2d 1, 19 (D.D.C. 2004).  While Plaintiff believes that Exemptions 3, 4 and 5 do not apply at all, the minimal amount of information that may actually be exempt surely can be segregated from the non-exempt information without rendering the non-exempt information meaningless.  After removal of any truly confidential information taken from other offerors' proposals and any

pre-decisional deliberative information, the PNMs will consist of information taken from PWC's proposals and the factual documentation of the negotiation between DSCP and PWC. It is impossible to imagine how such information could be rendered meaningless by the removal of the exempt portions. As such, this non-exempt information must be released.

### F.    Plaintiff Requests *In Camera* Review Of Requested Documents

In the event the Court feels unprepared to grant summary judgment to Plaintiff based on the above arguments, Plaintiff believes that an *in camera* review of the PNMs is necessary, and therefore requests that the Court conduct such a review. The FOIA recognizes that *in camera* review may be necessary in certain situations. 5 U.S.C. § 552(a)(4)(B). However, the decision to conduct such a review is "committed to the broad discretion of the trial court judge." Quiñon v. FBI, 86 F.3d 1222, 1227 (D.C. Cir. 1996) (internal quotations omitted).

Plaintiff requests an *in camera* review for two reasons. First, Defendants' description of the PNMs contradicts the description in the FAR and DoD guidance documents, and the experience of PWC personnel and its outside counsel. As described above, Defendants portray the PNMs as pre-decisional evaluative documents that include information from the proposals of all potential offerors, as well as DSCP's assessment of each offeror's proposal. See Miller Decl. ¶¶ 13, 16-18. The FAR and the DoD guidance documents, on the other hand, describe the PNMs as post-decisional records that document the negotiation process already completed with the winning contractor, as well as the fairness and reasonableness of the agreed-upon prices. While Mr. Rivers' affidavit clarifies that some information from other offerors within the competitive range may be included in the PNMs, they do not include the breadth of the information described by Defendants. See Rivers Aff. ¶ 6 at Exhibit G. Plaintiff believes that Defendants are either describing some document other than the PNMs, seeking to attach other documents to the PNMs, or are exaggerating the proprietary and deliberative content of the PNMs. As such, *in camera*

review is necessary to determine if Defendants are withholding the correct document, and to resolve the dispute regarding the contents of the requested documents. See, e.g. Mehl v. U.S. EPA, 797 F. Supp. 43, 46 (D.D.C. 1992) (*in camera* review conducted because agency affidavits contradicted other public information about requested documents); Quiñon, 86 F.3d at 1228 (*in camera* review appropriate when "contents of withheld documents" are disputed).

Second, *in camera* review is necessary because Defendants' declarations are insufficient on the issue of segregability. See Section E, supra. The Court of Appeals in this Circuit has stated that *in camera* review "may be particularly appropriate when . . . agency affidavits are insufficiently detailed to permit meaningful review of exemption claims . . . ." Quiñon, 86 F.3d at 1228. As described above, this need for "meaningful review" extends to agencies' assertions of non-segregability. Mead, 566 F.2d at 260-61. Here, Defendants have made the conclusory statement that information exempt from disclosure under Exemptions 3, 4 and 5 is "so inextricably interwoven" with non-exempt information that deletion of the exempt information would "render the document[s] meaningless." Defs.' Mem. of P. & A. at 17; Miller Decl. ¶¶ 24, 27, 29. Plaintiff believes that the PNMs include large amounts of non-exempt information that can be segregated and disclosed. However, since Defendants' declaration is not sufficiently detailed on this issue to allow for a meaningful challenge and review, *in camera* inspection is necessary.

Another factor weighing in favor of *in camera* review is the small number of documents requested. The Court of Appeals for the D.C. Circuit has stated that "when the requested documents are few in number and of short length, *in camera* review may save time and money." Quiñon, 86 F.3d at 1228 (citing Carter v. Dep't of Commerce, 830 F.2d 388, 393 (D.C. Cir. 1987)). Here, Plaintiff has requested only two documents. If Defendants have followed the

instructions in the FAR and DoD guidance documents, the two PNMs should not be lengthy at all.

Finally, *in camera* review should be granted because there is evidence that the agency has acted in bad faith. Just as when agency affidavits include conclusory statements, *in camera* review is "particularly appropriate" when the agency has acted in bad faith. Quiñon, 86 F.3d at 1228. As Defendants' bad faith is adequately described in Section I, it is unnecessary to repeat it here in detail. In summary, Defendants have acted in bad faith by creating long delays at every step of the FOIA process, by claiming clearly inapplicable exemptions, and by refusing to even attempt to redact allegedly exempt information. Such behavior is especially suspicious given DoD's general policy that PNMs are releasable to the contractor upon request. See n.6, supra. As noted above, Defendants continue to act in bad faith by refusing to even issue decisions on subsequent FOIA requests.

For the reasons described above, Plaintiff requests *in camera* review of the withheld documents.

## V.    CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that the Court grant summary judgment in favor of the Plaintiff, and order Defendants to release the requested records. Plaintiff further requests that the Court review the requested documents *in camera*, if necessary to grant summary judgment for Plaintiff.

Dated:  December 5, 2007                      Respectfully submitted,


                                                  /s/ Michael R. Charness
                                              _____

                                              Michael R. Charness (D.C. Bar No. 289322)
                                              Alexander O. Levine (D.C. Bar No. 501924)
                                              VINSON & ELKINS, L.L.P.
                                              The Willard Office Building
                                              1455 Pennsylvania Ave. Suite 600
                                              Washington, D.C. 20004
                                              Telephone:  (202) 639-6780
                                              Facsimile:  (202) 639-6640

                                              Attorneys of Record for Public Warehousing
                                              Company K.S.C.



