UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
PUBLIC WAREHOUSING COMPANY                )
K.S.C.,                                   )
                                          )
          Plaintiff,                      )
                                          )
          v.                              )          Civil Action 07-1476 (RBW)
                                          )
DEFENSE SUPPLY CENTER PHILADELPHIA,       )
THE DEFENSE LOGISTICS AGENCY and          )
THE DEPARTMENT OF DEFENSE,                )
                                          )
          Defendants.                     )
_____)

### MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN CAMERA REVIEW

In this action, which was brought pursuant to the Freedom of Information Act ("FOIA"), the Public Warehousing Company ("PWC") is seeking to obtain the price negotiation memoranda (the "PNMs") that the Defense Supply Center Philadelphia (the "DSCP") created in connection with its award of three government contracts to PWC. Defendants have moved for summary judgment on the grounds that: (1) no PNM was created for one of the three contracts at issue (SPM300-05-D-3119); and (2) the PNMs created in connection with the other two contracts (SPO300-03-D-3061 and SPM300-05-D-3128) are properly withheld pursuant to FOIA exemptions 3, 4, 5 and/or 7(A). For the reasons stated in Defendants' opening brief, as well as those set forth below, Defendants respectfully submit that this Court should grant their motion for summary judgment and dismiss this action.

## ARGUMENT

**I.    PWC's Request for the PNM for SPM300-05-D-3119 Was Properly Denied.**

Raymond G. Miller—a current DSCP employee who supervises the DSCP contracting officers who interact with PWC, is knowledgeable about the agency's use of PNMs with respect to PWC and "would know of all PNMs created in connection with contracts awarded to PWC"— has stated under oath that "[n]o PNM was created for SPM300-05-D-3119."  (Miller Decl. ¶¶1, 3, 7; Supp. Miller Decl. ¶1.)[1]  This is because SPM300-05-D-3119 was the result of an "emergency acquisition" where "offers were solicited from one source only."  (Miller Decl. ¶7.) PWC has not provided this Court with any reason to question Mr. Miller's sworn statement. Thus, this action should be dismissed to the extent it seeks the PNM for SPM300-05-D-3119.

**II.   PWC's Requests for the PNMs for SPO300-03-D-3061 and SPM300-05-D-3128 Were Properly Denied.**

The PNMs for SPO300-03-D-3061 and SPM300-05-D-3128 are protected from disclosure by FOIA exemptions 3, 4, 5 and/or 7(A).[2]

1.    Exemption 3.

Defendants have argued that the portions of the PNMs that contain information from the proposals of the unsuccessful offerors fall within the scope of the National Defense Authorization Act (the "NDAA"), and are thus properly withheld under exemption 3.  (See

---

[1] Citations in the form "(Miller Decl. ¶__)" refer to the Declaration of Raymond G. Miller, which Defendants submitted with their opening brief.  Citations in the form "(Supp. Miller Decl. ¶__)" refer to the Supplemental Declaration of Raymond G. Miller, attached hereto.

[2] PWC implies that Defendants have acted improperly in this litigation because they have invoked more exemptions than the DSCP invoked in its initial response to PWC's FOIA request. (See PWC Mem. at 3.)  However, it is settled law that, in litigation, an agency is not bound by the exemptions it relied upon at the administrative stage.  See Young v. Cent. Intelligence Agency, 972 F.2d 536, 538 (4th Cir. 1992) ("an agency does not waive FOIA exemptions by not raising them during the administrative process"); see also Ford v. West, No. 97-1342, 1998 WL 317561, at *1 (10th Cir. 1998); Dubin v. Dep't of Treasury, 555 F. Supp. 408, 411-12 (N.D. Ga. 1981), aff'd, 697 F.2d 1093 (11th Cir. 1983).

Defs.' Mem. of Points & Authorities ("Defs.' Mem.") at 5.)  Exemption 3 protects from disclosure materials that are "specifically exempted from disclosure by [a] statute [other than FOIA]."  5 U.S.C. § 552(b)(3).  And, the NDAA prohibits the release of "a proposal in the possession or control of an executive agency . . . to any person."  41 U.S.C. § 253b(m)(1).[3] Thus, to the extent the PNMs contain information from the proposals of the unsuccessful offerors, they clearly fall within the scope of the NDAA and may be withheld pursuant to exemption 3.

PWC does not dispute that documents that fall within the scope of the NDAA are properly withheld under exemption 3.  (See PWC's Mem. of Points & Authorities ("PWC's Mem.") at 8-10.)  Instead, it argues that the portions of the PNMs that contain information from the proposals of the unsuccessful offerors do not fall within the scope of the NDAA because the PNMs "are not [themselves] 'proposals.'"  (Id. at 8.)  PWC is attempting to draw a false distinction between proposals sent to an agency (which it concedes are protected by the NDAA) and agency-created documents that repeat the very information contained in those proposals (which it says are not protected by the NDAA).  However, information contained in a proposal does not lose its protection merely because the agency has copied it into another document.

PWC also argues that the portions of the PNMs that contain information from the proposals of the unsuccessful offerors are not protected by the NDAA because the PNMs "do not focus on the details of losing offerors' proposals."  (Id. at 8.)  However, the "focus" of the PNMs

---

[3] The NDAA defines the term "proposal" broadly to include "any proposal, including a technical, management, or cost proposal, submitted by a contractor in response to the requirements of a solicitation for a competitive proposal."  41 U.S.C. § 253b(m)(3).

is irrelevant to whether those portions of the PNMs that in fact contain information from the proposals of the unsuccessful offerors fall within the scope of the NDAA.[4]

To the extent PWC is arguing that none of the information contained in the PNMs falls within the scope of the NDAA because the PNMs do not contain information from the proposals of the unsuccessful offerors, it is wrong.  (See id. at 8-9.)  Mr. Miller's sworn declarations establish that the PNMs include a substantial amount of detailed information from the proposals of the unsuccessful offerors, including:  (1) the "prices offered"; (2) the "business proposal of each offeror"; (3) the "technical proposal of each offeror"; (4) the "location and capacity of storage facilities of the offerors"; (5) the "methods of inventory control of each offeror"; (6) the "quality control and assurance programs of each offeror"; (7) the "[s]ecurity measures of each offeror"; (8) the "suppliers of each offeror"; (9) the "[m]anagement practices of each offeror"; and (10) the key "[e]mployees of each offeror."  (Miller Decl. ¶17; Supp. Miller Decl. ¶6.)[5]  The fact that the PNMs are not required to include information from the proposals of the unsuccessful offerors (see 48 C.F.R. 15.406-3(a)) does not mean—as PWC repeatedly asserts throughout its brief (see, e.g., PWC Mem. at 9, 11, 13)—that they contain little or no information from those

---

[4] In actuality, over half of the PNMs are comprised of information from the unsuccessful offerors' proposals.  (Supp. Miller Decl. ¶6.)

[5] PWC relies heavily on statements submitted by Gary T. Rivers, Jr. to rebut Mr. Miller's testimony regarding the contents of the PNMs.  (See, e.g., PWC Mem. at 6, 8, 11.)  This reliance is misplaced.  Mr. Miller is a current employee of the division within the DSCP that created the PNMs (the Subsistence Supplier Operations Supply Chain), and he supervises the DSCP contracting officers who created the PNMs.  (See Miller Decl. ¶¶1, 3; Supp. Miller Decl. ¶1.)  Mr. Rivers, by contrast, is not now and has never been a DSCP employee, much less an employee of the Subsistence Supplier Operations Supply Chain.  Nor is there any indication that he has reviewed PNMs created by the Subsistence Supplier Operations Supply Chain, much less the PNMs at issue in this case.  Thus, Mr. Rivers' testimony as to what information DSCP employees did and did not include in the PNMs at issue is of little consequence.  Notably, Mr. Rivers has acknowledged that, in his experience, "some sections of [PNMs] discuss other offers."  (Rivers Aff. ¶5.)

proposals.  In fact, the PNMs "discuss and analyze the significant elements of <u>every</u> contract proposal in great detail."[6]  (Supp. Miller Decl. ¶5 (emphasis added); <u>see</u> <u>id.</u> at ¶6.)

