**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY** | ) | |
| **K.S.C.,** | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 07-01476 (RBW) |
| | ) | |
| **DEFENSE SUPPLY CENTER** | ) | |
| **PHILADELPHIA, THE DEFENSE** | ) | |
| **LOGISTICS AGENCY, and THE** | ) | |
| **DEPARTMENT OF DEFENSE.** | ) | |

_____

### PLAINTIFF'S REPLY TO DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN CAMERA REVIEW

Plaintiff Public Warehousing Company K.S.C. ("PWC") brought this action on August 16, 2007 under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking release of the price negotiation memoranda ("PNMs") created by Defense Supply Center Philadelphia ("DSCP") for its "prime vendor" contracts with Plaintiff, numbered SPO300-03-D-3061 ("PV 1"), SPM300-05-D-3119 ("PV Bridge") and SPM300-05-D-3128 ("PV 2"). Defendants have asserted that no PNM was created for PV Bridge, and they have refused to release the PNMs for PV 1 and PV 2, citing FOIA exemptions 3, 4, 5 and 7(A). 5 U.S.C. §§ 552(b)(3), (4), (5), (7)(A). Plaintiff has filed a combined motion for summary judgment and *in camera* review. Plaintiff respectfully requests that the Court grant its motion and order release of the PNMs to Plaintiff.

Defendants' position throughout this protracted litigation strains the imagination. It is riddled with conclusory and often contradictory statements, innuendo and unsupported allegations. Never once have Defendants approached PWC and attempted to discern what, if any, information may be redacted or not disclosed. Had they done so, they would have learned early in this process that PWC is not interested in any of the other offerors' proposals other than

the prices the offerors inserted for the various food products that the Government listed in the solicitations. That simple gesture would have eliminated many of the Government's alleged concerns, including any purported concerns that disclosure might reveal an offerors' strategies or proprietary information. The simple fact is that attorneys at the Department of Justice don't want PWC to have this documentation because they are concerned that it could somehow help PWC in dealing with the Government's investigation. Nothing more. Defendants' purported interest in protecting offerors' proprietary information is nothing more than subterfuge, as are the balance of their arguments.

We request that the Court review the documents *in camera* to satisfy itself that there is nothing to be protected from the public in these materials.

## ARGUMENT

### I.    Introduction

As this Court knows well, the "fundamental principle" of the FOIA is to allow for "public access to government documents." John Doe Agency v. John Doe Corp., 493 U.S. 146, 151 (1989). The Supreme Court has emphasized that "disclosure, not secrecy, is the dominant objective of the Act." Id. at 152. The Act does contain several exemptions to protect various types of documents, but because of the policy favoring disclosure, the exemptions must be "narrowly construed." FBI v. Abramson, 456 U.S. 615, 630 (1982). The statute is clear in that the agency claiming an exemption bears the burden of proving that the withheld records are actually exempt. 5 U.S.C. § 552(a)(4)(B). Defendants have not carried their burden to demonstrate the applicability of the cited exemptions, and therefore, the requested documents must be released.

**II.    Exemption 3 Does Not Apply**

Defendants' attempt to use the National Defense Authorization Act, 41 U.S.C. § 253b(m)(3) (the "NDAA"), to withhold "over half of the PNMs" is without merit.[1]  Under FOIA Exemption 3, information can be withheld from disclosure if such information is "specifically exempted from disclosure by statute."  5 U.S.C. § 552(b)(3).  The NDAA prohibits the release of "a proposal in the possession or control of an executive agency."  41 U.S.C. § 253b(m)(3).  The PNMs, a Government-generated memorialization of the negotiated agreement, are not proposals and therefore are not protected under the NDAA.

A "proposal" is narrowly defined under the statute as "any proposal, including a technical, management, or cost proposal, *submitted by a contractor* in response to the requirements of a solicitation for a competitive proposal."  Id. (emphasis added).  Citing no case law,[2] Defendants claim that this statutory definition should be broadly interpreted to include any Government-generated discussion of a losing offeror's proposal.[3]  (Defs.' Opp. at 3).[4]  Neither the statutory language nor the case law supports such an interpretation.

The PNMs do not satisfy the statutory definition of a "proposal" since they are not (1) proposals, (2) submitted by a contractor, or (3) in response to a solicitation.  By the terms of the

---

[1]    Defendants have abandoned their earlier position that any portion of the document subject to Exemption 3 would be non-segregable.  (Compare Defs.' Opp. at 12 with Defs.' Mem. of P. & A. at 17).

[2]    In their initial brief, Defendants cited to Hornbostel v. U.S. Dep't of the Interior, where the court found that three contractor proposals submitted to the Government were exempt from FOIA disclosure.  305 F.Supp.2d 21, 30 (D.D.C. 2003).  Importantly, these proposals were the actual contractor-drafted proposals and not subsequent Government-generated discussions of those proposals.

[3]    Defendants have already disclosed some information from the losing offerors' proposals: the names of the losing offerors.  (See November 20, 2007 Notice of Filing of Declarations at attachment 1).  Defendants' selective protection of this information undermines their assertions that this information is exempt from disclosure by the NDAA.

[4]    References to "Defs.' Opp. at __" refer to Defendants' Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary Judgment and In Camera Review, filed February 1, 2008.

statute itself, the NDAA was meant to apply only to a limited set of documents, i.e. "proposals." Had the statute been intended to apply beyond "proposals" to Government discussions of proposals, the statute would have explicitly said so.

Upholding the limited scope of FOIA Exemption 3, this Court has previously rejected attempts to stretch the Exemption beyond the statutory language. In <u>Center for Public Integrity v. Department of Energy</u>, the court rejected the Government's claim that that the term "proposal," as defined under the NDAA, should be read broadly to include sales proposals. 191 F. Supp. 2d 187 (D.D.C. 2002). The court therefore denied the Exemption 3 claim, finding that a sales proposal was not a "proposal" since it did not comport with the statutory definition of that term which required that the document be "submitted by a contractor." <u>Id.</u> at 194 (citing 41 U.S.C. § 253b(m)(3)); <u>see also</u> <u>Nat'l Inst. of Military Justice v. Dep't of Defense</u>, 404 F. Supp. 2d 325, 337 (D.D.C. 2005) (rejecting Exemption 3 claim, where the Government attempted to broadly interpret the statutory definition, and instead finding that "[t]his Court cannot read into a statute language that is clearly not there.").

The statutory language of the NDAA sets a specific and limited scope on the use of the Act that comports with the limited scope of FOIA Exemption 3. <u>See</u> 5 U.S.C.A § 552(b)(3)(B). Without these clear boundaries, Defendants would be able to abuse the Exemption in violation of the policy of FOIA to encourage disclosure. For instance, in footnote 4 of their brief, Defendants claim that "over half of the PNMs" are comprised of information from unsuccessful offerors' proposals which would be exempted under Exemption 3. (Defs.' Opp. at 4 n.4). While Plaintiff cannot view the documents to dispute such an incredible claim, it appears that Defendants are broadly taking any mention of a losing offeror, no matter how indirect or minor, and seeking to annex surrounding sentences. Defendants' conduct here to take a mile if given an inch

effectively demonstrates the need to hold the Government to the clearly defined boundaries called for by the statute.

## III.    Exemption 4 Does Not Apply

Under Exemption 4, commercial or financial information is protected from disclosure if it is likely to either (1) impair the Government's ability to obtain necessary information in the future; or (2) cause substantial harm to the competitive position of the person from whom the information was obtained.  National Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974).  Defendants claim that "[o]ver half of the two PNMs at issue in this case are comprised of information from the unsuccessful offerors' proposals" and that this information is protected from disclosure under Exemption 4.  (Defs.' Opp. at 6).  However, PWC is not interested in any non-price information from other offerors that may be present in the PNMs. That includes technical or management proposals submitted to the Government in connection with PV 1 and PV 2.

### A.    Any Requested Non-Price Information is Segregable from the Price Information that PWC Truly Seeks

In their initial brief, Defendants alleged that any information protected under Exemption 4 could not be segregated from the rest of the PNMs.  (Defs.' Mem. of P. & A. at 17).  Reversing course, Defendants now admit that any protected information falling under Exemption 4 would be segregable from the rest of the PNMs.  (Defs.' Opp. at 12).  Had Defendants been more initially forthright and made any effort to contact Plaintiff to discuss the matter instead of deliberately delaying the resolution of this matter for many months, PWC could have clarified its position with respect to the information it was seeking.