*Agility*

*A New Logistics Leader*

18 January 2007

TO WHOM IT MAY CONCERN

The Sultan Center Food Products Company K.S.C. ("The Sultan Center") is neither a parent nor a subsidiary of The Public Warehousing Company K.S.C.

Yours faithfully

**Elaine Richardson FCIS**
**Group Company Secretary**
**The Public Warehousing Company K.S.C.**

P.O. Box 25418, Safat 13115 Kuwait
Tel. +965 809 222, Fax +965 467 9617
The Public Warehousing Company K.S.C.

ص.ب 25418 الصفاة 13115 الكويت
هاتف 809 222 +965 . فاكس 9617 467 +965
www.agilitylogistics.com    شركة المخازن العمومية ش.م.ك.

**PWC LOGISTICS**

**Tabb, Jamie**

| | |
|---|---|
| **From:** | Charness, Michael |
| **Sent:** | Wednesday, July 25, 2007 9:50 AM |
| **To:** | Tabb, Jamie |
| **Subject:** | FW: FOIA REQUEST 07H032 |

**Attachments:**    rdl sample letterheadfor attachment.doc



rdl sample
etterheadfor attac..

-----Original Message-----
From: Gordon, Pamela (DSCP) [mailto:Pamela.Gordon@dla.mil]
Sent: Wednesday, July 25, 2007 8:04 AM
To: Charness, Michael
Cc: Ingargiola, Andrea (DSCP)
Subject: RE: FOIA REQUEST 07H032

Mr. Charness,
Please see the attached initial determination.
Andrea,
Please begin processing this.  The hard copy will follow.
Pamela Gordon
Office of Procurement Management

-----Original Message-----
From: mcharness@velaw.com [mailto:mcharness@velaw.com]
Sent: Tuesday, July 10, 2007 5:50 PM
To: Gordon, Pamela (DSCP)
Subject: FOIA REQUEST

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
      WEB REQUEST

      Submittor Name:   Michael Charness
      Company Name:     Vinson & Elkins LLP
      Address:  1455 Pennsylvania Avenue NW
                Suite 600
                Washington, DC  20004
      Phone:
      Fax:
      Email:    mcharness@velaw.com

      Document type:   other
      Document Description:
Video recording of oral presentation provided or produced to DSCP by Public Warehousing
Company K.S.C. on or about October 8, 2002 in response to Solicitation SPO300-02-R-4003


      Self Description: company
      Maximum Cost Willing to Pay: 50
      Waiver Explanation:


      Comments:

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Request the above FOIA.

1

An Email has been sent to this requestor saying:

Your FOIA Request has been received.--DSCP FOIA OFFICE



**DEFENSE LOGISTICS AGENCY**
DEFENSE SUPPLY CENTER PHILADELPHIA
700 ROBBINS AVENUE
PHILADELPHIA, PENNSYLVANIA 19111-5092

IN REPLY
REFER TO

This is in response to your Freedom of Information Act (FOIA) request. In accordance with Title 5 United States Code 552a of the Freedom of Information Act, the Defense Supply Center Philadelphia is providing you with a release determination. This release determination has been made on an initial review and could change as circumstances warrant, in which case you would be advised. **Your assigned reference number is 07H032.** The determination is as follows:

   a.  ( ) The record(s) requested is/are releasable and will be forwarded as soon as possible.

   b.  (x ) The record(s) or portions of the records requested is/are not releasable for the following reason(s):

      1.  ( ) exemption (b)(3), a statute that permits no discretion on the issue of release.

      2.  (x ) exemption (b)(4), confidential commercial/financial information provided to the Government by a concerned company(s). Pursuant to Executive Order 12600, dated June 23, 1987, a Predisclosure Notification will be forwarded to the concerned parties. This notice provides the company an opportunity to comment regarding the disclosure. A reply from the company is expected 30 calendar days from the date of this letter. Once a final determination has been made, all releasable records will be forwarded as soon as possible.

      3.  ( ) exemption (b)(5), confidential inter/intra-agency information.

   c.  ( ) The record(s) or portions of the records requested is/are not releasable for the following reason:

      1.  ( ) Records do not exist.

      2.  ( ) Records cannot be located.

A formal letter of explanation will follow as soon as possible. If you have any questions concerning this determination, you may contact Pamela Gordon at the above address or phone 215 737-3283 or e-mail pamela.gordon@dla.mil.

Sincerely,

PAMELA GORDON
Office of Procurement Management

**Tabb, Jamie**

| | |
|---|---|
| **From:** | Gordon, Pamela (DSCP) [Pamela.Gordon@dla.mil] |
| **Sent:** | Tuesday, July 31, 2007 6:25 AM |
| **To:** | Tabb, Jamie |
| **Cc:** | Guydon, Sandra (DSCP); Patkus, John (DSCP) |
| **Subject:** | RE: FOIA request 07H032 |

Thank you for clarifying that.
Pam Gordon

-----Original Message-----
From: Tabb, Jamie [mailto:jtabb@velaw.com]
Sent: Friday, July 27, 2007 2:20 PM
To: Gordon, Pamela (DSCP)
Subject: FOIA request 07H032

Ms. Gordon,

Also, in reference to FOIA request 07H032 - please note that Vinson & Elkins LLP
represents Public Warehousing Co., the author of the materials sought.  I would appreciate
it if you could pass this information along to the individuals who will be making the
final decision on the request.  It will likely affect the applicability of exemptions such
as Exemption 4, which you cited in your initial determination.