Finally, PWC argues that the NDAA does not protect from disclosure information from PWC's own proposals.  (PWC's Mem. at 9.)  Defendants agree.  To the extent the PNMs contain information from PWC's proposals, that information is not being withheld pursuant to exemption 3.  Rather, it is being withheld pursuant to exemptions 5 and 7(A).

> 2.    <u>Exemption 4.</u>

Defendants have also argued that the portions of the PNMs that contain information from the proposals of the unsuccessful offerors may be withheld pursuant to exemption 4 because they contain information that (1) was "obtained from a person," (2) is "commercial" in nature and (3) is "confidential."  5 U.S.C. § 552(b)(4).  (<u>See</u> Defs.' Mem. at 6-12.)  Despite PWC's arguments to the contrary, Defendants have properly invoked exemption 4.

> a.    *The PNMs contain information "obtained from a person."*

There can be no reasonable dispute that the portions of the PNMs that contain information from the proposals of the unsuccessful offerors contain information "obtained from a person."  The term "person" has been broadly defined to include individuals, as well as corporations and other business entities.  <u>See</u> 5 U.S.C. § 551(2) (defining "person" to include "an individual, partnership, corporation, association, or public or private organization other than an agency"); <u>see also</u> <u>Nadler v. Fed. Deposit Ins. Corp.</u>, 92 F.3d 93, 95 (2d Cir. 1996); <u>Airline Pilots Ass'n, Int'l v. U.S. Postal Serv.</u>, No. 03-2384, 2004 WL 5050900, at *3 (D.D.C. June 24, 2004).

---

[6] PWC recognizes that one purpose of the PNMs is to document and support the determination that the negotiated agreement with the contract awardee is fair and reasonable. (<u>See</u> PWC Mem. at 16 (citing PWC Ex. E at § 3.2.8.1); <u>see also</u> PWC Ex. F.)  Given this purpose, it makes perfect sense that the PNMs include not just the details of the accepted proposal, but also those of the proposals that were deemed less favorable.

Indeed, PWC appears to concede (as it must) that any information contained in the PNMs that was obtained from the unsuccessful offerors was "obtained from a person."  (See PWC's Mem. at 11-12 (because the PNMs "may contain information on other offerors," some "of the information in the PNMs [might] qualify as being obtained [from] a 'person'").)  Nevertheless, PWC argues that "[m]ost of the contents of the [PNMs]" were not "obtained from a 'person'" (other than PWC) because the Code of Federal Regulations does not "require[] information from losing offerors' proposals to be included in the [PNMs]."  (Id. at 11.)  Yet, as stated above, the fact that the PNMs are not required to include information from the proposals of the unsuccessful offerors does not mean that they do not in fact include such information.  (See supra at 4-5.)  And, Mr. Miller has submitted sworn declarations stating that the PNMs do include a substantial amount of such information.  (See Miller Decl. ¶17; see also Supp. Miller Decl. ¶6 ("Over half of the two PNMs at issue in this case are comprised of information from the unsuccessful offerors' proposals.").)  To the extent the PNMs contain information from the proposals of the unsuccessful offerors, they clearly contain information "obtained from a person."[7]

> b.  *The PNMs contain "commercial" information.*

PWC does not—and could not—dispute that the PNMs contain "commercial" information.  (See PWC Mem. at 10-14.)  Information is "commercial" so long as the submitting party has "a commercial interest" in it.  See Pub. Citizen Health Research Group v. Food & Drug Admin., 704 F.2d 1280, 1290 (D.C. Cir. 1983).  Here, the PNMs contain information from each

---

[7]  Although the PNMs were created by the government (which is not a "person" for purposes of exemption 4), the information contained therein is "covered by Exemption 4 if the[] [PNMs] contain summaries or reformulations of information supplied by a source outside of the government."  Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 29 (D.D.C. 2000).  Here, the PNMs contain information provided by the unsuccessful offerors (see, e.g., Miller Decl. ¶17), and that is the only information that is being withheld under exemption 4.  Thus, the fact that the government created the PNMs is irrelevant.

offeror's contract proposal, including the offeror's offer price, business proposal, technical proposal, storage capabilities and methods of inventory and quality control. (<u>See</u> Miller Decl. ¶17.) The offerors clearly have "a commercial interest" in that information. <u>See</u> <u>Pub. Citizen Health Research Group</u>, 704 F.2d at 1290.

c.    <em>The PNMs contain "confidential" information.</em>

<u>Involuntarily-Provided Information:</u>   The PNMs contain sensitive commercial information from the unsuccessful offerors' proposals that those offerors were required to provide to the government, including: supplier relationships; inventory and quality control practices; storage locations and capabilities; security measures; management practices; final offer prices; the component elements of the final offer prices; pricing strategies; operational concepts and plans; and the names of key personnel. (<u>See</u> Miller Decl. ¶¶8, 10, 11, 12; Supp. Miller Decl. ¶¶7, 8.) As Defendants demonstrated in their opening brief (<u>see</u> Defs.' Mem. at 8-11), that information is "confidential" because its disclosure would: (1) cause substantial harm to the competitive positions of the unsuccessful offerors (the "competitive harm prong"); and/or (2) impair the government's ability to obtain necessary information from offerors in the future (the "government impairment prong"). <u>See</u> <u>Nat'l Parks & Conservation Ass'n v. Morton</u>, 498 F.2d 765, 770 (D.C. Cir. 1974).

It is axiomatic that disclosure of the above information to PWC would severely damage the unsuccessful offerors' competitive positions. PWC and the unsuccessful offerors are competitors (indeed, they competed for the very contracts at issue (<u>see</u> Miller Decl. ¶¶30-31)), and PWC could use the information from their proposals to adjust its own business practices and thereby gain an unfair advantage over the unsuccessful offerors in the future. (<u>See, e.g.</u>, <u>id.</u> at ¶11 (disclosure of supplier relationships would allow a competitor to use the "same suppliers

7

or attempt to tie the supplier[s] to an exclusive contract"); id. at ¶12 (disclosure of, inter alia,

inventory, quality control, management and security practices would allow a competitor to adopt

the same practices); Supp. Miller Decl. ¶8 (disclosure of offer prices and their component

elements would allow a competitor to gain insight into pricing methodologies and strategies).)

Because PWC and the unsuccessful offerors are competitors, and because there is a "'likelihood

of substantial competitive injury'" to the unsuccessful offerors if PWC were to gain access to the

commercial information contained in their proposals, that information is "confidential" under the

competitive harm prong. See Pub. Citizens Health Research Group, 704 F.2d at 1291 ("evidence

revealing . . . 'the likelihood of substantial competitive injury' is sufficient to bring commercial

information within the realm of confidentiality"). The fact that several of the unsuccessful

offerors have submitted statements indicating that disclosure of the commercial information from

their proposals would harm their competitive positions (see Miller Decl. ¶¶32-33, Exs. A-B)

strongly supports a finding that that information is "confidential" under the competitive harm

prong.[8] See Pub. Citizen Health Research Group v. Nat'l Institutes of Health, 209 F. Supp. 2d

37, 50 (D.D.C. 2002).