Specifically, PWC has no interest in information that does not relate to the purpose of a

PNM, which is to document the negotiated price agreement with the awardee. See 48 C.F.R. §

15.406-3; (Rivers Aff. ¶¶ 4, 5).[5]   In its most recent filing, Defendants now claim that they

included information not required to be included in a price negotiation memorandum.[6]   (Defs.'

Opp. at 6).   Allegedly included in this list are a number of non-price elements from losing

offerors' proposals.[7]   (Id. at 7).   While this information would not be likely to cause competitive

harm, PWC has no interest in obtaining this information.   Accordingly, it would not object to the

focused and narrow redaction of these items, providing the Government does not take advantage

of such redactions to redact more than is necessary.

The remaining information Defendants claim is exempted includes "final offer prices; the

component elements of the final offer prices; [and] pricing strategies. . . ."   (Defs.' Opp. at 7).

As detailed below, this information does not fall under Exemption 4.

## B.    Defendants Have Failed to Demonstrate Likely Competitive Harm

Defendants have failed their burden to demonstrate how the release of stale, unit food

price information over 3 ½ to 5 ½ years old would be likely to cause competitive harm. See 5

U.S.C. § 552(a)(4)(B) (burden is on agency to justify decision to withhold information).   In their

latest brief, Defendants now claim that the PNMs include initial and final offer prices,

---

[5]    The affidavit of Gary T. Rivers, a retired contracting official, was attached to Plaintiff's Memorandum of Points and Authorities at Exhibit G.

[6]    Defendants' claims are internally inconsistent and not credible.   With every filing, Defendants seem to find more information in the PNMs that they somehow overlooked.   For instance, in Mr. Miller's Supplemental Declaration he suddenly discovers and declares that the PNMs contain information regarding key personnel, operational concepts and plans, and pricing strategies.   (Supp. Miller Decl. ¶ 7).   It is apparent that Mr. Miller is exaggerating summary references to such information in an attempt to tailor the contents of the PNMs to Defendants' legal arguments.

[7]    This information includes supplier relationships, inventory and quality control practices, storage locations and capabilities, security measures, management practices, operational concepts and plans, and the names of key personnel.

component elements of the final offer prices, and pricing strategies.  (Defs.' Opp. at 7).[8]  These conclusory statements don't pass the smell test.

It is critical that the Court understand what the pricing in these two procurements is and what it is not. Under these solicitations, the Government identified a series of food products that they expected to purchase, together with estimated quantities for each.  (PV 1 Solicitation at 11; Exhibit A; PV2 Solicitation at 19-20; Exhibit B).[9]  The offerors were asked to propose unit prices for each food item together with a flat distribution fee that would enable the offeror to recover its profit, overhead, general and administrative ("G & A") costs and other expenses.  (Id. at 4).  Like the unit price for the food items, the distribution fee was a single number that was not broken down into its constituent elements of profit, overhead, G & A, etc.  (Id). The prices contain no cost breakdowns and no disclosure of profit, overhead or other proprietary information of an offeror, but only summary, top level "initial and final offer prices." (Supp. Miller Decl. ¶ 8).  The prices proposed for these products have long been rendered outdated and irrelevant, as would any food prices generated many years ago.

In other words, no proprietary price information would be revealed at all.  Tellingly, Defendants have failed to provide anything other than conclusory assertions as to how such information could cause competitive harm.  See Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 906 (D.C. Cir. 1999) (finding conclusory and generalized assertions of substantial harm insufficient to sustain burden of nondisclosure under FOIA).  Defendants assert that that

---

[8]     Mr. Miller alleges that the PNMs include "component elements of each final offer price."  It is not entirely clear what Mr. Miller means by this vague term.  At any rate, Mr. Miller fails to provide any detail as to how such a component element could be used to "dissect G & A, overhead and profit," (Supp. Miller Decl. ¶ 8) since such breakdowns were not submitted by any offerors in response to the solicitations.

[9]     Relevant portions of the solicitations for the two contracts are attached as exhibits A and B to this motion. Solicitation No. SPO300-02-R-4033 ("PV 1 Solicitation") is attached at Exhibit A and Solicitation No. SPM300-04-R-0323) is attached at Exhibit B.  Both solicitations include relevant amendments, as well as blank price forms demonstrating the types of prices called for under the solicitations.

the release of the final offer prices coupled with their component elements "would allow a competitor to gain insight into pricing methodologies and strategies." (Defs.' Opp. at 8). The Defendants' conclusory statements, however, fail to demonstrate with any specificity how the release of these outdated, top-level food prices would be "likely to cause substantial competitive harm."[10] National Parks, 498 F.2d at 770; see also Pub. Citizen Health Research Group v. FDA, 704 F.2d 180, 1291 n.30 (D.C. Cir. 1983) (stating that litigants must show harm flowing from the potential for affirmative use of the information by competitors).

Furthermore, while Defendants baldly assert that the PNMs include "pricing strategies" there is no discussion in the Defendants' brief of such strategies or analysis of how release of such strategies could cause competitive harm. (Supp. Miller Decl. ¶ 7). And for good reason: given the nature of the pricing in this procurement, it is impossible to discern how anyone's pricing strategies would be revealed if their proposed food prices for various items on a very old procurement were disclosed.

In an analogous case, the D.C. District Court ruled that the release of bidders' total bid prices was not prohibited under Exemption 4. Ctr. for Pub. Integrity, 191 F. Supp. 2d at 194-95. In that case, the Government, as it does here, argued that the release of a bidder's total offer amount would provide information about the bidder's business strategies by revealing the bidder's valuation methodologies. Id. at 194. The court found that the Government's arguments were "supported by neither logic nor evidence" since the Government had failed to demonstrate that the information would be of substantial assistance to competitors. Id. at 195 (noting that the

---

[10]    Nor do the letters from offerors previously supplied by Defendants provide anything other than conclusory assertions of competitive harm. (See November 20, 2007 Notice of Filing of Declarations at attachment 1). First, it is not clear from the broad statements made by these offerors whether the Government told the offerors what proposal information was in the PNMs. Importantly, in response to this point, which was made in Plaintiff's Memorandum of Points and Authorities at 14 n.4, Defendants failed to assert that they did provide the offerors with a description of the specific proposal information being requested. (See Defs.' Opp. at 8 n.8).    Second, these offerors have no incentive to admit that the release of this information would not cause them competitive harm. Accordingly, their conclusory assertions of competitive harm should be discounted.

Government had failed to provide detailed explanations to support its competitive harm arguments).

### C.    Defendants Have Failed to Demonstrate Impairment

Release of this information would not impair the Government's ability to obtain necessary information in the future. National Parks, 498 F.2d at 770. Courts have not found impairment in the situation where a contractor's unwillingness to provide required information would likely prevent a contractor from being considered for contract award. See Badhwar v. U.S. Dep't of the Air Force, 622 F. Supp. 1364, 1377 (D.D.C. 1985) (no impairment from release of reports when submission is "effectively mandatory" in order to do business with government), aff'd in part & rev'd in part on other grounds, 829 F.2d 182 (D.C. Cir. 1987).[11] The top-level pricing information in the PNMs is particularly unlikely to cause impairment since it does not contain cost breakdowns, disclosure of profit, overhead or any proprietary information of an offeror.

Defendants mistakenly rely on a limited set of cases which hold that impairment can occur if disclosure would result in a diminution of the "reliability" or "quality" of what is submitted. (Defs.' Opp. at 10). Defendants cite to no case law where this limited exception was applied to information required to be submitted in order to win a Government contract. Nor do Defendants explain why a Government contractor would endanger its chances at contract award by submitting pricing information that was incomplete or nonresponsive to the Government's request. See Ctr. For Public Integrity, 191 F. Supp. at 197 (noting that the D.C. Circuit has

---

[11]    Defendants have alleged that certain past performance references mentioned in the PNMs were voluntarily submitted to the Government, claiming that such past performance references are not required to be submitted to the Government to be considered for award. (Defs.' Opp. at 11). While this may be technically true, as a realistic matter the Department of Defense would not award a multi-billion dollar Prime Vendor contract to an offeror with no past performance references. At any rate, this type of non-pricing information is not the type of information being sought by PWC. See supra at 6.

found that the benefits accruing to bidders from contracting with the Federal Government make
it unlikely that an agency's future contracting ability will suffer impairment due to disclosure of
price information).

## IV.    Exemption 5 Does Not Apply

Defendants continue to insist that the PNMs are exempt under Exemption 5, which
applies to "inter-agency or intra-agency memorandums or letters which would not be available
by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To
support their claim, they assert that the deliberative process privilege applies to the PNMs
because they are "predecisional" and "deliberative."  (Defs.' Opp. at 13); see Animal Legal
Defense Fund v. Dep't of Air Force, 44 F. Supp. 2d 295, 299 (D.D.C. 1999).  However, they are
neither.  The PNMs requested by Plaintiff do not qualify substantively for withholding under
Exemption 5.