Thanks,

Jamie F. Tabb
Associate (not admitted to the District of Columbia bar; directly supervised by licensed
members of the DC bar) Vinson & Elkins LLP The Willard Office Building
1455 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004-1008
Tel 202.639.6773
Fax 202.879.8873
jtabb@velaw.com

# Vinson&Elkins

**Michael R. Charness**  mcharness@velaw.com
**Tel** 202.639.6780  **Fax** 202.879.8980

November 14, 2007

**Via Certified Mail, Return Receipt Requested**

Director, Defense Logistics Agency
ATTN: DSS-C, Corporate Communications
8725 John J. Kingman Road, Suite 2533
Fort Belvoir, VA 22060-6221

      Re:    DSCP FOIA Control Numbers 07H032, 07H033 and 07I481

Dear DLA Director:

      We hereby appeal Defense Supply Center Philadelphia's ("DSCP") "deemed denial" of various requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, submitted on behalf of our client, Public Warehousing Company K.S.C. We filed the requests listed above in July and August of 2007, and despite several phone calls and e-mails, DSCP has failed to issue final determinations in response to our requests. Therefore, pursuant to 5 U.S.C. § 552(a)(6)(C)(i), we are deemed to have exhausted our administrative remedies with respect to DSCP. To the extent that DSCP intended to treat its initial determinations as final determinations, we appeal those initial determinations.

## I.    INTRODUCTION

      We filed the requests listed above on the following dates:

      07H032 – July 10, 2007
      07H033 – July 31, 2007
      07I481 (also referred to as 07H034, 07H035 and 07H036) – August 14, 2007

After submitting each request, Pamela Gordon of DSCP's Office of Procurement Management responded via e-mail with a FOIA control number and an initial determination that the requested material was not releasable. *See* Tabs 2, 4-6.

      In each of her letters, Ms. Gordon indicated that the respective determination had been made on initial review, and "could change as circumstances warrant." *Id.* She also

**Vinson & Elkins LLP  Attorneys at Law**

Austin Beijing Dallas Dubai Hong Kong Houston
London Moscow New York Shanghai Tokyo Washington

The Willard Office Building, 1455 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004-1008
**Tel** 202.639.6500 **Fax** 202.639.6604 **www.velaw.com**

V&E

wrote that "[a] formal letter of explanation will follow as soon as possible." Phone conversations between counsel and Ms. Gordon confirmed that DSCP's official decision on each request would be presented in a final determination letter from the relevant custodian of records.

On September 20, 2007, counsel wrote to Ms. Gordon, requesting anticipated response dates for each of the requests. As Ms. Gordon did not answer, counsel wrote again on September 28. On October 1, Ms. Gordon replied that the response to request no. 07H032 would be sent that week, and that she hoped to have the responses to the other requests in the same time frame. *See* e-mail string at Tab 1.

To date, DSCP has failed to send the final determinations on our requests. As such, we hereby appeal DSCP's deemed denial of all three requests. To the extent that DSCP intended to treat Ms. Gordon's initial determinations as final determinations, we appeal Ms. Gordon's denial of all three requests.

## II.    REQUEST NO. 07H032

On July 10, 2007, we submitted the following request: "Video recording of oral presentation provided or produced to DSCP by Public Warehousing Company K.S.C. on or about October 8, 2002 in response to Solicitation SPO300-02-R-4003." *See* Tab 2. On July 25, 2007, Ms. Gordon assigned to the request FOIA reference number 07H032. She also issued an initial determination that the record was not releasable due to the exemption at 5 U.S.C. § 552(b)(4), which applies to matter that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential." *Id.*

DSCP's reliance on this exemption is patently absurd, as our client Public Warehousing Company K.S.C. ("PWC") is the author of the content in the requested video recording. Our request was submitted on behalf of PWC, and we informed Ms. Gordon of this fact in an e-mail dated July 27, 2007. *See* Tab 3. Nonetheless, DSCP never amended its initial determination. We therefore appeal.

## III.   REQUEST NO. 07H033

On July 31, 2007, we submitted the following request: "All proposals submitted by offerors in response to the following solicitations: SPO300-02-R-4003, SPM300-04-R-

V&E

0323." *See* Tab 4.  On August 1, 2007, Ms. Gordon assigned to the request FOIA reference number 07H033.  *Id.*  She also issued an initial determination that the records were not releasable due to the exemption at 5 U.S.C. § 552(b)(3), which applies to matters that are "specifically exempted from disclosure by statute . . . , provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  *Id.*

Courts have consistently found that the agency invoking a FOIA exemption bears the burden of establishing its right to withhold documents from the public.  *See, e.g., Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 925 (D.C. Cir. 2003).  Ms. Gordon neglected to specify which statute specifically exempts the disclosure of the requested documents.  As such, DSCP has not carried its burden.  We therefore appeal DSCP's initial determination.

## IV.    REQUEST NO. 07I481 (AKA 07H034, 07H035, 07H036)

On August 14, 2007, we submitted the following request:

> All analyses of fairness and reasonableness of prices proposed or offered by Public Warehousing Company K.S.C. under the following contracts: SPO300-03-D-3061, SPM300-05-D-3119, SPM300-05-D-3128.  This includes analyses of prices offered during the life of the contracts, and analyses of prices offered in the proposals that led to the award of the contracts.  Please note that Vinson & Elkins LLP represents Public Warehousing Company K.S.C.

*See* Tab 5.  On August 17, 2007, Ms. Gordon assigned to the request FOIA reference numbers 07H034, 07H035 and 07H036.  *Id.*  She also issued an initial determination that the records were not releasable due to the exemptions at 5 U.S.C. §§ 552(b)(4) (described above) and 552(b)(7)(A).  *Id.*  The latter exemption applies to matters that are "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings."