It is equally clear that disclosure of the commercial information from the unsuccessful

offerors' proposals would make those offerors—and other companies with which the

government might seek to do business—less likely to provide detailed and reliable information

---

[8] PWC asserts that the unsuccessful offerors' statements as to competitive harm are unreliable because those entities "compete with PWC and have every incentive to hamper PWC's efforts." (PWC Mem. at 14 n.4.) However, the fact that the unsuccessful offerors compete with PWC is precisely why disclosure of their commercial information would result in competitive harm. Moreover, despite PWC's assertion to the contrary (see id.), the unsuccessful offerors' statements as to competitive harm are far from conclusory. For example, one of the unsuccessful offerors has described how disclosure of, inter alia, its "[k]ey [p]ersonnel" and the details of its "overall operations" would cause it competitive harm. (Miller Decl. Ex. A; see also id. at Ex. B.)

to the government in the future.  This would impair the government's ability to properly evaluate future contract proposals.  Thus, the commercial information from the unsuccessful offerors' proposals is "confidential" not only under the competitive harm prong, but also under the government impairment prong.  See Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 29 (D.D.C. 2000) (finding information confidential because "public disclosure of [the] information might encourage [submitters of information] to be less forthcoming in their submissions").

PWC insists that the commercial information in the PNMs from the unsuccessful offerors' proposals is not "confidential" under the competitive harm prong because the information is limited to "summary references to [the] losing offeror[s'] proposal[s]" and is "unlikely to include detail[s about those] . . . proposals."  (PWC Mem. at 13.)  This argument is based upon the incorrect and unsubstantiated premise that the PNMs contain little or no information—or only vague information—from the unsuccessful offerors' proposals.  (See supra 4-5 & n.5.)  In fact, the PNMs contain a substantial amount of specific information from the unsuccessful offerors' proposals, including information concerning those offerors' supplier relationships, inventory and quality control practices, management practices, key personnel, storage capabilities, pricing strategies and security measures.  (See Miller Decl. ¶¶8, 10-12, 17; Supp. Miller Decl. ¶¶4, 6-8.)  Such information is clearly "confidential" under the competitive harm prong.

PWC also asserts that any commercial information in the PNMs from the unsuccessful offerors' proposals is not "confidential" under the competitive harm prong because the information is from three to five years ago and is thus "stale."  (PWC Mem. at 10, 13.)  However, "[i]nformation does not become stale merely because it is old."  Ctr. for Auto Safety v.

Nat'l Highway Traffic Safety Admin., 93 F. Supp. 2d 1, 16 (D.D.C. 2000).  And, information

from the unsuccessful offerors' proposals concerning, inter alia, their supplier relationships,

inventory and quality control practices, management practices, key personnel, storage

capabilities, pricing strategies and security measures is not the type of information that would

become stale after only three to five years.[9]

 Finally, PWC argues that the commercial information from the unsuccessful offerors'

proposals is not "confidential" under the government impairment prong because the government

could (and does) require the submission of such information as a prerequisite to obtaining a

government contract.  (PWC Mem. at 13-14.)  This argument is based upon an incorrect

assumption—that where the government requires the submission of information, the disclosure

of that information can never lead to a finding of impairment sufficient to render the information

"confidential" under the government impairment prong.  That is simply not the law.  The D.C.

Circuit has made clear that even where an agency requires the submission of information, there

may be a finding of impairment where disclosure of that information would threaten the

reliability or quality of future submissions to the agency.  See Critical Mass Energy Project v.

Nuclear Regulatory Comm'n, 975 F.2d 871, 878 (D.D.C. 1992); see also Judicial Watch, Inc.,

108 F. Supp. 2d at 29-30, 33 (finding that information was "confidential" under the government

impairment prong, and observing that:  "[t]he government has a compelling interest in ensuring

---

  [9] PWC argues that information concerning the unsuccessful offerors' offer prices is not "confidential" because the offer prices were "based on prices received from suppliers and vendors either three . . . or five years ago."  (PWC Mem. at 13.)  However, PWC could use the pricing information in the PNMs—which includes not only the final offer prices, but also the elements of each final offer price and the offerors' pricing strategies—to gain unfair insight into its competitors' pricing methodologies.  (See Supp. Miller Decl. ¶8.)  Moreover, "[i]ndividuals who gain access to [the pricing information in the PNMs] and also have an operational knowledge of foodservice and distribution processes could break down the information in order to dissect G & A, overhead and profit."  (Id.)

that the information it receives is of the highest quality and reliability, and disclosure of

potentially sensitive commercial and financial information, even where submissions of

information are mandatory, would jeopardize the [government's] ability to rely on any such

information that is submitted"). Here, disclosure of information concerning, <u>inter alia</u>, the

unsuccessful offerors' supplier relationships, inventory and quality control practices,

management practices, key personnel, storage capabilities, pricing strategies and security

measures would, at a minimum, "encourage [companies] to be less forthcoming [with respect to

future] submissions." <u>Judicial Watch, Inc.</u>, 108 F. Supp. 2d at 29, 33. Thus, all such information

is "confidential" under the government impairment prong.

     <u>Voluntarily-Provided Information:</u> The PNMs also contain sensitive commercial

information from the unsuccessful offerors' proposals that they voluntarily provided to the

government—specifically, information regarding past performance. (Supp. Miller Decl. ¶9.)

This information is "confidential" because it is information that the unsuccessful offerors' would

not customarily release to the public. <u>See</u> <u>Critical Mass Energy Project</u>, 975 F.2d at 879. (<u>See</u>

<u>also</u> Supp. Miller Decl. ¶9.)

     PWC's arguments against the confidentiality of this information lack merit. First, PWC

argues that Defendants have failed to provide "any substantive description of [the] information"

that was voluntarily produced. (PWC Mem. at 12 n.3.) However, Mr. Miller's declarations

unambiguously describe this information as consisting of "information regarding [the offerors']

past performance." (Supp. Miller Decl. ¶9; <u>see</u> Miller Decl. ¶9.)[10] Second, PWC argues that

---

     [10] In his original declaration, Mr. Miller stated that the offerors also voluntarily produced
sanitation and pest management reports, discount information and socio-economic goals. In fact,
that information was involuntarily produced. (<u>See</u> Supp. Miller Decl. ¶7.) Nevertheless, the
information is clearly "confidential" under the competitive harm test and/or the government
impairment test. <u>See</u> <u>supra</u>.

Defendants have failed to establish that this information was voluntarily provided because they have not shown that "the offerors' proposals would have been considered for award absent such information." (PWC Mem. at 12 n.3.) Mr. Miller's supplemental declaration clarifies that the offerors' proposals would have been considered with or without this information. (See Supp. Miller Decl. ¶9 ("An offeror's failure to provide past performance information would not negatively impact the assessment of that offeror's proposal, nor would it disqualify the offeror from obtaining a government contract.").) See also Mallinckrodt v. West, 140 F. Supp. 2d 1, 6 (D.D.C. 2000) (rejecting the argument that "'all of the information submitted in an effort to win a government contract should be viewed as having been required'"). Third, PWC asserts that the PNMs would not be expected to—and, thus, do not—contain information voluntarily submitted by the unsuccessful offerors because "voluntarily-provided information would have little bearing on price negotiations [between the government and PWC] or the agreed-upon price [between the government and PWC]." (PWC Mem. at 12 n.3.) This argument is based upon PWC's erroneous and unsupported view—which Defendants have already dispelled several times herein (see supra 4-5, 6, 9)—that the PNMs contain little or no information from the unsuccessful offerors' proposals.

        d.     *The information in the PNMs that falls within the scope of exemption 4 is segregable.*

PWC asserts that any information in the PNMs that is exempt from disclosure under exemption 4 could be segregated from non-exempt material. (PWC's Mem. at 14.) Defendants agree. If this Court were to uphold Defendants' invocation of only exemption 4 (or only exemptions 3 and 4), then Defendants would release redacted versions of the PNMs (with the information from the unsuccessful offerors' proposals redacted out). (Supp. Miller Decl. ¶14.)