### A.    Exemption 5 Does Not Apply to the PNMs as Described in Procurement
Regulations

If, as Plaintiff believes, the PNMs for the Prime Vendor contracts follow the
requirements of the Federal Acquisition Regulation ("FAR") and all relevant DoD regulations,
the PNMs would fail to qualify as predecisional, deliberative documents.  Plaintiff filed this
FOIA request under the assumption that the PNMs here would follow these regulations, and the
information described in those regulations is what Plaintiff seeks in this action.  Even if the
documents include additional information, as alleged by Defendants, the sections memorializing
the price negotiation and documenting the fairness and reasonableness of the prices should be
disclosed.

The regulations task the contracting officer (and not the Source Selection Authority ("SSA")) with determining that the negotiated prices are fair and reasonable. See 48 C.F.R. § 15.402 ("Contracting officers must . . . [p]urchase supplies and services from responsible sources at fair and reasonable prices"). This is the relevant "decision" for the purposes of Exemption 5. Thus, the PNM cannot be predecisional because it is written *after* the contracting officer decides that the prices are reasonable. See Senate of Puerto Rico v. Dep't of Justice, 823 F.2d 574, 585 (D.C. Cir. 1987) ("A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates"). After all, the purpose of the PNM is to document the completed negotiation process, including the fairness and reasonableness of the agreed-upon prices. See 48 C.F.R. § 15.406-3 ("The contracting officer shall document in the contract file the principal elements of the negotiated agreement. The documentation . . . shall include . . . [d]ocumentation of fair and reasonable pricing"); Defense Logistics Acquisition Directive ("DLAD") § 15.406-3 ("While excessive detail should be avoided, the PNM, standing alone, must convince all reviewers that the price negotiated . . . was reasonable . . . The price reasonableness determination shall be documented in the contract file").[12]

Nor are the documents "deliberative." To be "deliberative," a document must "be a part of the agency give-and-take . . . by which the decision itself is made." Senate of Puerto Rico, 823 F.2d at 585. As discussed above, the regulations describe the PNM as factual documentation of completed negotiations, including the reasonableness of the agreed-upon price. Any "agency give-and-take" has long been completed by the time the PNMs are written—the document merely explains the agency's reasons for its decision. In this instance, there would not have been any "give or take" within the agency, since the prices accepted by the government would have

---

[12]    This provision was attached at Exhibit F to Plaintiff's Memorandum of Points and Authorities.

been those proposed by the offerors. Clearly, the PNMs as described by the relevant regulations would not qualify for withholding under Exemption 5.

### B. Exemption 5 Does Not Apply to the PNMs as Described by Defendants

Even the PNMs as described by Defendants, which vary from those prescribed in the regulations, could not be withheld under Exemption 5. Mr. Miller describes the PNMs as documents "used by a Source Selection Authority (SSA) to assist him/her in making a final award determination." (Supp. Miller Decl. ¶ 10). The documents apparently "discuss and analyze . . . the significant elements of every contract proposal in great detail." (Supp. Miller Decl. ¶ 5). Defendants assert that the PNMs are predecisional because they are written before the SSA makes the final decision as to which offeror should receive the contract. (Defs.' Opp. at 13). According to Defendants, the SSA makes his or her own independent decision and drafts a record of his or her decision that is distinct from the PNM. (Id. at 13-14).

However, an otherwise predecisional document loses its Exemption 5 protection if "an agency chooses expressly to adopt or incorporate by reference" that document. Sears, 421 U.S. at 161; see also Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980) ("even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue"). While Plaintiff does not have access to the SSA documents, it is evident that these documents do adopt or incorporate the PNMs.[13] After all, if they had not been adopted, Mr. Miller would have specifically cited this critical fact in his declaration, or Defendants would have submitted the declaration of the SSA.

---

[13]    It should be noted that the SSA document need not formally incorporate the PNMs by reference in order for such adoption to occur. See Am. Soc'y of Pension Actuaries v. IRS, 746 F. Supp. 188, 191 (D.D.C. 1990) ("the IRS places too much weight on the word 'expressly.' The Sears requirement of express adoption is designed to ensure that FOIA reaches only documents expressing the views actually relied upon by the government in making policy").

They did not do either of these things.[14]  Moreover, the proof of the pudding is in the eating—
DSCP awarded both of the contracts in question to PWC.  Therefore, the SSA must have
accepted the analyses of the contracting officers.  Given the alleged extent of the discussion of
the offerors' proposals in the PNMs, the SSA would have been hard-pressed not to adopt the
reasoning in the PNMs to justify the contract awards.  Indeed, the fact that the PNMs for both
contracts "are maintained in the contract files for each of the two contracts" (Miller Decl. ¶ 15)
strongly indicates that the discussions in the PNMs have in fact been adopted by DSCP.  If the
SSA documents did adopt the PNMs, the PNMs have lost their predecisional status.

    Nor are the documents deliberative.  While the FAR does portray the SSA as the official
making the final decision with regard to contract award, the Court must look "beneath formal
lines of authority to the reality of the decisionmaking process in question."  Schlefer v. United
States, 702 F.2d 233, 238 (D.C. Cir. 1983).  Mr. Miller states in his declaration: "I am aware of
situations where the SSA has declined to follow the recommendation contained in the PNM."
(Supp. Miller Decl. ¶ 12).  First, it is important to reiterate that Mr. Miller does not state that the
SSA did not follow the recommendations in this case—a very telling fact.  Also, the fact that Mr.
Miller states that he "is aware" of situations in which the SSA did not follow the PNM allows for
the inference that such disagreement occurs rarely.  Finally, the fact that the SSA occasionally
"decline[s] to follow" the PNM suggests that the SSA usually does "follow" the contracting
officer's decision.  Mere adoption of the previous conclusions of another official is hardly
independent decisionmaking.  As the Court of Appeals in this Circuit has stated, "'[d]ecisional'
documents . . . do not become 'deliberative' merely because some high agency official retains
formal authority, deferentially or infrequently exercised, to overturn the decision."  Schlefer, 702

---

[14]    However, Mr. Miller does state in his declaration that "[i]n this case, the SSA considered the PNMs in
making his final decision."  (Supp. Miller Decl. ¶ 11).

F.2d at 259.[15]  While the SSA may have formal authority to overturn the contracting officer's

decision, as Mr. Miller admits such authority is infrequently exercised, and was certainly not

exercised in the case of the PV 1 and PV 2 contracts.

Contrary to the Defendants' arguments, the withholding of the PNMs would not serve the

purposes underlying Exemption 5.  These purposes are:

> [(1)] to assure that subordinates within an agency will feel free to provide the
> decisionmaker with their uninhibited opinions and recommendations without fear
> of later being subject to public ridicule or criticism; [(2)] to protect against
> premature disclosure of proposed policies before they have been finally
> formulated or adopted; and [(3)] to protect against confusing the issues and
> misleading the public by dissemination of documents suggesting reasons and
> rationales for a course of action which were not in fact the ultimate reasons for the
> agency's action.

Coastal States, 617 F.2d at 866.  Since DSCP agreed with the contracting officers'

recommendation and awarded the contracts to PWC, no contracting officer would be inhibited

from providing their opinions in the future.  See Sears, 421 U.S. at 161 ("agency employees will

generally be encouraged rather than discouraged by public knowledge that their policy

suggestions have been adopted by the agency").  Second, this is not a case in which information

will be released before a decision is finalized.  DSCP awarded these contracts to PWC several

years ago.  Third, to the extent that DSCP adopted the reasoning of the PNMs in making its

contract award decisions, the public will not be misled by dissemination of that reasoning.

### C.    Defendants Have Not Shown that "Exempt" Information is Non-Segregable

Defendants have claimed that if Exemption 5 is applicable, none of the information in the

PNMs could be released.  (Defs.' Opp. at 17-18).  They argue that the contracting officers'

analysis is intertwined with the factual information from the offerors' proposals.  (Id.).  Even

---

[15]    It should also be noted that while Mr. Miller has stated that the SSA on these procurements had a higher
position in the chain of command than the contracting officers who drafted the PNMs, the SSA is not required to
have a higher rank.  See 48 C.F.R. § 15.303 ("The contracting officer is designated as the source selection authority,
unless the agency head appoints another individual for a particular acquisition . . . .")

assuming that such information is properly withheld under Exemption 5 (which Plaintiff disputes), Defendants have failed to explain why the documentation of the negotiation process could not be disclosed. Instead, they have baldly stated, in a sub-heading, that "the deliberative process privilege protects all material contained in the PNMs." Such conclusory statements with regard to segregability are patently insufficient. See Mead Data Cent., Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977); Animal Legal, 44 F. Supp. at 301. At the very minimum, Plaintiff is entitled to the factual, non-deliberative information in the PNMs. After all, that is the information Plaintiff sought when it filed its FOIA request.