Later that day, Ms. Gordon sent a "corrected attachment" which assigned to the same request FOIA reference number 07I481.  *See* Tab 6.  She also issued a revised initial

V&E

determination that the records were not releasable due to the exemptions at 5 U.S.C. §§ 552(b)(7)(A) (described above) and 552(b)(5).  *Id.*  The latter exemption applies to matters that are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  *Id.*

## A.    Exemption (7)(A)

In order to withhold a document under 5 U.S.C. § 552(b)(7)(A), the government must show that "(1) a law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm."  *Manna v. U.S. Dep't of Justice,* 51 F.3d 1158, 1164 (3d Cir. 1995).  DSCP has not satisfied either branch of this test.

While not stated in Ms. Gordon's letter, we assume the relevant prospective law enforcement proceeding would be one arising out of the investigation being conducted by the Department of Justice ("DOJ").  If this is indeed the case, we fail to see how disclosure of the "fair and reasonable" price analyses for these contracts, most of which were prepared years before this investigation started, "could reasonably be expected perceptibly to interfere" with such a potential proceeding.  *North v. Walsh,* 881 F.2d 1088, 1097 (D.C. Cir. 1989).

The documents were created by DSCP as a routine task during administration of the cited contracts.  They include no information about potential witnesses, evidence, strategy or the direction of the DOJ investigation.  *See Crowell & Moring v. Dep't of Defense,* 703 F. Supp. 1004 (D.D.C. 1989); *Alyeska Pipeline Serv. v. EPA,* 856 F.2d 309 (D.C. Cir. 1998); *Solar Sources, Inc. v. United States,* 142 F.3d 1033 (7th Cir. 1998).  Thus, it is unclear how DOJ's investigation could be impeded by the release of the documents.

Because DSCP has not carried its burden to demonstrate how release of the documents could "reasonably be expected to interfere" with a law enforcement proceeding, we appeal DSCP's refusal to release the documents.

## B.    Exemption 5

The exemption at 5 U.S.C. § 552(b)(5) is meant to protect "those documents, and only those documents, normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149 (1975).  We are aware of no privilege that would prevent

V&E

discovery of the DSCP's "fair and reasonable" price analyses in civil litigation, and DSCP has not specified any such privilege. Therefore, we appeal DSCP's denial of our request on this ground as well.

## V.    CONCLUSION

For the reasons noted above, we appeal DSCP's deemed denial of FOIA requests 07H032, 07H033 and 07I481. Alternatively, we appeal DSCP's initial determinations denying these requests.

Please be advised that the FOIA statute requires the Defense Logistics Agency to respond to this appeal within 20 business days. *See* 5 U.S.C. § 552(a)(6)(A)(ii). We look forward to receiving your response within this time frame.

Sincerely,

Michael R. Charness
Attorney for Public Warehousing Company, K.S.C.

Enclosures

Government will be treated as reasonably available. What is significant depends upon the circumstances of each acquisition.

(d) Possession of a Certificate of Current Cost or Pricing Data is not a substitute for examining and analyzing the contractor's proposal.

(e) If cost or pricing data are requested by the Government and submitted by an offeror, but an exception is later found to apply, the data shall not be considered cost or pricing data and shall not be certified in accordance with this subsection.

[62 FR 51230, Sept. 30, 1997, as amended at 66 FR 2129, Jan. 10, 2001]

### 15.406–3 Documenting the negotiation.

(a) The contracting officer shall document in the contract file the principal elements of the negotiated agreement. The documentation (e.g., price negotiation memorandum (PNM)) shall include the following:

(1) The purpose of the negotiation.

(2) A description of the acquisition, including appropriate identifying numbers (e.g., RFP No.).

(3) The name, position, and organization of each person representing the contractor and the Government in the negotiation.

(4) The current status of any contractor systems (e.g., purchasing, estimating, accounting, and compensation) to the extent they affected and were considered in the negotiation.

(5) If cost or pricing data were not required in the case of any price negotiation exceeding the cost or pricing data threshold, the exception used and the basis for it.

(6) If cost or pricing data were required, the extent to which the contracting officer—

(i) Relied on the cost or pricing data submitted and used them in negotiating the price;

(ii) Recognized as inaccurate, incomplete, or noncurrent any cost or pricing data submitted; the action taken by the contracting officer and the contractor as a result; and the effect of the defective data on the price negotiated; or

(iii) Determined that an exception applied after the data were submitted

and, therefore, considered not to be cost or pricing data.

(7) A summary of the contractor's proposal, any field pricing assistance recommendations, including the reasons for any pertinent variances from them, the Government's negotiation objective, and the negotiated position. Where the determination of price reasonableness is based on cost analysis, the summary shall address each major cost element. When determination of price reasonableness is based on price analysis, the summary shall include the source and type of data used to support the determination.

(8) The most significant facts or considerations controlling the establishment of the prenegotiation objectives and the negotiated agreement including an explanation of any significant differences between the two positions.

(9) To the extent such direction has a significant effect on the action, a discussion and quantification of the impact of direction given by Congress, other agencies, and higher-level officials (i.e., officials who would not normally exercise authority during the award and review process for the instant contract action).

(10) The basis for the profit or fee prenegotiation objective and the profit or fee negotiated.

(11) Documentation of fair and reasonable pricing.

(b) Whenever field pricing assistance has been obtained, the contracting officer shall forward a copy of the negotiation documentation to the office(s) providing assistance. When appropriate, information on how advisory field support can be made more effective should be provided separately.