3.    Exemption 5.

Defendants have argued that the PNMs may be withheld in their entirety under

exemption 5 because the information contained therein falls within the scope of the deliberative

process privilege.  (Defs.' Mem. at 12-13.)  See 5 U.S.C. § 552(b)(5).  The deliberative process

privilege protects from disclosure "materials that are both predecisional and deliberative."

Mapother v. Dep't of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993); see Cobell v. Norton, 213

F.R.D. 1, 4-5 (D.D.C. 2003).  As demonstrated below, the PNMs clearly satisfy both of those

requirements.  Moreover, permitting Defendants to withhold the PNMs would serve the purposes

underlying the deliberative process privilege.

a.    *The PNMs are predecisional.*

PNMs are written by contracting officers to assist the Source Selection Authority (the

"SSA") in making a final decision as to which offerors should be awarded particular contracts.

(See Supp. Miller Decl. ¶¶10-11.)  See also 48 C.F.R. 15.308.  Although each PNM contains a

recommendation as to which offeror should receive the contract, in every case, the SSA

evaluates all relevant factors and makes his own independent decision.  (See Supp. Miller Decl.

¶¶10-11.)  See also 48 C.F.R. 15.308 ("While the SSA may use reports and analyses prepared by

others, the source selection decision shall represent the SSA's independent judgment.").  Indeed,

there have been situations where the SSA has declined to follow the recommendation in a

PNM.[11]  (See Supp. Miller Decl. ¶12.)  Moreover, the SSA creates a written record of his

---

[11] PWC's reliance on Schlefer v. United States, 702 F.2d 233 (D.C. Cir. 1983), is
misplaced.  In that case, the D.C. Circuit held that documents containing the advice of an
agency's chief counsel as to how certain statutes should be interpreted were not protected by the
deliberative process privilege because (1) "in practice," the officials who requested the chief
counsel's advice "always follow[ed his] advice," and (2) the chief counsel was the ultimate
authority on questions of statutory interpretation.  Id. at 237-38.  Here, by contrast, the
recommendations in the PNMs are not always followed (see Supp. Miller Decl. ¶12), and the

decision that is entirely distinct from the PNM.  (See Supp. Miller Decl. ¶10.)  See also 48 C.R.F. 15.308 ("The source selection shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA.").

Thus, despite PWC's insistence to the contrary (see PWC Mem. at 15-16), the contracting officers who authored the PNMs at issue were not the final decision-makers.  (See Supp. Miller Decl. ¶¶10-12.)  The SSA was the final decision-maker.  (See id.)  And, the SSA did not merely ratify the PNMs and adopt the reasoning in the PNMs as his own.  (See Supp. Miller Decl. ¶10.)  Instead, in accordance with 48 C.F.R. 15.308, the SSA created entirely new documents in which he described precisely how he arrived at his ultimate decision.  (See id.)  Accordingly, the PNMs are plainly predecisional.  See Senate of Puerto Rico v. Dep't of Justice, 823 F.2d 574, 585 (D.C. Cir. 1987) ("A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates.").

### b.    The PNMs are deliberative.

The PNMs are deliberative because they "played a role" in the agency's decision-making process with respect to the contracts to which they relate.  Cobell, 213 F.R.D. at 5 (for a document to be "deliberative," "there must have been a process of decision-making, in which the information [in the document] . . . played a role"); see Senate of Puerto Rico, 823 F.2d at 585 (for a document to be "deliberative," it "'must . . . be a part of the agency give-and-take . . . by which the decision itself is made'").  The PNMs contain the contracting officers' assessments of, among other things:  (1) "[t]he prices offered by each offeror"; (2) "[t]he strength of the technical offer of each proposal"; (3) "[t]he strength of the business offer of each proposal"; (4) "the delivery and distribution prices of each offeror"; (5) "the strengths and weaknesses of each

individuals who draft the PNMs are not the ultimate authority on contract decisions (see id. at ¶¶10-13).

proposal"; and (6) "[t]he ability of each offeror to satisfy the customers' needs." (Miller Decl. ¶18.) The PNMs also recommend which offeror should receive the contracts. (See Supp. Miller Decl. ¶11.) And, crucially, the SSA considered the PNMs, and the recommendations and analyses therein, in making his final decision to award PWC the contracts. (See Supp. Miller Decl. ¶¶10-11.) See also 48 C.F.R. 15.308. Thus, the PNMs clearly "played a role" in the agency's decision-making process and, as a result, are deliberative.[12] See Cobell, 213 F.R.D. at 5.

        c.     *Permitting Defendants to withhold the PNMs would serve the purposes underlying the deliberative process privilege.*

The deliberative process privilege is meant:

> [(1)] to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; [(2)] to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and [(3)] to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

Notwithstanding PWC's arguments to the contrary (see PWC Mem. at 16-17), permitting Defendants to withhold the PNMs would serve those goals. As demonstrated above, the PNMs are predecisional documents in which subordinates analyzed the various contract proposals and made recommendations to the SSA as to which offeror should be awarded the contracts. (See

---

[12] Two factors that courts often consider in determining whether a document is deliberative are: "(1) the 'nature of the decisionmaking authority vested in the officer . . . issuing the disputed document' and (2) 'the relative positions in the agency's chain of command occupied by the document's author and recipient.'" Cobell, 213 F.R.D. at 5 (quoting Senate of Puerto Rico, 823 F.2d at 585)). Here, both factors favor a finding that the PNMs are deliberative. The authors of the PNMs lacked final decision-making authority with respect to the contracts at issue, and held a lower position in the agency's chain of command than the PNMs' ultimate recipient, the SSA. (See Supp. Miller Decl. ¶¶10-13.)

supra 13-14.)  If the PNMs were released to the public, those subordinates might be less

forthcoming in the future with respect to their opinions and analyses.  Moreover, the PNMs do

not contain the agency's final decision on any matter discussed therein.  (See supra 13-14.)

Thus, release of the PNMs might cause confusion by disclosing reasons and rationales that were

not in fact the bases for the SSA's ultimate decision.

      d.    *The fact that the PNMs might be produced in a future enforcement proceeding is irrelevant to whether Defendants have properly invoked exemption 5 in response to PWC's pending FOIA request.*

PWC argues that because the Department of Justice (the "DOJ") has stated that PWC

"'will get discovery of the PNM[s] . . . at the appropriate time under the Federal Rules in the

event the government brings a contract fraud case'" against it, Defendants cannot now invoke

exemption 5.  (PWC Mem. 15 (quoting Graham Decl. ¶8).)[13]  PWC is wrong.  Because

Defendants have demonstrated that the PNMs are predecisional and deliberative, they have

established that the PNMs are protected from disclosure by the deliberative process privilege and

may be withheld pursuant to exemption 5.  The fact that PWC may or may not gain access to the

PNMs at some future date in the context of an enforcement proceeding brought by the DOJ (in

which Defendants would not be parties) does not mean that Defendants have waived their right

to invoke exemption 5 in response to PWC's pending FOIA request.[14]  See 5 U.S.C. § 552(b)(5)

---

[13] Citations in the form "(Graham Decl. ¶__)" refer to the Declaration of James J. Graham, which Defendants submitted with their opening brief.