## V.       Exemption 7(A) Does Not Apply

Defendants have continued to assert that the PNMs may be withheld in their entirety pursuant to Exemption 7(A). Def. Opp. Mem. 18. To withhold documents under this exemption, Defendants must show first that the documents have been "compiled for law enforcement purposes." John Doe Agency, 493 U.S. at 153. If they satisfy that threshold inquiry, Defendants must then demonstrate that disclosure of the documents sought "could reasonably be expected perceptibly to *interfere* with an enforcement proceeding." North v. Walsh, 881 F.2d 1088, 1097 (D.C. Cir. 1989) (emphasis in original). Perhaps realizing that their initial declarations fell far short of these standards, the Department of Justice officials have conveniently submitted supplemental declarations in an attempt to cure the previous deficiencies. However, Defendants have still not carried their burden.

### A.       Defendants Have Not Demonstrated that the PNMs Were "Compiled for Law Enforcement Purposes"

To satisfy the threshold inquiry for invocation of Exemption 7(A), Defendants must demonstrate that the requested documents were "collected or assembled" for law enforcement

purposes "when the Government invokes the Exemption." John Doe Agency, 493 U.S. at 153. In this case, DSCP first invoked Exemption 7(A) on April 9, 2007. (Compl. ¶ 8).

In their initial declarations, the DOJ officials failed to specify when they "compiled" the requested PNMs. In fact, the declarants did not even establish that the PNMs were "compiled for law enforcement purposes" at all.[16] (See Pl.'s Mem. of P. & A. at 19)

Defendants now offer supplemental declarations from the DOJ officials. Mr. Graham states that "[i]n 2006 . . . I requested and received" the PNMs. (Supp. Graham Decl. ¶ 3). Mr. Coulter states that "[i]n 2006, government procurement documents, including the available PNMs, were provided for my review." (Supp. Coulter Decl. ¶ 3). While these declarations identify a date prior to April 2007, Defendants have still failed to demonstrate that the PNMs were "compiled for law enforcement purposes." Receipt or review of a document is not equivalent to the addition of a document to a law enforcement file. See John Doe Agency, 493 U.S. at 153 ("[a] compilation, in its ordinary meaning, is something composed of materials collected and assembled from various sources or other documents"). Despite two opportunities to do so, neither official has asserted that the PNMs were "collected" or "assembled" in a law enforcement or investigatory file prior to April 2007. In fact, there is affirmative evidence that the PNMs have not been "compiled for law enforcement purposes," and in fact remain in the contract file at DSCP. (See Miller Decl. ¶ 15 ("The requested PNMs are maintained in the contract files for each of the two contracts. I have verified that the PNMs are, in fact, part of each contract file")).

Even if receipt or review of the PNMs could constitute "compilation," the declarants' assertion that they received the PNMs in 2006 should be given little credence by the court. First,

---

[16]    The Declarants merely asserted that "one of [their] first steps on this matter was to . . . review" the requested PNMs. (Coulter Decl. ¶ 4; Graham Decl. ¶ 4).

the statements are self-serving, coming only after Plaintiff pointed out that declarants had not specified the date of compilation. Second, neither declaration provides the month or date that the documents were reviewed or received. This lack of specificity casts doubt on the accuracy of the declarants' recollections. Mr. Coulter's supplemental declaration is especially difficult to believe, given that he previously testified that review of the PNMs was "one of [his] first steps" on the PWC investigation, to which he had been assigned since November 2005. (Coulter Decl. ¶¶ 1, 4.) One would have assumed that this "first step" would have occurred in November or December of 2005, not in 2006.

Defendants have not carried their burden of demonstrating that the PNMs were "compiled for law enforcement purposes." Their Exemption 7(A) claim thus fails on this ground alone.

### B. Defendants Have Not Demonstrated that the PNMs Could Reasonably be Expected to Interfere with Enforcement Proceedings

Even if the court finds that the PNMs were "compiled for law enforcement purposes," and that the compilation took place before April 2007, Defendants' Exemption 7(A) claim still fails, as they have not satisfied the second part of the 7(A) inquiry. That is, Defendants have not shown a "reasonable likelihood" of interference with DOJ's investigation or a potential enforcement proceeding. See Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 926 (D.C. Cir. 2003). Instead, they have merely repeated their list of supposed harms, without any attempt at tying the alleged harms to the actual content of the requested documents. (See Defs.' Opp. at 21). The Defendants' effort is insufficient to carry their burden. See Campbell v. Dep't of Health & Human Services, 682 F.2d 256, 259 (D.C. Cir. 1982) ("the government must show, by more than a conclusory statement, how the particular kinds of . . . records requested would interfere . . . .").

In their initial Memorandum of Points and Authorities, Defendants asserted a broad array of potential harms that would allegedly occur through release of the PNMs, which the DOJ declarants described as "internal government document[s] reflecting the government thinking in awarding the contract." (Coulter Decl. ¶ 4; Graham Decl. ¶ 4). In response, Plaintiff pointed out that such a document would have no relevance to the issues outlined by the declarants as being central to the investigation. (Pl.'s Mem. of P. & A. at 20-24). Now, magically, the PNMs suddenly do "discuss matters relevant to the role of the Sultan Center and the issue of supplier 'discounts,' which are at the core of the government investigation." (Supp. Graham Decl. ¶ 4).

Ignoring for the moment the self-serving nature of the new information in Mr. Graham's declaration, it is worth examining exactly what kind of information concerning these issues could possibly be discussed in the PNMs. While the PNMs are supposed to be used to document the price negotiation process between the agency and the contractor, see 48 C.F.R. § 15.406-3(a), Mr. Miller has described DSCP's PNMs as including broad-based discussions of "the significant elements of every offeror's proposal." (Supp. Miller Decl. ¶ 4). Given this, the alleged references to prompt payment discounts and The Sultan Center in the PNMs would necessarily be limited to the information in *PWC's* proposals, and DSCP's comments on that information.[17]

Because any discussions of these issues in the PNMs would be limited as such, it is impossible to understand how disclosure of these references would "reasonably be expected perceptibly to interfere" with the ongoing investigation.[18] North, 881 F.2d at 1097. The

---

[17]    On the issue of prompt payment discounts, PWC's proposals notified DSCP that the offered prices would not be reduced by such discounts. With regard to The Sultan Center, the proposals portrayed the company as PWC's primary supplier for local market products, and discussed the benefits inherent in using a subcontractor with a large retail chain and pre-existing supplier relationships.

[18]    Strangely, Defendants argue that "the very fact that the PNMs do or do not discuss specific issues relevant to the matters under investigation is itself highly material information." (Defs.' Opp. at 22). This argument is nonsensical, since Defendants and Mr. Graham have asserted that the PNMs do in fact contain information relevant to the matters under investigation.

references in the PNMs to these issues would have no relation to DOJ's two theories: (1) that PWC "received unlawful kickbacks under the cover of 'discounts' from its U.S. suppliers that should have been refunded to the government" and (2) that PWC "used the Sultan Center . . . to artificially inflate its bills to the government." (Supp. Graham Decl. ¶ 4). It is unimaginable that that a memorialization of negotiations that took place years before this investigation started would address either of those allegations. If the DSCP officials had made any statements corroborating these theories in the PNMs, they obviously would not have awarded the contracts to PWC. Given the clear lack of connection between the PNMs and the foci of DOJ's investigation, there is no way that disclosure would give PWC "earlier and greater access to [DOJ's] case." Alyeska Pipeline Service Co. v. U.S. E.P.A., 856 F.2d 309, 313 (D.C. Cir. 1988). Nor would disclosure of the PNMs reveal to PWC "the scope, direction, or focus" of the DOJ's investigation. Campbell, 682 F.2d at 265.[19]

    Even if the PNMs include some positive comments about PWC's proposals, the release of the documents would not cause interference in DOJ's investigation. The law of this Circuit is clear in that "an individual may . . . obtain under FOIA information that may be useful in non-FOIA litigation." North, 881 F.2d at 1099. Defendants agree with this premise, but point out that information that could reasonably be expected to interfere in non-FOIA litigation may not be released. (Defs.' Opp. at 22 n.20). This merely begs the question as to under which category the PNMs fall. Are these documents that could potentially be "useful" to PWC (perhaps by demonstrating why DSCP found PWC's prices to be fair and reasonable), or are these documents that will allow PWC to "map the course of the investigation and thus develop the means to impede it"? Ctr. for Nat'l Sec. Studies, 331 F.3d at 928.