### 15.407 Special cost or pricing areas.

### 15.407–1 Defective cost or pricing data.

(a) If, before agreement on price, the contracting officer learns that any cost or pricing data submitted are inaccurate, incomplete, or noncurrent, the contracting officer shall immediately bring the matter to the attention of the prospective contractor, whether the defective data increase or decrease



Search our site for...  Go

Contact Us | Employee LOG IN

**DEFENSE CONTRACT MANAGEMENT AGENCY**

| ABOUT US | CUSTOMERS | EMPLOYEES | NEWS ROOM | eTOOLS | SMALL BUSINESS | CAREERS | Info Memos | Policy |

| Instructions | Guidebook | Points of Contact | Community of Practice |

| Process | Tools & Additional Guidance | Performance | Successful Practices | Process Information | Training |

Process
Flowchart

Guidebook

# Pricing and Negotiation

## Process - Process Description

**1. DCMA performs contract pricing in either of two ways:**

1.1. IPT Pricing:
Buying commands' synonyms for IPT Pricing include Alpha Contracting, One Pass Contracting, Massive Concurrency, Shoulder-to-Shoulder, etc. IPT Pricing is all the Government participants (i.e., DCMA, DCAA, and the buying command) getting together as a team to stay in continuous communication with the contractor while the contractor is developing the proposal. The team concurrently evaluates, analyzes, fact-finds, and even resolve issues as the proposal is being developed. Typically, by the time the formal proposal is ready to be submitted, there are only a few issues remaining to be resolved, and those can be dealt with relatively quickly. While IPT pricing is normally used for contract pricing of major weapon systems, it may also lend itself to other types of negotiations. For instance, DCMA-negotiated Forward Pricing Rate Agreements (FPRAs) (refer to *Forward Pricing Rate Agreements* process), is an excellent candidate for IPT pricing.

1.2. Other Contract Pricing:
Other Contract Pricing includes all other DCMA contract pricing. This is any contract pricing effort that does not use the IPT pricing process. Other Contract Pricing can take on many forms depending upon the needs of the Program Manager (PM), the PCO, or the ACO (on DCMA-negotiated actions).

**2. Commercial Item Determination.** DCMA guidance is that determination of an item's commerciality (Commercial Item Handbook) is the responsibility of the PCO. If issues arise concerning the commercial designation of an item, those issues are referred to the PCO for resolution. This guidance applies even in cases where DCMA has been delegated negotiation authority. This does not relieve DCMA team members from the responsibility for establishing price reasonableness using appropriate analytical techniques.

**3. IPT PRICING:**

3.1. DCMA personnel participate on IPT Pricing teams when requested by the Program Manager (PM), the PCO, or the ACO. DCMA fully satisfys the customer's (buying command or ACO) pricing assistance needs, and provides team members to meet those needs. Team members may include contract administrators/specialists, engineering, industrial specialists, quality, transportation, pricing and auditing.

3.1.1. REACH AGREEMENT ON OVERALL TEAM PLAN:

3.1.1.1. IPT Pricing is characterized by communication between the contracting parties to facilitate proposal analysis and negotiation, and resolve as

3.2.7.1. Regardless of who performs the negotiation (buying command or DCMA), DCMA personnel are to be fully responsive to the negotiator's requests to attend the negotiation.

3.2.7.2. During negotiation, should a contractor insist upon a price that the negotiator considers unreasonable, the matter is escalated through the management chain of command, both within DCMA and the customer Service, until resolved. There should be no trepidation about involving Headquarters when local avenues have been exhausted.

### 3.2.8. PREPARE PRICE NEGOTIATION MEMORANDUM:
Negotiation of Fair and Reasonable Prices (INFORMATION)

3.2.8.1. At the conclusion of negotiation, a PNM is prepared. The purpose of the PNM is to document and support the determination that the negotiated settlement is fair and reasonable. ( Adequate Documentation) The PNM also serves as a key document in Defective Pricing cases. The minimum requirements for a PNM are set forth in FAR 15.406-3. The negotiator is responsible for preparing the PNM.

3.2.8.2. The good PNM includes:

- discussion of price analysis performed or reasons why it was not performed;
  identification of cost or pricing data, and the extent to which the government relied on it;
  discussion of rationale for final disposition of audit recommendations and costs questioned;
- comments on the status of Contractor Systems.

3.2.8.3. As with the Prenegotiation Objectives, the scope and depth of the PNM should be directly related to the dollar value, importance, complexity, and most importantly, the degree to which the Prenegotiation Objectives were achieved during negotiation.

3.2.8.4. When the results of the negotiation do not differ significantly from the Prenegotiation Objectives, the PNM may be an addendum to the Prenegotiation Objectives Document. If used, the addendum addresses the reasons for differences between the results and the Prenegotiation Objectives.

### 3.2.9. RECEIVE APPROVAL OF PRICE NEGOTIATION MEMORANDUM:

3.2.9.1. Review and approval of the PNM follows the same procedures as for Prenegotiation Objectives. (See Paragraph 3.2.5. above.) Review of the draft contract document is an integral part of PNM approval.

3.2.9.2. For actions not exceeding $25,000, where the Prenegotiation Objectives were achieved during negotiation, the requirement for review and approval of the PNM may be waived by CMO management; any local PNM procedure for this needs to be in writing.

### 3.2.10. COMPLETE DISTRIBUTION REQUIREMENTS:  PNMs are distributed to DCAA and any other offices that provided assistance.