[14] PWC cites the Department of Defense Contract Pricing Reference Guide (the "Guide") to show that it is entitled to obtain the PNMs.  (See PWC Mem. at 15 n.6.)  However, the Guide merely states that in the context of a price audit, "most agencies authorize . . . release of . . . portions [of the relevant PNM]."  (PWC Ex. H at § 5.2.)  Here, there is no price audit; there is only a FOIA request.  And, as shown above, Defendants have rightly determined that the PNMs are exempt from disclosure under FOIA.  In any event, the Guide does not guarantee or direct the release of PNMs.

(exemption 5 protects from disclosure documents that "would not be available by law to a party . . . in litigation <u>with the agency</u>" (emphasis added)).

Importantly, in evaluating the invocation of any FOIA exemption (including exemption 5) the identity of the requesting party is irrelevant. <u>See</u> <u>Dep't of Justice v. Reporters Comm.</u>, 489 U.S. 749, 771 (1989) ("Except for cases in which the objection to disclosure is based on a claim of privilege and the person requesting disclosure is the party protected by the privilege, the identity of the requesting party has no bearing on the merits of his or her FOIA request."); <u>Lardner v. Dep't of Justice</u>, No. 03-0180, 2005 WL 758267, at *7-8 (D.D.C. Mar. 31, 2005) (same). The only relevant question is whether the documents at issue fall within the scope of the claimed exemption. If they do, then no person may receive them through a FOIA request. If they do not, then any person may submit a FOIA request and obtain them. Thus, the fact that PWC may itself be entitled to receive the PNMs in discovery in the context of an enforcement proceeding brought against it is irrelevant to whether the PNMs are properly withheld from the entire universe of potential FOIA requestors (including PWC) under exemption 5.

As a final matter, the fact that PWC may obtain the PNMs through discovery in the context of a future litigation does not mean that it is entitled to use FOIA as a means to obtain that discovery now. Indeed, it is settled law that "the purpose of FOIA is not to serve as a tool for discovery." <u>Newry Ltd. V. U.S. Customs & Border Protection Bureau</u>, No. 04-02110, 2005 WL 3273975, at *4 (D.D.C. July 29, 2005) (citing cases).

   e. *The deliberative process privilege protects all material contained in the PNMs.*

As Defendants have repeatedly stated herein, the PNMs contain detailed information concerning the "significant elements" of each contract proposal, as well as the contracting officers' assessment of each proposal and recommendations to the SSA. (<u>See</u> Supp. Miller Decl.

¶¶ 4-5; <u>see also</u> Miller Decl. ¶¶17-18.)  The contracting officers' analyses and recommendations are clearly protected from disclosure by the deliberative process privilege.  Moreover, the PNMs' recitation of the "significant elements" of each contract proposal is also protected from disclosure because:  (1) as one would reasonably expect, the contracting officers' discussion of that information is often intertwined with their analyses and recommendations; and (2) disclosure of "the manner of selecting or presenting [that information] would reveal [much about] the deliberative process."[15]  <u>Ryan v. Dep't of Justice</u>, 617 F.2d 781, 790 (D.C. Cir. 1980).  (<u>See</u> Supp. Miller Decl. ¶4 ("The contracting officers who create the PNMs determine which information from the offerors' proposals is sufficiently important to merit inclusion in the PNMs."); <u>id.</u> at ¶15 ("the information in the PNMs reflects . . . the contracting officers' analyses of the contract proposals . . . [and their] determinations as to which elements of the proposals were significant enough to merit inclusion in the PNMs").)

    4.    <u>Exemption 7(A).</u>

    Finally, Defendants have argued that the PNMs may be withheld in their entirety pursuant to exemption 7(A) because:  (1) they were compiled in connection with prospective law enforcement proceedings; and (2) their release "could reasonably be expected to cause some articulable harm" with respect to those proceedings.  <u>Manna v. Dep't of Justice</u>, 51 F.3d 1158, 1164 (3d Cir. 1995); <u>see</u> <u>North v. Walsh</u>, 881 F.2d 1088, 1097-98 (D.C. Cir. 1989).  (<u>See also</u> Defs.' Mem. at 14-17.)  As detailed below, Defendants have properly invoked exemption 7(A).

---

[15] The particulars of the contract proposals submitted by the unsuccessful offerors are also properly withheld pursuant to exemptions 3 and 4.  (<u>See</u> <u>supra</u> Part II.1-2.)

    a.     *The PNMs were compiled in connection with prospective law enforcement proceedings.*

Attorneys in the DOJ's Civil and Criminal Divisions sought and obtained the PNMs for use in their investigations of whether PWC engaged in contract fraud with respect to the contracts at issue in this case.  (See Supp. Graham Decl. ¶1; Graham Decl. ¶1; Coulter Decl. ¶1.)[16]  Thus, the PNMs were clearly compiled in connection with a prospective law enforcement proceeding; in fact, they were compiled in connection with two such proceedings—one criminal and one civil.  (See id.)  See also Kani v. U.S. Dep't of Justice, 11 F. Supp. 2d 42, 44 (D.D.C. 1998) (holding that once documents "are assembled . . . for . . . law enforcement purposes, [they] qualify for protection under Exemption 7 regardless of their original source").

PWC maintains that Defendants have not established that the PNMs were compiled in connection with a prospective law enforcement proceeding because Defendants have not shown that the DOJ attorneys investigating PWC requested or received the PNMs before Defendants first invoked exemption 7(A).  (See PWC Mem. at 19.)  This argument is unavailing.  There is no dispute that Defendants first invoked exemption 7(A) in April 2007.  (See id. at 19 (stating that Defendants first invoked exemption 7(A) on April 9, 2007).)  And, James J. Graham, one of the DOJ attorneys investigating PWC, has submitted a sworn declaration stating that he requested and received the PNMs in 2006, shortly after he was assigned to the investigation.  (See Supp. Graham Decl. ¶3; see also Supp. Coulter Decl. ¶3 ("In 2006, government procurement documents, including the available PNMs, were provided for my review.").)[17]

---

[16] Citations in the form "(Supp. Graham Decl. ¶__)" refer to the Supplemental Declaration of James J. Graham, attached hereto.  Citations in the form "(Coulter Decl. ¶__)" refer to the Declaration of Art J. Coulter, which Defendants submitted with their opening brief.

[17] Citations in the form "(Supp. Coulter Decl. ¶__)" refer to the Supplemental Declaration of Art J. Coulter, attached hereto.

      b.     *The release of the PNMs could reasonably be expected to cause some articulable harm.*

Because the PNMs were compiled in connection with prospective law enforcement proceedings, they fall within the scope of exemption 7(A) so long as their release "could reasonably be expected to cause some articulable harm" with respect to those proceedings. Manna, 51 F.3d at 1164; see North, 881 F.2d at 1097-98.  This final requirement is easily satisfied.  As stated above, the DOJ is investigating whether PWC engaged in contract fraud with respect to the contracts at issue in this case.  (See Supp. Graham Decl. ¶1.)  Among other things, the DOJ is investigating whether PWC:  (1) "received unlawful kickbacks under the cover of 'discounts' from its U.S. suppliers that should have been refunded to the government"; and/or (2) "used the Sultan Center—a non-U.S. company that PWC claims is one of its external suppliers, but that the DOJ believes is in fact related to it—to artificially inflate its bills to the government under the contracts."  (Supp. Graham Decl. ¶2; see Graham Decl. ¶2.)  As demonstrated below, disclosure of the PNMs could reasonably be expected to negatively impact the DOJ's investigations.