---

[19]     As Plaintiff pointed out in its previous filing, DOJ has already publicly revealed its case theories in this proceeding, as well as other proceedings.

In attempt to portray the PNMs as the type of document that *is* regularly withheld from disclosure under Exemption 7(A), Mr. Graham likens the PNMs to "a witness statement of the victim of an alleged crime." (Supp. Graham Decl. ¶ 6).[20] This comparison is wholly illogical. Unlike a witness statement of an alleged crime, the PNMs contain no evidence of wrongdoing. These documents are merely a documentation of the negotiation process, or at most, a review of PWC's proposals. Given the fact that the PV 1 PNM was written before there was any contractual relationship between the parties, and the fact that the PV 2 PNM was written to justify an additional contract award to PWC, there is simply no way that the documents describe allegedly criminal activity. The Court should ignore Mr. Graham's imaginative comparison.

Defendants have resurrected the same vague and speculative claims of hypothetical interference previously cited, again failing to demonstrate why disclosure of the information in the PNMs could cause such harms. The first three examples on Mr. Graham's list are that PWC could "(1) anticipate the government's litigation strategy; (2) refine its own litigation strategy; [and] (3) tailor its future testimony." (Supp. Graham Decl. ¶ 5). Even if these examples could be considered "interference," Defendants' concern is misplaced. As discussed above, there is no way that disclosure would give Plaintiff premature access to DOJ's case. Without such information, it is unclear how PWC would anticipate DOJ's strategy, refine its own strategy or change its testimony. As explained previously, PWC has already formulated its positions with respect to the key issues in this case and has made them public in this and other litigation before this court and in other forums. (See Pl.'s Mem. of P. & A. at 2-3, 23). At best, the information in the PNMs regarding prompt payment discounts and The Sultan Center would confirm PWC's belief that DSCP knew of and concurred with its proposed actions on both issues. The more

---

[20]     Mr. Graham perhaps had in mind one of the leading Exemption 7(A) cases, <u>NLRB v. Robbins Tire & Rubber Co.</u>, in which the Supreme Court withheld from release witness statements that were to be used in an unfair labor practice proceeding. 437 U.S. 214 (1978).

likely scenario is that the PNMs provide no relevant information.  In either case, PWC's defenses and testimony would remain the same.

Mr. Graham's fourth concern is that PWC could "identify potential witnesses and their positions on key issues."  (Supp. Graham Decl. ¶ 5).  This argument is a red herring.  Defendants can easily redact the names of the DSCP contracting employees who drafted the PNMs, thus eliminating any fear that PWC would "contact potential witnesses."  (Defs.' Opp. at 21).

Finally, Mr. Graham asserts that PWC could "manufacture or alter evidence."  (Supp. Graham Decl. ¶ 5).  Again, Defendants have not demonstrated why disclosure of the PNMs would cause such an alleged harm.  The investigation is focused on PWC's actions during performance of the contracts, not with what was said in its proposals.  The PNMs will not provide any insight into DOJ's theories, and will not disclose evidence to be used against PWC. To the extent the PNMs contain a few positive comments about PWC's proposals, Plaintiff fails to see what evidence could be "manufactured" or "altered" as a result of the PNMs' release.  As with the comparison of the PNMs to witness statements, Defendants have apparently added this alleged harm to their list simply because it is a recognized form of interference.  See Alyeska, 856 F.2d at 312 (discussing potential for "destruction or alteration of relevant evidence, and the fabrication of fraudulent alibis").  The mere assertion of a hypothetical harm is insufficient to carry Defendants' burden.  Campbell, 682 F.2d at 259.

## C.    Defendants Have Not Shown that "Exempt" Information is Non-Segregable

Defendants have asserted that "all of the material in the PNMs relating to PWC is properly withheld pursuant to Exemption 7(A)."  (Defs.' Opp. at 23).  As support for this conclusion, they refer to all of their arguments regarding the general applicability of Exemption 7(A).  (Id.).  However, these arguments are premised on the allegation that the PNMs include

some information about prompt payment discounts and The Sultan Center that is relevant to the

DOJ's investigation.  Assuming for the moment that such information does exist in the PNMs,

and assuming that release of the information could cause some interference with the

investigation (which Plaintiff finds absurd), Defendants have not set forth any rationale why the

parts of the PNMs which do <u>not</u> discuss these issues could not be disclosed.  Defendants have

made yet another conclusory assertion with regard to segregability.  As such, they have failed to

carry their burden on this issue.  <u>See</u> <u>Mead</u>, 566 F.2d at 242; <u>Animal Legal</u>, 44 F. Supp. at 301.

## VI.    The Court Should Grant Plaintiff's Request for *In Camera* Review

Plaintiff has requested that the Court exercise its discretion to review, *in camera*, the two

documents at issue.  In response to Plaintiff's request, Defendants argue, in essence, that such

review is not necessary since the Court should trust the representations Defendants have made.

Defendants' representations, however, are internally inconsistent and contradictory, and are

indicative of a general tendency to exaggerate the contents of the PNMs.  Accordingly,

Defendants have not given the Court adequate reason to "just trust them."

Defendants initially represented that the information falling under Exemptions 3 and 4

were so "inextricably interwoven" that it was not segregable.  (Miller Decl. ¶¶ 24, 29).  Now,

Defendants admit, without any real explanation for its change in position, that such information

*is* segregable.  (Defs. Opp. at 12).  Similarly, upon further review, Defendants now allege that the

PNMs contain offeror information regarding key personnel, operational concepts and plans, and

pricing strategies.  (<u>Id.</u> at 7).  Again, Defendants provide no real explanation as to why they

suddenly "discovered" that such information was in the PNMs.  The same pattern is apparent in

the sudden revelation that the PNMs contain information on the topics DOJ is investigating.  (<u>Id.</u>

at 20).  Defendants also allege that the PNMs include information about offerors' pricing

22

strategies, yet in the same breath state that the information "*could* reveal . . . pricing strategies." (Supp. Miller Decl. ¶ 8 (emphasis added)). Similarly, Defendants make the incredible claim that "over half" of the PNMs are comprised of information from losing offerors' proposals which is exempt under Exemption 3 and 4. (Defs.' Opp. at 4 n. 4, 6). The Court can gauge the accuracy of these allegations only if it views the documents for itself.

Furthermore, Defendants' description of the PNMs is unreliable because it contradicts the description of the document in the federal regulations and the DoD guidance documents. Mr. Rivers, a former contracting official with years of experience at the DLA, confirms that PNMs include only summary information from other offerors. (Rivers Aff. ¶ 6). For these reasons, *in camera* review is necessary to resolve the dispute between what is publicly known to be in the PNMs and the Defendants' conclusory assertions of what is in the PNMs. See, e.g. Mehl v. U.S. EPA, 797 F. Supp. 43, 46 (D.D.C. 1992) (in camera review conducted because agency affidavits contradicted other public information about requested documents).

*In camera* review is also necessary because Defendants' arguments and the declarations are insufficient on the issue of segregability. While Defendants and Mr. Miller now admit that information they have withheld pursuant to Exemptions 4 and 5 is segregable from the rest of the document, their conclusory statements with regard to the inability to segregate allegedly exempt information under Exemptions 5 and 7(A) are plainly insufficient. See Mead, 566 F.2d at 242. As outlined above, Defendants claim that Exemption 5 would apply to all of the "deliberative" discussions in the PNM, as well as the factual information interspersed with those discussions. However, they fail to explain why the summary of the negotiations and the documentation of the fairness and reasonableness of the prices should not be released. Under Exemption 7(A), Defendants assert that no non-exempt information can be released, despite the fact that only

small sections of the PNMs allegedly discuss information relevant to the DOJ's investigation. Even accepting for the moment Defendants' arguments on Exemptions 5 and 7(A), Plaintiff believes that the PNMs contain large amounts of non-exempt information that could be segregated and disclosed. *In camera* inspection is necessary to determine which party is right.

While Defendants claim it is irrelevant, another factor weighing in favor of *in camera* review is the small number of documents requested. See Quiñon v. FBI, 86 F.3d 1222, 1228 (D.C. Cir. 1996) ("when the requested documents are few in number and of short length, in camera review may save time and money"). Here, Plaintiff has requested only two documents.