4. CUSTOMER REQUIREMENT:  On January 25, 2002, GAO issued Government Auditing Standard No. 3, "Independence," requiring the DCAA auditor and any technical specialist providing support to an audit to be free both in fact and appearance from personal and external impairments to independence. The standard can be accessed at http://www.gao.gov/ under Other Publications, click on The Yellow Book. This standard, effective January 1, 2003, requires the auditor seeking technical support to obtain representations from the technical specialist that s/he is independent from the activity or program under audit. A sample  DCAA request for technical assistance containing the requirements of the new standard and their request for a signed statement is provided as Attachment 1. The DCMA technical specialist/s signs and returns



# DLAD PART 15

- 15.101-90 Phased competition

- SUBPART 15.2 - SOLICITATION AND RECEIPT OF PROPOSALS AND INFORMATION
  - 15.201 Exchanges with industry before receipt of proposals.
  - 15.204 Contract format.
    - 15.204-2 Part I--The Schedule.
    - 15.204-3 Part II--Contract Clauses.
    - 15.204-5 Part IV Representations and Instructions.
  - 15.209 Solicitation Provision and Contract Clauses
- SUBPART 15.3 - SOURCE SELECTION
  - 15.301 Definitions.
  - 15.303 Responsibilities.
  - 15.304 Evaluation factors and significant subfactors.
    - 15.304-90 Automated best value system.
  - 15.305 Proposal Evaluation.
  - 15.308 Source Selection Decision
- SUBPART 15.4 – CONTRACT PRICING
  - 15.401 Definitions.
  - 15.402 Pricing policy.
  - 15.403 Obtaining cost or pricing data.
    - 15.403-1 Prohibition on obtaining cost or pricing data (10 U.S.C. 2306a and 41 U.S.C. 254b).
    - 15.403-4 Requiring cost or pricing data (10 U.S.C. 2306a and 41 U.S.C. 254b).
    - 15.403-4(b)(91) Cost or pricing data for indefinite quantity and requirements contracts.
    - 15.403-5 Instructions for Submission of Cost or Pricing Data or Information Other Than Cost or Pricing Data.
  - 15.404 Proposal analysis.
    - 15.404-1 Proposal analysis techniques.
    - 15.404-2 Information to support proposal analysis.
    - 15.404-4 Profit.
    - 15.404-73 Alternate structured approaches.
    - 15.404-71-4 Facilities capital employed.
  - 15.405 Price negotiation
  - 15.406 Documentation
    - 15.406-1 Prenegotiation objectives.
    - 15.406-3 Documenting the negotiation.
  - 15.407 Special cost or pricing areas.
    - 15.407-1 Defective cost or pricing data.
    - 15.407-5 Estimating systems.
  - 15.408 Solicitation provisions and contract clauses.

(1) **DESC** petroleum acquisitions not involving a cost proposal audit, that consist entirely of unrelated line items that are consolidated solely for administrative purposes. The briefing in such cases may be conducted at a level lower than the chief of the contracting office when no single line item is valued $200,000 or more, even though the total acquisition is valued $500,000 or more.

(2) For **DSCP**, subsistence actions cited at **15.406-1(b) (91)** may be delegated, regardless of dollar value, by the chief of the contracting office to the Defense Subsistence Region commanders, with redelegation authorized to the purchasing division chiefs.

(3) Orders against Federal Supply Schedules or mandatory orders placed under the Javits-Wagner-O'Day Act (FAR Subpart 8.7).

*15.406-3 Documenting the negotiation.*

(a) While excessive detail should be avoided, the PNM, standing alone, must convince all reviewers that the price negotiated (or awarded without negotiations**)** was reasonable, given the circumstances of the particular acquisition. Although the content will vary depending on the magnitude of the contract, contract type, cost or pricing data obtained, the extent of negotiations, etc., a standard format should be used. The PNM should have the following subdivisions: "Subject," "Introductory Summary," "Particulars," "Procurement Situation," "Negotiation Summary," and "Miscellaneous." For acquisitions involving cost or pricing data, the Negotiation Summary shall include a schedule reflecting each element of cost and profit in the contractor's proposal, the approved negotiation objectives, any revised proposal or negotiation objective, and the final negotiated amount. A copy of the PBM, along with any changes thereto, shall accompany and be listed as an attachment to the PNM.

**(11) The price reasonableness determination shall be documented in the contract file and in appropriate automated price history records (e.g., SAMMS price reasonableness codes). It is essential to accurately complete the price reasonableness codes, because when conducting price analysis on future proposed prices for the same or similar items, the contracting officer cannot consider a comparison of prior contract prices with current proposed prices to be valid if the prior price was unreasonable (see FAR 15.404-1(b)(2)(ii).**

**(b)(90)(1)** A copy of the PNM shall **also** be furnished to the **local** cost/price analyst, value engineer, and/or other technical specialist that was involved in **any** price review or negotiation.

**(b)(90)(2)** When an IGE was furnished for assistance in proposal evaluation, the contracting officer should assure information on its utility is included in the Contracting Technical Data File and any other local data bases for future reference. Additionally, the contracting officer should forward this information, along with any specific suggestions based on lessons learned on the buy, to the office(s) preparing and furnishing the IGE.

*15.407 Special cost or pricing areas.*

*15.407-1* **Defective cost or pricing data.**

(b)(7) The 26 U.S.C. 6621 quarterly interest rate cited in the corresponding FAR paragraph, is published in an Internal Revenue Bulletin the Federal Register during the third week of March, June, September and December. **The annual rate for the forthcoming quarterly period and information on its application is available on the DLA Pricing Webpage at http://www.dla.mil/j-3/j-336/Pricing/Default%20test.asp .**

(d)(90) If, following review by the pricing element and legal (see 1.691(a)) and approval in accordance with **15.406-1**(b)(91), the contracting officer's planned settlement objective is less than 70 percent of the amount reported by the GAO, DoD IG, or DCAA, a copy of the approved briefing memorandum, including the audit and pricing reports and other relevant documentation (see **15.406-1**(b)(91)(5) and (93)), shall be furnished for receipt in HQ DLA, ATTN: **J-73** at least **10** working days prior to initiating settlement action with the contractor.