The PNMs are internal government documents (to which PWC does not have access) that contain detailed accounts of, inter alia:  (1) the government's views on matters related to PWC's contract proposals, including matters related to its suppliers; and (2) communications between PWC and the government concerning the particulars of its contract proposals, including communications about its suppliers.  (Supp. Graham Decl. ¶4.)  Thus, the PNMs would be expected to discuss matters relevant to the supplier-related issues that the DOJ is investigating.  And, according to Mr. Graham, the PNMs do in fact "discuss matters relevant to the role of the Sultan Center and the issue of supplier 'discounts.'"  (Id.)

Because the PNMs discuss matters relevant to the issues the DOJ is investigating (see id. at ¶¶4-5), their disclosure could reasonably be expected to interfere with the DOJ's investigations.  If PWC were to gain access to the PNMs, it could use the information contained therein to:  (1) anticipate the DOJ's litigation strategy; (2) refine its own litigation strategy; (3) tailor its future testimony; (4) identify potential witnesses and their positions on key issues[18]; and (5) manufacture or alter evidence.  (Id. at ¶5; see Graham Decl. ¶7; Coulter Decl. ¶7.)  For example, any discussions in the PNMs of the views of DSCP employees (or their communications with PWC) about the issue of supplier "discounts" would undoubtedly impact PWC's litigation strategy and future testimony.  (See Supp. Graham Decl. ¶5.)  Any such discussions might also incentivize PWC to contact potential witnesses and/or manufacture or alter evidence.[19]

Moreover, the very fact that the PNMs do or do not discuss specific issues relevant to the DOJ's investigations would likewise impact, among other things, PWC's litigation strategy and future testimony.  For example, PWC has taken the position that "it was contractually entitled to retain [the] discounts" under investigation, and that one of the DSCP contracting officers with whom it communicated recognized that alleged fact.  (PWC Mem. at 2.)  Given the amount of detail included in the PNMs (see Miller Decl. ¶¶17-18; Supp. Miller Decl. ¶¶4-5), one would

---

[18] PWC's assertion that the PNMs "include no information about potential witnesses" (PWC Mem. at 21) is plainly incorrect.  The contracting officers who created the PNMs—and whose opinions and recommendations are contained therein—would be witnesses in any fraud action against PWC relating to the contracts.  Moreover, the PNMs contain references to, and discuss the views of, DSCP employees with whom PWC has not previously interacted.  (Supp Miller Decl. ¶2.)  It is likely that those employees would also be witnesses in any future fraud action against PWC.

[19] Because "the PNMs contain the government's views on matters relevant to the fraud the DOJ is investigating," and because the "government is the victim [of the] alleged fraud," the PNMs "are akin to a witness statement of the victim of an alleged crime."  (Supp. Graham Decl. ¶6.)  Such a "witness statement" should not be disclosed to the target of the investigation (PWC) while the investigation is ongoing.  (See id.)

expect that they would include statements supporting PWC's current position, assuming PWC's current position has merit.  Thus, if the PNMs do not contain any such statements, then PWC would almost certainly adjust its litigation strategy and future testimony.

The potential harms discussed above are precisely the kinds of harms that courts routinely find sufficient to justify the withholding of documents pursuant to exemption 7(A). See Nat'l Labor Relations Bd. v. Robins Tire & Rubber Co., 437 U.S. 214, 241 (1978) (observing that exemption 7(A) is properly invoked where disclosure of information would provide a party with "earlier and greater access to [the opposing party's] case than he would otherwise have," such that the party could "intimidat[e]" witnesses and "'construct defenses'"); see also North, 881 F.2d at 1097-98 (discussing the types of harms "at which section 7(A) is directed").  Notably, PWC has not given this Court any reason to believe that it seeks the PNMs for a reason unrelated to the DOJ's investigations.[20]

PWC argues that the release of the PNMs could not reasonably be expected to affect the DOJ's investigations because the PNMs do not contain any information relevant to those investigations.  (PWC Mem. at 21-24.)  This argument fails because, as discussed above, the PNMs do in fact discuss matters relevant to the issues the DOJ is investigating.  (See supra 20-22; see also Supp. Graham Decl. ¶¶4-6.)  Moreover, the very fact that the PNMs do or do not discuss specific issues relevant to the matters under investigation is itself highly material information.  (See supra 21-22.)

_____

[20] PWC cites North, 881 F.2d at 1099, for the proposition that an "'individual may . . . obtain under FOIA information that may be useful in non-FOIA litigation.'"  (PWC Mem. at 23.) While that is true, PWC neglects to mention an important caveat to that general proposition— that information responsive to a FOIA request may be withheld where its disclosure could reasonably be expected to interfere with non-FOIA litigation.  See North, 881 F.2d at 1097-98. Here, as shown above, the PNMs are properly withheld because their disclosure could reasonably be expected to interfere with the DOJ's ongoing investigations.  Moreover, as stated above, "FOIA is not to serve as a tool for discovery."  Newry Ltd., 2005 WL 3273975, at *4.

PWC also argues that disclosure of the PNMs could not reasonably be expected to affect the DOJ's investigations because PWC has already (1) formulated its defenses to the expected charges, and (2) announced its positions on what it views as the key issues.  (PWC Mem. at 23.)  However, the fact that PWC has formulated certain defenses and announced its positions on what it views as the key issues does not change the fact that it could use the information in the PNMs to, inter alia, identify additional defenses, modify its current defenses, identify additional key issues and manufacture or alter evidence.

          c.     *If Defendants have properly invoked exemption 7(A) (and they have), then none of the information in the PNMs is subject to disclosure.*

For the reasons discussed above, all of the material in the PNMs relating to PWC is properly withheld pursuant to exemption 7(A).  And, the remaining material—all of which relates to the unsuccessful offerors—is properly withheld pursuant to exemptions 3, 4 and/or 5.  (See supra Part II.1-3.)

     5.    <u>PWC's Request for In Camera Review Should Be Denied.</u>

PWC asserts that this Court should conduct an <u>in camera</u> review of the PNMs for two reasons:  <u>first</u>, Defendants' description of the PNMs as pre-decisional, evaluative documents that contain information from the unsuccessful offerors' proposals is allegedly contrary to the Code of Federal Regulations, various Department of Defense and other documents and the experience of PWC's affiant and counsel; and <u>second</u>, Defendants have purportedly failed to sufficiently address the issue of segregability.  (PWC Mem. at 26-27.)  As discussed below, those arguments for in camera review are unavailing.[21]

---

[21] PWC also asserts that <u>in camera</u> review is appropriate because "there is evidence that [Defendants have] acted in bad faith."  (PWC Mem. at 28.)  To support its claim of "bad faith," PWC cites the delays it has experienced with respect to the processing and litigation of its FOIA request, as well as the fact that Defendants have claimed numerous exemptions and have refused

Defendants have submitted two sworn declarations from Mr. Miller, a current DSCP employee who supervises the contracting officers who created the PNMs, and he has stated that the PNMs:  (1) are pre-decisional; (2) "include the significant elements of every offeror's proposal"; and (3) "discuss and analyze . . . the significant elements of every contract proposal in great detail."  (Supp. Miller Decl. ¶¶1, 4-5, 10-11; see Miller Decl. ¶¶1, 3, 17-18.)[22]  In a futile effort to undermine Mr. Miller's testimony, PWC cites to:  (1) the experience of its affiant and counsel—neither of whom is or has ever been a DSCP employee; and (2) the Code of Federal Regulations and various Department of Defense and other documents—which, as discussed above, establish at most that the PNMs were not required to include all of the information that Mr. Miller has sworn they include.  (See, e.g., supra 4 & n.5, 5 n.6, 16 n.14.)  None of the "evidence" to which PWC cites is sufficient to undercut Mr. Miller's testimony and create a material issue of fact with respect to the nature and contents of the PNMs.