Finally, *in camera* review should be granted because there is evidence that the agency has acted in bad faith. See Quiñon, 86 F.3d at 1228 (in camera review is "particularly appropriate" when the agency has acted in bad faith.). Defendants have obstructed Plaintiff's efforts at receiving even non-exempt portions of the PNMs by creating roadblocks and long delays at every step of the FOIA process, by claiming clearly inapplicable exemptions and by refusing to even attempt to redact allegedly exempt information. As Plaintiff pointed out in its previous filing, Defendants have also refused to respond to subsequently-filed FOIA requests and appeals.

## VII. Conclusion

For the foregoing reasons, as well as those set forth in Plaintiff's Combined Motion for Summary Judgment and *In Camera* review, Plaintiff respectfully requests that the Court grant summary judgment in favor of the Plaintiff, and order Defendants to release the requested records. Plaintiff further requests that the Court review the requested documents *in camera*, if necessary to grant summary judgment for Plaintiff.

Dated:  February 13, 2008

Respectfully submitted,

/s/ Michael R. Charness

Michael R. Charness (D.C. Bar No. 289322)
Alexander O. Levine (D.C. Bar No. 501924)
VINSON & ELKINS, L.L.P.
The Willard Office Building
1455 Pennsylvania Ave. Suite 600
Washington, D.C. 20004
Telephone:  (202) 639-6780
Facsimile:  (202) 639-6640

Attorneys of Record for Public Warehousing
Company K.S.C.

**PRIME VENDOR EUROPE**
**ZONES I, II & III**
***SUPPLIES/SERVICES AND PRICES***

## 4. PRICING

**ALL OFFERORS ARE REQUESTED TO SUBMIT PRICING FOR ALL CORE ITEMS IN THE APPLICABLE ZONE.**

**A. Pricing will be based on the following pricing formula:**

Unit Price = Delivered Price + Fixed Distribution Price (or Fee)

### *Definitions*

**Unit Price** – The unit price is defined as the total price (in U.S. currency) that is charged to DSCP per unit for a product delivered to the Government,

**Delivered Price** – The actual invoice price (in U.S. Currency) of the product paid to the manufacturer/supplier, for delivery of product to offeror's CONUS distribution point.

**Distribution Price** – The Distribution Price is defined as a firm fixed price, offered as a dollar amount, which represents all elements of the unit price, <u>other than</u> the delivered price. The distribution price typically consists of the Prime Vendor's projected general and administrative expenses, overhead, profit, packaging costs, transportation cost from the Prime Vendor's OCONUS distribution facility(s) to the final delivery point or any other projected expenses associated with the distribution function. This distribution price is intended to reflect the difference between the delivered price and the unit price to deliver the specified product to the ordering activity. This distribution price shall represent the amount to be added to the actual invoice price paid to the manufacturer or supplier by the Prime Vendor for each item. This distribution price shall remain fixed for the base year of the contract, and is subject to any agreed option year adjustments.

Although technically part of the distribution price, for the purposes of this solicitation, ocean transportation costs (the cost of shipping the product from contractor's CONUS facility(s) to the contractor's OCONUS facility(s), aka "Point to Point" delivery), will be deleted from the delivered price. Accordingly, for purposes of submitting offers under this solicitation, ocean transportation costs will be ignored. The Defense Transportation System will handle point-to-Point delivery.

?? **On page 10**, under (3) ESTIMATED VALUE/GUARANTEED MINIMUM revise the TOTAL ESTIMATED DOLLAR VALUE CHART as follows:

|  | First Year (Yr) | Option Yr 1 | Option Yr 2 | Option Yr 3 | Option Yr 4 | Base Yr Plus 4 Option Yrs |
|---|---|---|---|---|---|---|
| Zone 1 | $22,785,480 | $22,785,480 | $22,785,480 | $22,785,480 | $22,785,480 | $113,927,400 |
| Zone 2 | $25,442,615 | $25,442,615 | $25,442,615 | $25,442,615 | $25,442,615 | $127,213,075 |
| Zone 3 Kuwait/Qatar | $22,391,904 | $22,391,904 | $22,391,904 | $22,391,904 | $22,391,904 | $111,959,520 |
| Zone 3 Saudi Arabia | $7,871,681 | $7,871,681 | $7,871,681 | $7,871,681 | $7,871,681 | $39,358,405 |
| Total | $78,491,680.00 | $78,491,680.00 | $78,491,680.00 | $78,491,680.00 | $78,491,680.00 | $392,458,400 |

?? **On page 11**, after the definition of Unit Price the following note is added:

Note:  Multiple Unit Prices for the same item are not permitted.

?? **On page 11**, under paragraph 4 "Pricing," subparagraph "A" delete the Delivered Price definition and insert the following:

Delivered Price -  (also known as "product price", and/or "landed costs")
    For CONUS purchases  -- The delivered price is the manufacturer/supplier's actual invoice price  (in U.S. currency) to deliver product to the Prime Vendor's CONUS distribution point.
    NOTE:  For those items being picked up by the Defense Transportation System (DTS) from the manufacturer/suppliers facility (also known as "Source load" or "drop-shipments"), the delivered price is the manufacturer/supplier's actual invoice price (in U.S. currency) for product only.  The delivered price in this instance shall not include any transportation costs to the Prime Vendor's CONUS distribution point.
    For OCONUS purchases -- The delivered price is the manufacturer/supplier's actual invoice price (in U.S. currency) to deliver product to the Prime Vendor's OCONUS distribution point.
    NOTE:  For those items being delivered directly to the end-user customer from the OCONUS manufacturer/supplier (for example: chemical products) -- the delivered price shall not include any transportation costs, as those would be considered as part of the Offeror's Distribution Price.

**On page 14**, on the "Item Categories" chart delete categories 36, 38, 39, 40, 41, 42, 44 and 45 and insert the following:

| CATEGORY NUMBER | CATEGORY DESCRIPTION |
|---|---|
| 36 | Government Furnished Materials (GFM) for Prime Vendor Distribution of FF&V and other Perishable Items (i.e., Fresh Bakery, Dairy and Other Items that are required to be cooled, chilled or frozen to maintain wholesomeness) Locally Purchased by DSCPE (Zones I and II Only) |
| 38 | GFM – UGR-H&S Group Rations (Zone I Only) |
| 39 | GFM – UGR-A Semiperishable Group Rations (number of cases per unit of issue =2) (Zone I Only) |
| 40 | GFM – UGR-A Breakfast Perishable Group Rations (Zone I Only) |
| 41 | GFM – UGR-A Dinner Perishable Group Rations (Zone I Only) |
| 42 | GFM – Individual Feeding Rations (Zone I Only) |
| 44 | Prime Vendor Dairy and other items that are required to be cooled, chilled or frozen to maintain wholesomeness. (BPA – Zone III Only) |
| 45 | Prime Vendor Fresh Bakery (BPA – Zone III Only) |

## ATTACHMENT 3 – Core Items for Zone III – Kuwait & Qatar

**\*Note:** Invoice or written quote must be submitted on items designated by an asterisk (\*)

| | |
|---|---|
| **Item 1**          **Item Category Code: 34**<br>7340 -01 -E08 -0660<br>Unit of Issue:   EA<br><br>**SPOON,**<br>basting, slotted, 14 inch(36 cm) long<br><br>**VENDOR QUESTIONS**<br><br>                                        Price Based On<br>Estimated quantity:        172    Invoice (Y/N)?:___<br>  *Delivered price per unit:*        _____<br>*+ Distribution price per unit:*     _____<br>*Total unit price:*                 _____<br>*Qty X total unit price:*           _____ | **Item 2**          **Item Category Code:  35**<br>7350 -01 -E08 -0666<br>Unit of Issue:   CS<br><br>**PLATE, PAPER,**<br>3 compartment, extra strong, 500 ea/case<br><br>**VENDOR QUESTIONS**<br><br>                                        Price Based On<br>Estimated quantity:        301    Invoice (Y/N)?:___<br>  *Delivered price per unit:*        _____<br>*+ Distribution price per unit:*     _____<br>*Total unit price:*                 _____<br>*Qty X total unit price:*           _____ |
| **Item 3**          **Item Category Code:  35**<br>7350 -01 -E08 -0794<br>Unit of Issue:   CS<br><br>**DISPENSER, SUGAR,**<br>24 ea/case<br><br>**VENDOR QUESTIONS**<br><br>                                        Price Based On<br>Estimated quantity:        86    Invoice (Y/N)?:___<br>  *Delivered price per unit:*        _____<br>*+ Distribution price per unit:*     _____<br>*Total unit price:*                 _____<br>*Qty X total unit price:*           _____ | **Item 4**    \*          **Item Category Code:  35**<br>7360 -01 -E08 -0659<br>Unit of Issue:   CS<br><br>**FLATWARE SET,**<br>plastic, (1 knife, 1 fork, and 1 spoon), wrapped, 500 sets/case<br><br>**VENDOR QUESTIONS**<br><br>                                        Price Based On<br>Estimated quantity:      2,085    Invoice (Y/N)?:___<br>  *Delivered price per unit:*        _____<br>*+ Distribution price per unit:*     _____<br>*Total unit price:*                 _____<br>*Qty X total unit price:*           _____ |
| **Item 5**          **Item Category Code: 34**<br>7920 -01 -E08 -0729<br>Unit of Issue:   EA<br><br>**BROOM, DUST BROOM,**<br>w/handle, 37.5 inch(95.3 cm) high<br><br>**VENDOR QUESTIONS**<br><br>                                        Price Based On<br>Estimated quantity:        44    Invoice (Y/N)?:___<br>  *Delivered price per unit:*        _____<br>*+ Distribution price per unit:*     _____<br>*Total unit price:*                 _____<br>*Qty X total unit price:*           _____ | **Item 6**          **Item Category Code: 35**<br>7920 -01 -E08 -0834<br>Unit of Issue:   CS<br><br>**SPONGE, CLOTH,**<br>24 /case<br><br>**VENDOR QUESTIONS**<br><br>                                        Price Based On<br>Estimated quantity:      1,506    Invoice (Y/N)?:___<br>  *Delivered price per unit:*        _____<br>*+ Distribution price per unit:*     _____<br>*Total unit price:*                 _____<br>*Qty X total unit price:*           _____ |