*15.407-5* **Estimating systems.**

Refer to DFARS 215.407-5-70, Disclosure, maintenance, and review requirements, **215.407-5-70**(g)(2)(vi) and (3). See **also** subpart 17.92.

(b**)(91)** Follow-up on contract audit reports.

**(a)** Responsibility of the chief of the contracting office. The contract follow-up official for DLA contracting offices

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PUBLIC WAREHOUSING COMPANY K.S.C., | ) ) ) | |
| v. | ) ) | Civil Action No. 07-01476 (RBW) |
| DEFENSE SUPPLY CENTER PHILADELPHIA, THE DEFENSE LOGISTICS AGENCY, and THE DEPARTMENT OF DEFENSE. | ) ) ) ) ) | |

### AFFIDAVIT OF GARY T. RIVERS, Jr.

I, Gary T. Rivers, Jr., declare as follows:

1.     I am Gary T. Rivers, Jr., a part-time consultant working with Leading Edge Systems Richmond ("LESR") and Service & Sales, Inc. ("SSI"), two DLA small business contractors.  I perform price reviews on various Defense Supply Center Richmond ("DSCR") purchases for LESR and assist in resolving contractual issues for SSI.

2.     I have been asked to provide this affidavit to provide details regarding what types of information are included in Price Negotiation Memoranda ("PNMs").  I am familiar with PNMs from my 34 years working as a contracting official at DSCR.  DSCR is a sibling group to the Defense Supply Center Philadelphia ("DSCP"), with both groups falling under the auspices of the Defense Logistics Agency ("DLA").

3.     At DSCR, I retired as the senior contracting official in a DSCR Product Center (division).  In this position I had an unlimited contracting officer's warrant and supervised approximately 50 contract specialists and support personnel.  I reviewed and approved contract actions including Pre-negotiation Briefing Memoranda, Price Negotiation Memoranda and contract awards.

1

4.     The purpose of the PNM is to document the agency's negotiated price agreement with the contractor, as well as the price negotiation process between the agency and the offerors determined to be in the competitive range. This usually includes an analysis of the contractor's price proposal as well a price or cost reasonableness analysis of the contractor's cost or pricing data. The PNM is written after the negotiation process is complete, and after the contracting officer has made his or her choice for award.

5.     The focus of the PNM is on the negotiated price agreement, and the bulk of the PNM is dedicated to that agreement. The information in the PNM supports the fairness and reasonableness of the prices agreed upon with the firm the contracting officer has chosen for award. Accordingly, while some sections of the PNM discuss other offerors within the competitive range, these sections are not as detailed as those discussing the firm the contracting officer has chosen for contract award. Additionally, the sections including information submitted by other offerors tend to be drafted as distinct paragraphs or sections, and could be easily redacted if necessary.

6.     Furthermore, information from other offerors is limited to material from those offerors' price proposals. The prices submitted by other offerors are often used to demonstrate why the prices of the contracting officer's choice for contract award are fair and reasonable. It would be very unusual for a PNM to contain information from the other sections of an offeror's bid, such as its technical and business proposals. It is worth emphasizing that the PNM does not include information submitted by all offerors, but rather only offerors whose prices are determined to be within the competitive range.

7.     Any information from other offerors appearing in the PNM is taken from submissions required under the terms of the request for proposals ("RFP"), or solicitation.

Voluntarily provided information not required under the RFP would not appear in the PNM. The reason for this is that additional voluntarily-provided information would have little bearing on price negotiations or the agreed-upon price.

8.      Once the PNM is written, it is incorporated into the contract file as documentation of the negotiated agreement reached between the agency and the contractor, as well as the reasonableness of that agreement. The stated agreement and rationale for that agreement are added into the contract file to document the contracting officer's decision.

9.      The PNM is distinct from the pre-negotiation briefing memorandum, which is drafted by the agency prior to the negotiation. The pre-negotiation memorandum includes assessments and evaluations of offerors' proposals that were made prior to the beginning of negotiations. While the pre-negotiation briefing memorandum may sometimes be attached to the PNM, it is not normally considered part of the PNM. The PNM and the pre-negotiation briefing memorandum are usually two distinct documents.

10.     The PNM is also distinct from documents drafted by evaluators, such as a Source Selection Advisory Council ("SSAC") report. The SSAC report contains an evaluation of all offerors' proposals, which include information other than price. In contrast, the PNM focuses on price negotiation alone. Its purpose is to demonstrate price reasonableness, rather than to document agency deliberations and comparisons. The PNM does not contain a tradeoff analysis comparing one offeror's proposal to the others.

3

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

IN WITNESS WHEREOF, the undersigned has executed this affidavit on December 4, 2007.

Gary T. Rivers, Jr.

Sworn to and subscribed
before me this 4th day
of December, 2007.

Notary Public

My commission expires: My Commission Expires March 31, 2009

4

*Consider Defective Pricing Significance* (FAR 15.407-1(b), 52.215-10, 52.215-11, DCAM 14-120.1, and Kaiser Aerospace & Electronics Corp., 90-1 BCA ¶22,489).

The FAR defective pricing clauses provide that the Government is entitled to remedies if a contract price was increased by any "significant amount," because the contractor provided cost or pricing data that were not complete, accurate, and current. However, it does not define what amount is significant.