As to the issue of segregability, Defendants have explained that if this Court were to uphold their invocation of only exemption 3 and/or exemption 4, then they would be able to— and would—release redacted versions of the PNMs (with the information from the unsuccessful offerors' proposals redacted out).  (See supra 12; see also Supp. Miller Decl. ¶14.)  Defendants have further explained in sufficient detail that if this Court were to uphold their invocation of exemption 5 and/or exemption 7(A), then they would be entitled to withhold the PNMs in their entirety.  (See supra 17-18, 23; see also Supp. Miller Decl. ¶15.)

---

to release redacted versions of the PNMs.  However, the processing and litigation of FOIA requests takes time, and any attendant delays are certainly not evidence of bad faith.  Indeed, the most recent "delay" was due to a change in personnel at the U.S. Attorney's Office.  Moreover, Defendants have demonstrated herein that their claimed exemptions were appropriate and that they were completely justified in refusing to release redacted versions of the PNMs.  There is no evidence of bad faith.

[22] Mr. Miller's descriptions of the PNMs as pre-decisional (see Supp. Miller Decl. ¶¶10-13) are entirely consistent with 48 C.F.R. 15.308.  (See supra 13-14.)

Because PWC's arguments in support of its request for <u>in camera</u> review are without merit, this Court should exercise it broad discretion and deny that request.[23]  <u>See</u> <u>Carter v. U.S. Dep't of Commerce</u>, 830 F.2d 388, 392 (D.C. Cir. 1987) ("'the decision of whether to conduct <u>in camera</u> inspection [is left] to the broad discretion of the trial judge'").

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those set forth in Defendants' opening brief, Defendants respectfully request that this Court GRANT their motion for summary judgment and DENY PWC's cross-motion for summary judgment and <u>in camera</u> review.

Respectfully submitted,


        /s/
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


        /s/
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


        /s/
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 307-0372
Fax: (202) 514-8780
Christopher.Harwood@usdoj.gov


Of Counsel:
Sandra Guydon
Defense Logistics Agency

---

[23] Because PWC has failed to articulate a good reason for this Court to conduct an <u>in camera</u> review of the PNMs, the fact that there are only two documents at issue is irrelevant. (<u>Cf.</u> PWC Mem. at 27-28.)  Courts do not conduct <u>in camera</u> reviews any time a FOIA request concerns only a small number of documents.  Rather, courts conduct <u>in camera</u> reviews when there is good reason to do so.  Here, there is not.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2008, I caused a copy of the foregoing to be served on counsel for Plaintiff via the Court's Electronic Case Filing system.


_____/s/_____
Christopher B. Harwood

FOR THE DISTRICT OF COLUMBIA

PUBLIC WAREHOUSING COMPANY

K.S.C.

**V.**

CIVIL ACTION NO. 07-1476

DEFENSE SUPPLY CENTER

PHILADELPHIA
THE DEFENSE LOGISTICS AGENCY,

THE DEPARTMENT OF DEFENSE

## SUPPLEMENTAL DECLARATION OF RAYMOND G. MILLER

I, RAYMOND G. MILLER, do make the following declarations:

1.  I am the Director of the Subsistence Supplier Operations Supply Chain, which is part of the Defense Supply Center Philadelphia (DSCP), which is part of the Defense Logistics Agency, which is part of the Department of Defense. I supervise the DSCP contracting officers who interact with the Public Warehousing Company (PWC). I am knowledgeable about the DSCP's use of price negotiation memoranda (PNMs) with respect to PWC. I would know of all PNMs created in connection with contracts awarded to PWC.

2.  Although the PNMs at issue were written primarily by the contracting officers with whom PWC interacted during the proposal process, the PNMs contain references to, and discuss the views of, Subsistence Supplier Operations employees with whom PWC has not interacted.

3.  The contracts that are the subject of this lawsuit are "Prime Vendor" contracts.

4.  Within Subsistence Supplier Operations, it is our practice to include the significant elements of every offeror's proposal in the PNMs for Prime Vendor contracts. The contracting officers who create the PNMs determine which information from the offerors' proposals is sufficiently important to merit inclusion in the PNMs.

5.  Within Subsistence Supplier Operations, it is our practice to discuss and analyze

in the PNMs the significant elements of every contract proposal in great detail.

6.  Although the regulations governing PNMs do not expressly require PNMs to include the particulars from the unsuccessful offerors' proposals, it is our practice in Subsistence Supplier Operations to include such information in PNMs. Over half of the two PNMs at issue in this case are comprised of information from the unsuccessful offerors' proposals.

7.  The PNMs at issue in this case include the following information from the unsuccessful offerors' proposals which those offerors were required to provide to the government: supplier relationships; inventory and quality control practices; storage location and capabilities; sanitation and pest management reports; management practices; security measures; discount information; socio-economic goals; offer prices; pricing strategies; operational concepts and plans; and information regarding key personnel. Offerors do not want competitors to know the names of their key personnel who are the decision makers. The loss of a decision maker is more than the loss of a single individual. Key personnel also are privy to much information that companies keep confidential.

8.  The PNMs at issue in this case include not only the initial and final offer prices of each offeror, but also the component elements of each final offer price. In other words, the PNMs contain detailed pricing information with respect to each offeror that competitors could use to gain unfair insight into the offerors' pricing methodologies and strategies. In the PNMs we discuss the prices of each offer. This information is proprietary in that it could reveal detailed operational concepts and pricing strategies. Competitors could use this information to gain an unfair advantage over their rivals. Individuals who gain access to this information and also have an operational knowledge of foodservice and distribution processes could break down the information in order to dissect G & A, overhead and profit. Inasmuch as a new solicitation for this area has just been issued, this information can give the requestor a decisive advantage in pricing in an industry where profit margins are very tight.

9.  The PNMs at issue in this case also include information from the unsuccessful offerors' proposals which those offerors submitted voluntarily——namely, information regarding past performance. An offeror's failure to provide past performance information would not negatively impact the assessment of that offeror's proposal, nor would it disqualify the offeror from obtaining a government contract. Information regarding past performance would have been provided to the DSCP in strict confidence and with the expectation that it would be used by the DSCP for evaluation purposes only and would not be released to parties outside the Government. Information regarding past performance is not the type of information that the offerors would customarily release to the public.

2

10.   PNMs are used by a Source Selection Authority (SSA) to assist him/her in making a final award determination. The decision, however, is an independent determination made by the SSA. The SSA writes his/her own document explaining his/her decision and the factors used to support it. The SSA created his own documents explaining why PWC was awarded the contracts at issue in this case.

11.   In every procurement where an SSA is appointed (an SSA was appointed in the procurements of the contracts at issue in this case), the SSA is the final decision maker. A contracting officer can and does recommend, and his recommendations are contained in a PNM. However the SSA is free to reject this recommendation. In this case, the SSA considered the PNMs in making his final decision.