| Item 7 | Item Category Code: 33 |
| --- | --- |

**7930 -01 -E08 -0771**
Unit of Issue:   CS

**WAX, FLOOR,**
1.3 gal(5 l) co, 2/case

**VENDOR QUESTIONS**

|  |  | Price Based On |  |
| --- | --- | --- | --- |
| Estimated quantity: | 32 | Invoice (Y/N)?:___ |
| *Delivered price per unit:* | _____ |
| *+ Distribution price per unit:* | _____ |
| *Total unit price:* | _____ |
| *Qty X total unit price:* | _____ |

| Item 8 | Item Category Code: 33 |
| --- | --- |

**7930 -01 -E08 -0786**
Unit of Issue:   CS

**DELIMER, LIME STAIN REMOVER,**
1.3 gal(5 l) co, 2/case

**VENDOR QUESTIONS**

|  |  | Price Based On |  |
| --- | --- | --- | --- |
| Estimated quantity: | 13 | Invoice (Y/N)?:___ |
| *Delivered price per unit:* | _____ |
| *+ Distribution price per unit:* | _____ |
| *Total unit price:* | _____ |
| *Qty X total unit price:* | _____ |

| Item 9 | Item Category Code: 3 |
| --- | --- |

**8905 -00 -126 -8743**
Unit of Issue:   LB

**PORK SPARERIBS,**
fzn, max 4.5 lb (2.041 kg), namp 416, wt range a and/or b and/or c

**VENDOR QUESTIONS**

|  |  | Price Based On |  |
| --- | --- | --- | --- |
| Estimated quantity: | 39,960 | Invoice (Y/N)?:___ |
| *Delivered price per unit:* | _____ |
| *+ Distribution price per unit:* | _____ |
| *Total unit price:* | _____ |
| *Qty X total unit price:* | _____ |

| Item 10    * | Item Category Code: 7 |
| --- | --- |

**8905 -00 -127 -8472**
Unit of Issue:   LB

**COD FILLETS,**
fzn (natural or loin cuts), skinless, us gr a equiv, 5 oz min wt

**VENDOR QUESTIONS**

|  |  | Price Based On |  |
| --- | --- | --- | --- |
| Estimated quantity: | 61,863 | Invoice (Y/N)?:___ |
| *Delivered price per unit:* | _____ |
| *+ Distribution price per unit:* | _____ |
| *Total unit price:* | _____ |
| *Qty X total unit price:* | _____ |

| Item 11 | Item Category Code: 5 |
| --- | --- |

**8905 -00 -164 -6874**
Unit of Issue:   LB

**SCALLOPS, RAW,**
fzn, us gr a equiv, min 20 max 40 count/lb

**VENDOR QUESTIONS**

|  |  | Price Based On |  |
| --- | --- | --- | --- |
| Estimated quantity: | 27,456 | Invoice (Y/N)?:___ |
| *Delivered price per unit:* | _____ |
| *+ Distribution price per unit:* | _____ |
| *Total unit price:* | _____ |
| *Qty X total unit price:* | _____ |

| Item 12    * | Item Category Code: 5 |
| --- | --- |

**8905 -00 -267 -1933**
Unit of Issue:   LB

**LOBSTER TAIL, SPINY, RAW,**
fzn, 5 to 8 oz ea, shall be processed from only fresh p. argus or p. interruptus species or only fzn p. marginatus spices

**VENDOR QUESTIONS**

|  |  | Price Based On |  |
| --- | --- | --- | --- |
| Estimated quantity: | 15,437 | Invoice (Y/N)?:___ |
| *Delivered price per unit:* | _____ |
| *+ Distribution price per unit:* | _____ |
| *Total unit price:* | _____ |
| *Qty X total unit price:* | _____ |

Case 1:07-cv-01476-RBW    Document 23-3    Filed 02/13/2008    Page 1 of 5

<u>SUPPLIES / SERVICES AND PRICES</u>

On occasion, airlift requests will be weeks/months in advance of an RDD (i.e. in support of special holiday requirements or additions of new customers) and the timeline above will not apply. However, the prime vendor must keep DSCP apprised of the status of all pending airlifts via a weekly airlift report. This report shall contain:   at a minimum, date of order, RDD, container #'s, carrier, ETA, and cost.

**Since this AOR is rapidly changing in terms of personnel, and base locations, it is imperative for a prime vendor to be able to demonstrate the ability to meet this requirement through the procedures outlined above. Although by its very nature this is a dynamic rather than a guaranteed business, a portion of the Government estimates used in this solicitation included past costs of performing commercial airlifts.**

**For perishable type products, the Prime Vendor will be required to provide either dry ice or wet ice and package using tri-walls. This product protection will be part of the Prime Vendor's operating expense addressed via the distribution fees – no additional or separate fees will be paid for ice or protective packaging.**

**Flight schedules can change with little or no notice.  At times, product may have been already packaged and delivered for shipment.  U.S. Government will not be liable for the costs of the material, product or delivery due to schedule changes.**

**14. <u>Pork Issues:</u>**

**Vendors are cautioned that historically pork products could not be transported into Saudi Arabia or across Saudi Arabia via truck or other ground transportation. For this reason the DTS process will be the normal means used for transporting pork.**

15.    <u>PRICING:</u>

ALL OFFERORS ARE REQUESTED TO SUBMIT PRICING FOR ALL CORE ITEMS IN THE APPLICABLE ZONE. Also, you must submit a separate list of each distribution category, annotated with your distribution fee for each category for each zone on which you are offering.

A. Pricing will be based on the following pricing formula:

Unit Price = Delivered Price + Fixed Distribution Price (or Fee)

<u>Definitions</u>

<u>Unit Price</u> – The unit price is defined as the total price (in U.S. currency) that is charged to DSCP per unit for a product delivered to the Government.  Note:  Multiple Unit Prices for the same item are not permitted.

<u>Delivered Price</u> – (also known as "product price", and/or "landed costs")

Case 1:07-cv-01476-RBW    Document 23-3    Filed 02/13/2008    Page 2 of 5

SUPPLIES / SERVICES AND PRICES

For CONUS purchases -- The delivered price is the manufacturer/supplier's actual invoice price (in U.S. currency) to deliver product to the Prime Vendor's CONUS distribution point.

NOTE:  For those items being picked up by the Defense Transportation System (DTS) from the manufacturer/suppliers facility (also known as "Source load" or "drop-shipments"), the delivered price is the manufacturer/supplier's actual invoice price (in U.S. currency) for product only.  The delivered price in this instance shall not include any transportation costs to the Prime Vendor's CONUS distribution point.

For OCONUS purchases -- The delivered price is the manufacturer/supplier's actual invoice price (in U.S. currency) to deliver product to the Prime Vendor's OCONUS distribution point.