One BCA found that the Government was entitled to a reduction of $5,000 even though that amount was only two-tenths of one percent of the contract price. The decision pointed out that the language of the Truth in Negotiations Act does not vest in a contractor the right to keep amounts obtained through supplying defective pricing data on the grounds that the amount so obtained was insignificant in relation to the overall contract price.

However, substantial resources are required to identify, pursue, and settle defective pricing allegations. Accordingly, you should consider the materiality of alleged defective pricing before you decide to pursue the allegation.

There are no universal Government policy on materiality, but DCAA provides one useful guideline. In DCAA potential price adjustments of less than five percent of contract price or $50,000, whichever is less, are normally considered immaterial and not pursued unless:

- A contractor's deficient estimating practices have resulted in recurring defective pricing; or
- The potential price adjustment is due to a system deficiency which affects all contracts priced during the period.

*Request a Defective Pricing Audit* (FAR 15.407-1(c)). If you still suspect that the contract price significantly increased because of defective cost or pricing data, request an audit to evaluate the accuracy, completeness, and currency of the cost or pricing data submitted by the contractor through the close of negotiations. As part of your request, provide the following information:

- Identify the data that you suspect are defective.
- Describe, in detail, your reasons for suspecting that the data are defective.
- Provide the auditor a copy of:
  - The PNM if one was not previously provided.
  - The final proposal index of cost or pricing data provided by the contractor.
  - Any cost or pricing data provided to the contracting officer to support the contractor's pricing proposal, but not previously provided to the auditor.
- If the auditor needs any additional information or support to complete the audit, you should provide it in a timely manner.

## 5.2 Developing The Government Position On Price Adjustment

*Requirement for Prompt Audit Resolution* (FAR 15.407-1, DODD 7640.2, and OMB Circular A-50).

The first step in developing a Government position on a price reduction for defective pricing is a post-award audit. Although the FAR requires contracting officers to request a Government audit when they suspect defective pricing, most audits that identify defective pricing are undertaken as part of a

you develop your prenegotiation objectives. Limit the data released to that used as a basis for the prime contract price reduction.

- If there is some reason that you are unable to release the entire audit report, provide the contractor with a detailed summary of key elements.
- If the defective pricing allegations relate to subcontractor data, provide information necessary to support a prime contract price reduction available to the prime contractor. Assure that you do not disclose subcontractor trade secrets or confidential business information.
- If the contractor requests a copy of the price negotiation memorandum (PNM), most agencies authorize contracting officer release of pertinent portions. However, you should consult your agency legal counsel to determine your authority for release and any conditions required for release.

Establish a reasonable date for contractor response (normally 30 days). The period for response may be extended if necessary, but you should always emphasize to the contractor that a timely and complete response is essential to timely disposition of the defective pricing allegations.

*Review Information Available Within Government Resources.*  Review the PNM and other information available within Government resources related to cost or pricing data submission and contract negotiation. Weigh the audit findings against any other information identified.

- In particular, you should consider the documentation in the PNM. The PNM should provide essential information concerning the cost or pricing data submitted by the contractor and the reliance placed on that data in contract pricing.
- You may find documents that clearly support the position that the data were defective and significantly affected the negotiated price.
- You may find other documents with information indicating that the data were not defective, such as:
  - Additional proposal updates provided by the contractor during the course of negotiations (e.g., later purchase orders, more current labor and overhead rates, or production techniques proposed by the contractor during negotiations).
  - Evidence indicating that the defective data did not have a significant effect on contract price because the contracting officer did not rely on it.
- Collect factual information and documentation from engineers, price analysts, production specialists, and others who may possess information on the preaward negotiation process that is not included in the contract file.

*Review the Contractor's Response* (FAR 15.407-1(b)(3), 15.407-1(d), Univ. of Cal., San Francisco, 97-1 BCA ¶28,642, and M-R-S Mfg. Co. v. U.S., 203 Ct.Cl. 551, 492 F.2d 35).

Review the contractor's response to identify areas of agreement and the contractor's rationale for any disagreement. If the contractor agrees with the audit findings, your task is easy. Occasionally, a contractor will even submit a check with its audit response. However, more often, the contractor will submit a rebuttal to the audit findings.

Obtain support as necessary from other members of the negotiation team. Support from the cognizant auditor and legal counsel can be particularly valuable.

Remember that the Government's right to a price adjustment is not affected by any of the following

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PUBLIC WAREHOUSING COMPANY    )
K.S.C.,    )
   )
v.    )    Civil Action No. 07-01476 (RBW)
   )
DEFENSE SUPPLY CENTER    )
PHILADELPHIA, THE DEFENSE    )
LOGISTICS AGENCY, and THE    )
DEPARTMENT OF DEFENSE.    )
_____

## PROPOSED ORDER AND JUDGMENT

Having considered the parties' cross-motions for summary judgment, it is hereby

ORDERED that Plaintiff's motion for summary judgment is GRANTED; it is

FURTHER ORDERED that Defendants' motion for summary judgment is DENIED; it is

FURTHER ORDERED that Defendants release the price negotiation memoranda requested under Plaintiff's Freedom of Information Act request, for Defense Supply Center Philadelphia contracts SPO300-03-D-3061 and SPM300-05-D-3128 to Plaintiff by no later than five (5) calendar days from entry of this Order; it is

FURTHER ORDERED that Defendants shall pay the Plaintiff's costs and reasonable attorneys fees incurred in this action; it is

FURTHER ORDERED that JUDGMENT is entered for Plaintiff; and, it is

FURTHER ORDERED that this Order and Judgment shall constitute a FINAL JUDGMENT in this case.

SO ORDERED.

SO ORDERED, this _____ day of December, 2007.

                                                           _____

The Honorable Reggie B. Walton
United States District Judge