12.   I am aware of situations where the SSA has declined to follow the recommendation contained in a PNM.

13.   In the contracts at issue, the contracting officers who drafted the PNMs held a lower position than the SSA in the chain of command of Subsistence Supplier Operations.

14.   If only exemptions 3 and 4 are properly invoked in this case, Defendants could segregate the discussions of the unsuccessful offerors' proposals from the discussions of PWC's proposals in the PNMs.

15.   If exemption 5 applies, it would be impossible to produce any part of the PNMs because the information in the PNMs reflects either (1) the contracting officers' analyses of the contract proposals (which, in many instances, is intertwined with their discussion of the elements of each proposal); or (2) the contracting officers' determinations as to which elements of the proposals were significant enough to merit inclusion in the PNMs.

I declare pursuant to 28 USC §1746, under the penalty of perjury that the foregoing are true and correct statements.

RAYMOND G. MILLER
Director, Subsistence Supplier Operations
Defense Supply Center Philadelphia

3

TOTAL P.02

## Supplemental Declaration of James J. Graham

1.  I, James J. Graham, am a trial attorney in the Fraud Section of the Criminal Division, United States Department of Justice ("DOJ"), and have been assigned to investigate whether the Public Warehousing Company ("PWC") engaged in contract fraud with respect to the contracts at issue in this case—SPO300-03-D-3061 and SPM300-05-D-3128.

2.  The DOJ is investigating, among other things, whether PWC (a) received unlawful kickbacks under the cover of "discounts" from its U.S. suppliers that should have been refunded to the government; and (b) used the Sultan Center—a non-U.S. company that PWC claims is one of its external suppliers, but that the DOJ believes is in fact related to it—to artificially inflate its bills to the government under the contracts.

3.  In 2006, shortly after I was assigned to investigate PWC for alleged contract fraud, I requested and received the price negotiation memoranda ("PNMs") that PWC is seeking to obtain through this litigation.

4.  The PNMs are internal government documents that contain detailed accounts of, among other things, (1) the government's views on matters related to PWC's contract proposals, including matters related to its suppliers, and (2) communications between PWC and the government concerning the details of its contract proposals, including communications about its suppliers. Thus, the PNMs would be expected to—and, in fact, do—discuss matters relevant to the supplier-related issues that the DOJ is investigating. For example, the PNMs discuss matters relevant to the role of the Sultan Center and the issue of supplier "discounts," which are at the core of the government investigation.

5.  Because the PNMs discuss matters relevant to the issues the DOJ is investigating (including the issue of supplier "discounts"), disclosure of the PNMs to PWC could reasonably be expected to interfere with the DOJ's investigation. Specifically, if PWC were to gain access to the PNMs, it could use the information therein to: (1) anticipate the government's litigation strategy; (2) refine its own litigation strategy; (3) tailor its future testimony; (4) identify potential witnesses and their positions on key issues; and (5) manufacture or alter evidence. For example, it is axiomatic that PWC could use the information in the PNMs concerning the issue of supplier "discounts" to gain early access to the government's litigation strategy and to adjust its own strategy.

6.  As stated above, the PNMs contain the government's views on matters relevant to the fraud the DOJ is investigating. The government is the victim in PWC's alleged fraud. Thus, the PNMs are akin to a witness statement of the victim of an alleged crime and should not be disclosed to the target while the investigation is ongoing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 25, 2008

James J. Graham

<u>Supplemental Declaration of Art J. Coulter</u>

1.  I, Art J. Coulter, am a trial attorney in the Fraud Section of the Civil Division, Commercial Litigation Branch, United States Department of Justice. Since November 2005, I have been assigned to a civil investigation of alleged contract fraud involving government contracts awarded to the Public Warehousing Company (PWC).

2.  As part of this investigation, I have requested all government procurement records including the Price Negotiation Memorandums (PNM) being sought in this Freedom of Information Act action. Although I requested all procurement documents for SPM300-05-D-3119, my understanding is that a PNM was not created for this procurement.

3.  In 2006, government procurement documents, including the available PNMs, were provided for my review.


        I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

        Executed on February 1, 2008.

        _____
        Art J. Coulter

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
PUBLIC WAREHOUSING COMPANY              )
K.S.C.,                                 )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        Civil Action 07-1476 (RBW)
                                        )
DEFENSE SUPPLY CENTER PHILADELPHIA,     )
THE DEFENSE LOGISTICS AGENCY and        )
THE DEPARTMENT OF DEFENSE,              )
                                        )
        Defendants.                     )
_____)

## <u>RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7(h) and 56.1 of the Local Rules of this Court, Defendants respectfully submit this response to Plaintiff's Statement of Material Facts Not In Genuine Dispute ("Plaintiff's Statement"). Defendants respond to the numbered paragraphs in Plaintiff's Statement as follows:

1.      Defendants do not dispute the facts set forth in paragraph 1.

2.      Defendants dispute the facts set forth in paragraph 2 to the extent they purport to describe the purpose of price negotiation memoranda ("PNMs"), and to the extent they imply that no information other than that identified in 48 C.F.R. 15.406-3(a) appears in the PNMs at issue. For an accurate description of the contents of the PNMs at issue, see the declarations of Raymond G. Miller, which Defendants submitted with their briefing. (<u>See, e.g.</u>, Miller Decl. ¶¶8, 10-13, 16-18; Supp. Miller Decl. ¶¶4-9.)

3.      Defendants dispute Plaintiff's characterization of the Department of Justice's ("DOJ") investigations. For an accurate description of the DOJ's investigations, see the

declarations of James J. Graham and Art J. Coulter, which Defendants submitted with

their briefing.  (<u>See</u> Graham Decl. ¶2; Supp. Graham Decl. ¶2; Coulter Decl. ¶2.)

4.    Defendants do not dispute the facts set forth in paragraph 4.

5.    Defendants do not dispute the facts set forth in paragraph 5.

6.    Defendants do not dispute the facts set forth in paragraph 6.


                                        Respectfully submitted,


                                        _____/s/_____
                                        JEFFREY A. TAYLOR, D.C. BAR #498610
                                        United States Attorney


                                        _____/s/_____
                                        RUDOLPH CONTRERAS, D.C. BAR #434122
                                        Assistant United States Attorney


                                        _____/s/_____
                                        CHRISTOPHER B. HARWOOD
                                        Assistant United States Attorney
                                        555 Fourth St., N.W.
                                        Washington, D.C.  20530
                                        Phone: (202) 307-0372
                                        Fax: (202) 514-8780
                                        Christopher.Harwood@usdoj.gov

Of Counsel:
Sandra Guydon
Defense Logistics Agency

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
PUBLIC WAREHOUSING COMPANY                       )
K.S.C.,                                          )
                                                )
        Plaintiff,                               )
                                                )
        v.                                       )        Civil Action 07-1476 (RBW)
                                                )
DEFENSE SUPPLY CENTER PHILADELPHIA,              )
THE DEFENSE LOGISTICS AGENCY and                 )
THE DEPARTMENT OF DEFENSE,                       )
                                                )
        Defendants.                              )
_____)

## ORDER

     Having considered Defendants' Opposition to Plaintiff's Cross-Motion for Summary

Judgment and In Camera Review, and the entire record herein, it is, this _____ day of

_____, 2008, hereby

     ORDERED that Plaintiff's Cross-Motion for Summary Judgment and In Camera Review

is denied.

     SO ORDERED.


                                    _____
                                    UNITED STATES DISTRICT JUDGE


Copy to:  ECF Counsel