Distribution Price – The Distribution Price is defined as a firm fixed price, offered as a dollar amount, which represents all elements of the unit price, other than the delivered price.  The distribution price typically consists of the Prime Vendor's projected general and administrative expenses, overhead, profit, packaging costs, transportation cost from the Prime Vendor's OCONUS distribution facility(s) to the final delivery point or any other projected expenses associated with the distribution function.  This distribution price is intended to reflect the difference between the delivered price and the unit price to deliver the specified product to the ordering activity.  This distribution price shall represent the amount to be added to the actual invoice price paid to the manufacturer or supplier by the Prime Vendor for each item.  This distribution price shall remain fixed for the base year of the contract, and is subject to any agreed option year adjustments.

Although technically part of the distribution price, for the purposes of this solicitation, ocean transportation costs (the cost of shipping the product from contractor's CONUS facility(s) to the contractor's OCONUS facility(s), aka "Point to Point" delivery), will be deleted from the delivered price.
Accordingly, for purposes of submitting offers under this solicitation, ocean transportation costs will be ignored.   The Defense Transportation System will handle point-to-Point delivery.

B.   The Government's ordering system requires that pricing will be fixed for a certain period of time.  Pricing will be at the time of order.  These prices will be fixed until delivery, provided that delivery is requested within the time frame of six (6) days starting the day after the order is placed.  If delivery is not requested until after this time frame, pricing will be as of the delivery date.

For example:  Orders placed on March 1st will be priced at time of order, if the delivery is required between March 2nd and March 7th, inclusive.  However, if delivery is not required until March 8th, or after, the order will be priced with those prices in effect at the time of delivery.

C.  Vendors may change prices in their STORES Vendor Item Catalog once every two weeks.  The submissions are to be made by Wednesday, to be in effect the following

This amendment contains two sections. Section I contains actual revisions (adds/changes/deletions) to the solicitation requirements. Section II provides answers to questions which were submitted in reference to the pre-proposal conference. The answers in Section II are provided for clarification purposes only and do not change the requirements in the solicitation.

## Section I

The solicitation is herein amended as follows:

Block 8 of the SF1449, page 1 of the solicitation, offer due date local time, is extended to 16 Nov 04. Please note this new closing date in any location which refers to the solicitation closing date.

Amendment 0001, page 33, item 68, the item description should read "UGRA- Heat and Serve supplied as GFM." The category should be "B," and accordingly, you only need to supply your distribution fee for this category.

The Note at the bottom of page 11 which begins "Due to security concerns," delete and substitute the following "Vendors are encouraged to submit alternate proposals which will effectively address the delivery requirements/timeframes within the solicitation. No specific location or number of platforms is mandated by the government in order to accomplish this."

Page 20, para. 3 to the definition of delivered price which begins "For OCONUS purchases," add the following: "Where OCONUS routes represent a recurring requirement, the DTS system will be used and transportation costs should therefore not be included in the delivered price. If however, the government determines that minimum source load requirements will not be met, DTS will not be utilized and the vendor will need to include transportation costs from their overseas point of origin as part of the delivered price. Clearly indicate on your paper submission of the market basket prices where you have included non-DTS transportation costs in your pricing. Vendors should substitute "Overseas Platform," for "CONUS Platform," in the Supply Pipeline chart on page 98 and indicate the country of origin, where an overseas point of origin will be used to support your platform.

# PRIME VENDOR SCHEDULE OF ITEMS
## Solicitation Requirements for
## SPM30004R0323

### MIDDLE EAST ZONE 1

#### Top Core Items

| Item 1 | | |
|---|---|---|
| 8905 -01 -062 -9763 | | |
| Unit of Issue:   LB | | |

**POLLOCK FILLETS,**
fzn, atlantic or alaska, iqf, glazed, or frozen solid pack, glazed or unglazed, skinless, us gr a equiv, 3 oz ea min wt

**VENDOR QUESTIONS**

| | IRAQ | KUWAIT |
|---|---|---|
| Estimated quantity: | 1,316,500 | 185,700 |
| Delivered price per unit: | _____ | _____ |
| + Distribution price per unit: | _____ | _____ |
| Total unit price: | _____ | _____ |
| Qty X total unit price: | _____ | _____ |
| Price Based On Invoice(Y/N): | _____ | |
| Category #: | _____ | |

| Item 2 | | |
|---|---|---|
| 8905 -01 -388 -1164 | | |
| Unit of Issue:   LB | | |

**BEEF FAJITA STRIPS,**
fzn, raw, seasoned or marin, 1/2 in. by 1/2 in. by 2 in. min length prior to cooking

**VENDOR QUESTIONS**

| | IRAQ | KUWAIT |
|---|---|---|
| Estimated quantity: | 454,200 | 50,360 |
| Delivered price per unit: | _____ | _____ |
| + Distribution price per unit: | _____ | _____ |
| Total unit price: | _____ | _____ |
| Qty X total unit price: | _____ | _____ |
| Price Based On Invoice(Y/N): | _____ | |
| Category #: | _____ | |

| Item 3 | | |
|---|---|---|
| 8905 -01 -E19 -1290 | | |
| Unit of Issue:   LB | | |

**BEEF, ROAST, CKD, DELI, SLICED, FZN,**
thin, 5 lb pg

**VENDOR QUESTIONS**

| | IRAQ | KUWAIT |
|---|---|---|
| Estimated quantity: | 289,520 | 43,200 |
| Delivered price per unit: | _____ | _____ |
| + Distribution price per unit: | _____ | _____ |
| Total unit price: | _____ | _____ |
| Qty X total unit price: | _____ | _____ |
| Price Based On Invoice(Y/N): | _____ | |
| Category #: | _____ | |

| Item 4 | | |
|---|---|---|
| 8905 -01 -E19 -3087 | | |
| Unit of Issue:   PG | | |

**FISH, TUNA,**
light, 43 oz flexible pouch

**VENDOR QUESTIONS**

| | IRAQ | KUWAIT |
|---|---|---|
| Estimated quantity: | 128,064 | 38,856 |
| Delivered price per unit: | _____ | _____ |
| + Distribution price per unit: | _____ | _____ |
| Total unit price: | _____ | _____ |
| Qty X total unit price: | _____ | _____ |
| Price Based On Invoice(Y/N): | _____ | |
| Category #: | _____ | |

| **Item 5**<br>**8905 -01 -E19 -4313**<br>Unit of Issue:   LB | **Item 6**<br>**8905 -01 -E19 -7370**<br>Unit of Issue:   LB |
|---|---|
| **BEEF, GRD, BULK, FZN,**<br>85% min lean, 100% pure grd beef, 10 lb pg, NAMP 136 | **FISH, CRAB LEGS, ALASKAN KING, PRECKD, FZN,**<br>legs and claws, min 80% fill, 16-20 legs/10 lb, 20 lb co |

**Item 5 / Item 6 VENDOR QUESTIONS**

| | IRAQ | KUWAIT | | IRAQ | KUWAIT |
|---|---|---|---|---|---|
| Estimated quantity: | 1,478,720 | 183,680 | Estimated quantity: | 161,840 | 26,640 |
| Delivered price per unit: | _____ | _____ | Delivered price per unit: | _____ | _____ |
| + Distribution price per unit: | _____ | _____ | + Distribution price per unit: | _____ | _____ |
| Total unit price: | _____ | _____ | Total unit price: | _____ | _____ |
| Qty X total unit price: | _____ | _____ | Qty X total unit price: | _____ | _____ |
| Price Based On Invoice(Y/N): | _____ | | Price Based On Invoice(Y/N): | _____ | |
| Category #: | _____ | | Category #: | _____ | |

| **Item 7**<br>**8905 -01 -E59 -1217**<br>Unit of Issue:   LB | **Item 8**<br>**8905 -01 -E59 -2158**<br>Unit of Issue:   LB |
|---|---|
| **SAUSAGE, BREAKFAST LINKS, PRECKD, FZN,**<br>pork, edible casing, 1 oz ea, 10 lb case | **BACON, SLICED, PRECKD, FZN,**<br>cured, smoked, extra thk, 6/200 slice bags/case |

**Item 7 / Item 8 VENDOR QUESTIONS**

| | IRAQ | KUWAIT | | IRAQ | KUWAIT |
|---|---|---|---|---|---|
| Estimated quantity: | 661,800 | 99,080 | Estimated quantity: | 1,075,776 | 104,352 |
| Delivered price per unit: | _____ | _____ | Delivered price per unit: | _____ | _____ |
| + Distribution price per unit: | _____ | _____ | + Distribution price per unit: | _____ | _____ |
| Total unit price: | _____ | _____ | Total unit price: | _____ | _____ |
| Qty X total unit price: | _____ | _____ | Qty X total unit price: | _____ | _____ |
| Price Based On Invoice(Y/N): | _____ | | Price Based On Invoice(Y/N): | _____ | |
| Category #: | _____ | | Category #: | _____ | |